# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| COREY D. CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: _____ |
| | ) | |
| VIACOM, INTERNATIONAL, INC., | ) | JURY DEMAND |
| VIACOM MEDIA NETWORKS, | ) | |
| MTV NETWORKS ENTERPRISES, INC., | ) | |
| JIM CANTIELLO, and JOHN DOES 1-20, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT

**COMES NOW** Plaintiff COREY DELANEY CLARK ("Plaintiff"), a resident of the State of Tennessee within this District, by and through counsel, John Ray Clemmons and James H. Freeman, and states his cause of action against Defendants VIACOM INTERNATIONAL, INC., MTV NETWORKS ENTERPRISES, INC., and VIACOM MEDIA NETWORKS (collectively, "Corporate Defendants"), and JIM CANTIELLO ("Cantiello") and John Does 1-50.

## STATEMENT OF THE CASE

Plaintiff respectfully submits this Verified Complaint for monetary damages and equitable relief to seek civil redress against Defendants for their tortious and malevolent conduct, including but not limited to:

- causing severe harm to Plaintiff's reputation and character in the community on both a local and global level;

- diminishing the economic value of Plaintiff's good will in his business, occupation and trade;

1

- depriving Plaintiff of his constitutional right of publicity to his own name;

- disparaging Plaintiff's intellectual property rights and calling for a boycott of the sale and distribution of his musical works;

- causing actual economic injuries measured in terms of out-of-pocket costs, lost profits and the impairment of procuring novel business opportunities;

- inflicting upon Plaintiff emotional suffering, stress and severe mental anguish;

- using an authoritative and *traditionally* credible news content provider -- MTV News -- as a vehicle to maintain a long-standing, wholly one-sided crusade of character assassination and commercial disparagement;

- using the digital frontier of the internet to engage in dangerous forms of *yellow* journalism whereby distorted, non-credible and biased accounts written by "cultural observers" are masqueraded and contextualized for readers as objective news reports written by professional journalists with formal pedigrees in the standards of the trade.

- abusing the constitutional privilege of "freedom of press" by communicating un-newsworthy, defamatory material about a private U.S. citizen with the intent to permanently impair his state property rights and decimate his mental well-being.

As a direct and proximate result of Defendants' long-standing pattern of unlawful conduct, Plaintiff respectfully requests *inter alia* that this Court award Plaintiff the monetary damages outlined in the Prayer for Relief; permanently enjoin Defendants from engaging in further such unlawful conduct vis-à-vis Plaintiff; deter Corporate Defendants and others similarly situated from engaging in such harmful conduct; and administer justice in a manner deemed fair and equitable by the Court.

As per the annexed Verification, Plaintiff swears, under the penalty of perjury, that the following statements relating to the above-captioned matter are true and correct to the best of Plaintiff's personal knowledge:

## PARTIES

1.     Plaintiff COREY D. CLARK ("Plaintiff or "Corey Clark") is a citizen of the State of Tennessee, domiciled within this District.   From October 2002 through March 2003, Corey Clark participated as a contestant on the second season of *American Idol*, commonly considered to be the most popular television show and singing contest in history.   Plaintiff is currently a self-employed singer/songwriter and a husband and father of three children.

2.     Defendant VIACOM INTERNATIONAL, INC. ("Viacom") is a corporation duly organized under the laws of the State of Delaware that is authorized and/or registered to do business in the State of New York.  Viacom's principal place of business is located at 1515 Broadway, New York, NYC 10036.  Viacom is a leading, international multi-media company owning some of the world's best-known cable television networks including MTV, VH1, Nickelodeon, Comedy Central, BET, Spike TV, TV Land and CMT.   Viacom also owns movie studio Paramount Pictures.   Information published or broadcast by Viacom reaches over two billion people in 700 million households in more than 160 countries around the world.   Viacom actively solicits viewers and internet readers in both the State of Tennessee and the State of New York and purposefully avails itself of the laws of both the State of New York and the State of Tennessee.   At all times relevant to this action, Viacom owns and operates Defendant MTV Networks Enterprises, Inc. and Viacom Media Networks.   At all times relevant to this action, Viacom exercised supervisory authority over individuals retained and/or employed as MTV News Correspondents, including the Defendant Jim Cantiello, and participated in the decision to publish the libelous and disparaging statements concerning Plaintiff.

3.     Defendant MTV NETWORKS ENTERPRISES, INC. ("MTV Networks") is a corporation organized under the laws of the State of Delaware that is authorized and/or registered to do business in the State of New York.    Its principal place of business is located at 1515 Broadway, New York, NY 10036.   MTV Networks is a wholly owned division and/or subsidiary of Viacom that

3

operates under the control and supervision of Defendant Viacom. MTV Networks owns and operates the internet properties *MTV News* and *MTV International*, among other entities and/or divisions. Upon information and belief, MTV Networks was "re-branded" as "Viacom Media Networks" in 2011. MTV Networks actively solicits viewers and internet readers in both the State of New York and the State of Tennessee and purposefully avails itself of the laws of both the State of New York and the State of Tennessee. At all times relevant to this action, MTV Networks exercised supervisory authority over individuals retained and/or employed as MTV News correspondents, including Defendant Cantiello, and participated in the decision to publish the libelous and disparaging statements that are the subject of this action.

4. Defendant VIACOM MEDIA NETWORKS ("Viacom Media Networks") is the "d/b/a" of Defendant MTV Networks or its successor-in-interest, transferee, assignee, and/or beneficiary of Defendant MTV Networks and a wholly owned subsidiary that operates under the control and supervision of Defendant Viacom. Upon information and belief, Viacom Media Networks currently owns and operates the internet properties MTV News and MTV International, among other entities and/or divisions. Viacom Media Networks actively solicits viewers and internet readers in both the State of New York and the State of Tennessee and purposefully avails itself of the laws of both the State of New York and the State of Tennessee. At all times relevant to this action, Viacom Media Networks exercised supervisory authority over individuals retained and/or employed as MTV News Correspondents, including Defendant Cantiello, and participated in making the final decision to publish the libelous and disparaging statements that are the subject of this action.

5. Defendant JIM CANTIELLO ("Cantiello") is a person and resident of the State of New York who, upon information and belief, may also be domiciled in the State of California. Defendant Cantiello is a self-described "lowly TV fan" who was duly retained by Corporate Defendants for a period of approximately nine years, from 2004 to 2012. Beginning in 2007, Cantiello was employed by

4

Corporate Defendants as an official MTV News Correspondent. His position required him to write articles that purported to be "news," having been disseminated by Corporate Defendants worldwide under the trade name and mark "MTV News" and "MTV Newsroom" at www.MTV.com; as well as under the trade name and mark "VH1 News" at www.VH1.com.

6. At all times relevant to this action, the Corporate Defendants held Jim Cantiello out to the public as the *"American Idol* Expert" of MTV News. As an official MTV News Correspondent and *American Idol* Expert, Cantiello's words and statements were and continue to be disseminated on a daily basis to at least two billion people worldwide in over 700 million households in more than 160 countries around the world. In the absence of this Court's granting of equitable relief, the defamatory material shall remain readily accessible to billions of people from the initial date of internet publication to the end of Plaintiff's natural life and then in perpetuity for the lives of his heirs.

7. Upon information and belief, at all times herein mentioned, Defendant Cantiello was the agent and employee of each of Corporate Defendants and, in doing the things hereinafter alleged, was acting within the course and scope of such agency and employment.

8. Plaintiff is further informed and believes that each of Corporate Defendants herein gave consent to, ratified, approved, and authorized the acts alleged herein concerning Defendant Cantiello.

9. The true names and capacities of the defendants, DOES 1 through 20, whether individual, corporate, associate or otherwise, are unknown to Plaintiff at the time of filing this Complaint. Plaintiff, therefore, sues said Defendants by such fictitious names and will ask leave of court to amend this Verified Complaint to show their true names or capacities when the same have been ascertained. Plaintiff is informed and believes, and therefore alleges, that each of the DOE defendants is, in some manner, responsible for the events and happenings herein set forth and proximately caused injury and damages to the plaintiff as herein alleged.

5

10.     Defendants, DOES 1 through 10, were, at all times herein mentioned, an unknown type of business entity duly organized and existing under and by virtue of the laws of the United States, and authorized to do business, and/or doing business in the State of New York and the State of Tennessee.

11.     Defendants, DOES 11 through 15, inclusive, were at all times relevant, the Chief Executive Officer(s) of Corporate Defendants and DOES 1 through 10, inclusive, and as such were in managerial positions and were responsible for implementing policies of said Defendants, and in fact, in doing the actions complained of in this Complaint, were implementing and following the policies of Corporate Defendants and DOES 1 through 10.

12.     Defendants, DOES 16 through 20, inclusive, were at all times relevant supervisors and/or managers for the Corporate Defendants and DOES 1 through 10, inclusive, and as such were in managerial positions and were responsible for implementing policies of said Defendants and in fact, in doing the actions complained of in this Complaint, were implementing and following the policies of the Corporate Defendants and DOES 1 through 10.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over Corporate Defendants, because Corporate Defendants transact business in the State of Tennessee and maintain offices in this District, with address at 330 Commerce St., Nashville, Tennessee 37201-1805.  Corporate Defendants and Cantiello have committed tortious acts in the State of Tennessee having an injurious effect to Plaintiff.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds the sum of seventy-five thousand ($75,000.00), exclusive of interest and costs.

15.     This Court has supplemental jurisdiction over the claims for relief that arise under Tennessee statutory and/or common law pursuant to 28 U.S.C. § 1376(a), because they form part of the same controversy and derive from the same facts.

6

16.     Venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400(a).

17.     Venue is also proper in this defamation action, because Plaintiff may sue in any jurisdiction where the defamatory remarks are published. <u>Keeton v. Hustler Magazine, Inc.</u> 465 U.S. 770 (1984). Here, the remarks were published on MTV.com and VH1.com, internet properties owned and operated by Corporate Defendants Viacom International, Inc. and MTV Networks Enterprises, Inc. (and/or Viacom Media Networks), and the libelous communications were received and continue to be available to internet users and readers within this District.

## INTRODUCTION

**"Freedom of the press was not created merely for the benefit of the press, but because it is essential to the preservation of free government and progress of civilization. * * * Therefore, the press, like individual citizens, must not abuse its constitutional rights or overlook its obligations to others.**

**- Chief Justice Hyde, 159 S.W.2d 295 (Missouri)**

18.     This is an action for monetary damages and equitable relief brought by Plaintiff Corey Delaney Clark, a Top 10 Finalist who competed in Season Two of the world's most popular talent contest, *American Idol*, as against the Corporate Defendants and former MTV News Correspondent Jim Cantiello.

19.     The case at bar highlights the increasingly dangerous proliferation of baseless "tabloid" journalism within the context of a traditional American news media source: MTV News, the news division of MTV Networks, a subsidiary of Viacom.

20.     While the constitutional right to freedom of the press protects news organizations from reporting newsworthy events for the sake of public debate, it is does not protect news organizations from making repeated, unsubstantiated false statements of fact for the sake of exposing a private citizen to ridicule; nor does it protect news organizations from passing off gossip columnists as "news correspondents"; nor does it protect news organizations from senselessly maligning the property rights of private citizens who are deprived of the fair opportunity to refute the attacks on a

comparable media platform.

21.     Plaintiff Corey Clark is African-American singer, songwriter and performer whose musical talent and star quality was unanimously celebrated by *American Idol's* judges and producers when he first auditioned for Season Two of the show in October 2002.

22.     In mid-December 2002, after the producers and judges narrowed down a field of 70,000 hopefuls to an elite group of 32 semi-finalists, *American Idol's* most revered Judge, Simon Cowell, who has earned a near flawless penchant for predicting the success of aspiring young singers, publicly declared that Corey Clark was a strong front-runner to win the 2003 *American Idol* contest.

23.     The national television viewing audience, consisting on average of more than 25 million people, repeatedly voted to advance Corey Clark through the *American Idol* competition as one of the Top 10 Finalists.

24.     Despite the praise and accolades Corey Clark received from the judges, commentators and viewing audience, Plaintiff was suddenly disqualified from the *American Idol* contest on March 31, 2003 in a shocking and controversial manner.

25.     Plaintiff's 2003 disqualification was orchestrated and exploited for maximum media exposure by *American Idol's* producers and network.

26.     The disqualification was purportedly based on claims that Plaintiff had "failed to disclose" or "withheld information" from *American Idol* producers concerning his October 12, 2002 arrest in Topeka, Kansas (the "2002 Kansas Arrest").

27.     At the time of Plaintiff's 2003 disqualification, the government's misdemeanor charges against Plaintiff were *pending* trial and therefore had yet to be adjudicated.

28.     The corporate decision to disqualify Corey Clark from the *American Idol* contest (for reasons other than his celebrated talent as a singer or performer) was unilaterally made by *American Idol's* producers, creators and broadcast network executives; and, upon information and belief, with

8

the participation of *American Idol*'s corporate sponsors, contractual beneficiaries and/or third party contractual beneficiaries.

29. In the weeks following Plaintiff's 2003 disqualification, Plaintiff issued public statements to the national media, including PEOPLE magazine, in which he vehemently protested his unjust disqualification from *American Idol*.

30. Plaintiff particularly challenged the reasons cited by FOX and *American Idol*'s senior executive producer Nigel Lythgoe as the basis for his disqualification. Corey Clark stated that the producers of *American Idol* knew about the 2002 Kansas Arrest well before the date of his disqualification.

31. MTV has a long-standing history of reporting "real news", i.e., objective, fact-based communications that conform to accepted standards of journalistic practices and ethics. In a fair and objective manner, MTV has historically covered U.S. presidential elections and tackled major newsworthy issues impacting this nation's youth, from teen pregnancy to drug abuse. Although MTV Networks is in the field of broadcasting news about the music and entertainment industry, its venerable MTV News division is not considered a purveyor of unsubstantiated tabloid fodder.

32. The first official MTV News Correspondent, Kurt Loder, had a graduate degree in journalism and background as editor-in-chief for *Rolling Stone* magazine before joining MTV News. In contrast, Defendant Cantiello, the architect of the defamation crusade against Plaintiff, had absolutely no formal training as a journalist nor any professional experience as a news reporter when being retained by Corporate Defendants. Yet, incredibly, Cantiello occupied the same position in the MTV News hierarchy as Kurt Loder - MTV News Correspondent.

33. As an MTV News Correspondent, Corporate Defendants granted Cantiello *carte blanche* access, from May 2007 through January 2012, to use MTV News Room and his status as an MTV News Correspondent to write a continuous, one-sided stream of defamatory material about Plaintiff

and make disparaging remarks about Plaintiff's musical compositions that had no bearing whatsoever to any contemporaneous news event or occurrence.

34. Cantiello's vicious campaign to expose Plaintiff to contempt, hatred, disgrace and aversion was communicated – and continues to be communicated on a daily basis - to a much broader, international audience than professional journalists Kurt Loder ever had the privilege to access.

35. When the news of Plaintiff's disqualification from *American Idol* became a matter of public concern back in March-April 2003 and again in April-May 2005, MTV News published no less than ten (10) full-length news articles on MTV.com, each of which was written by journalists accredited with a formal education and professional experience. The MTV News articles concerning Plaintiff were written by trade journalists employed by Corporate Defendants, namely Corey Moss, Gil Kaufman and Chris Harris.

36. The facts and events surrounding Plaintiff's 2003 disqualification from *American Idol* and his romantic relationship with *Abdul* were reported by Moss, Kaufman and Harris in no less than ten separate news articles published by the Corporate Defendants. All of the articles written by Moss, Kaufman and Harris were presented in a substantially *accurate* and *objective* manner, consistent with fundamental standards of the journalistic trade.

37. Given the controversial nature of the subject matter and the existence of disputed facts, Plaintiff was repeatedly asked by MTV News Correspondents to comment on the matter. Plaintiff was directly quoted in a majority of the 2003-2005 MTV News articles published by the Corporate Defendants.

38. About a year after the news of the "sex scandal" had subsided, in April 2006, the Corporate Defendants began telecasting a program on VH1 television entitled "Embarrassing Moments 2" which contained a segment in which Corey Clark was severely ridiculed and portrayed as a "hoax" and a fame-starved derelict who had completely fabricated his relationship with Abdul.

10

Plaintiff threatened to sue Viacom as a result but the litigation was abandoned for lack of financial resources.

39. Then, starting in May of 2007, Corporate Defendants authorized and/or directed Defendant Jim Cantiello to begin disseminating one stream of false and defamatory statements of fact concerning Plaintiff, relating to the same subject matter covered by Moss, Kaufman and Harris in 2003 and 2005, and using the identical journalistic platform - MTV News.

40. The Corporate Defendants, through MTV News, MTV.com, VH1 News and VH1.com and/or any other portal of information controlled by Viacom, never made a distinction for its readers between MTV News reports written by its professional journalists, who are formally trained to operate within the standard and ethical canons of the trade, and distorted falsehoods written by *yellow* journalists such as Cantiello.

41. By allowing an individual such as Cantiello to masquerade as an MTV News Correspondent while presenting false and defamatory material concerning Plaintiff under the guise of MTV News, Corporate Defendants undermined the integrity of the trade and compromised the credibility of MTV News' core mission: to accurately inform and educate the public about newsworthy matters based on the presentation of source-driven, verifiable facts.

42. As recent as July 6, 2011, less than one-year before the filing of this Verified Complaint, and over eight years after Plaintiff competed as a Top Finalist on *American Idol*, Defendants published false and defamatory statements concerning Plaintiff, which were known or should have been known by Defendants to be verifiably false when made, for no other reason on Defendants' part than to disparage Plaintiff, malign his reputation and traumatize his mental well-being.

43. Upon information and belief, Cantiello was terminated by the Corporate Defendants in late January 2012, shortly after MTV Network's legal department received correspondence from Plaintiff's attorney asking MTV to retract the libelous statements written by Cantiello on July 6, 2011.

44.     Plaintiff is a caring human being, a loving father, a son, and a long-standing resident of this Judicial District.  Like every other Man endowed with inalienable rights under both federal and state constitutional law, he is entitled to live his Life in peace, to pursue the American Dream of prosperity and happiness, and he has standing before this Court to protect his professional reputation, personal integrity and legacy as a Man and a natural born United States citizen.  Defendants have left Plaintiff no choice but to seek judicial intervention for Defendants' unlawful conduct.

45.     The direct and proximate result of Defendants' long-standing campaign to defame and spread injurious falsehoods about Plaintiff has been, *inter alia*, to stigmatize Plaintiff in the global community at large, cause him loss of enjoyment of life and consortium, induce stress and severe anxiety, impair his ability to secure gainful employment (regardless of industry or trade), and cause him to sustain actual economic injuries.

46.     While the Corporate Defendants may seek to escape liability by shifting focus to Defendant Cantiello as some kind of "renegade gossip columnist", the inescapable truth remains that the Corporate Defendants directed and supervised Cantiello for more than nine (9) years, held him out as an official "MTV News Correspondent" and marketed his role as MTV Network's "*American Idol Expert*".

47.     Cantiello's libelous and disparaging statements, dating back to May 2007, were not made for the purpose of reporting a newsworthy event or for the sake of public debate.  Rather, the defamatory material published by the Corporate Defendants was motivated solely by a malicious intention to permanently stigmatize Corey Clark, who was at best a *limited* public figure through the year 2005.

48.     From early 2006 through the present day, Plaintiff has attempted to pursue a private life with his family in a county located within this judicial district and, separate and apart from his three-month long participation on Season Two of *American Idol* in 2003, to establish a reputation as an

12

upstanding citizen with the liberty to affect positive change in his community.

49. Notwithstanding his efforts to depart the public spotlight, Defendants have persisted in a libelous crusade to defame his character and disparage his intellectual property rights with full knowledge that Corey Clark had no access to a comparable media platform with which to respond.

50. Notwithstanding Plaintiff's attempts to "move on" from his *American Idol* nightmare experience, the Corporate Defendants directed, supervised, controlled, aided and/or abetted Defendant Cantiello, year-after-year, in the prosecution of a cruel, un-newsworthy campaign of blatant character assassination, utilizing the popular and widely disseminated MTV News and VH1 News platforms to, among other tortious acts:

    (a)    permanently malign, mock, and draw shame to Plaintiff Corey Clark;

    (b)    portray Corey Clark in a false light calculated with malevolent intent to cause him detriment, embarrassment and mental suffering;

    (c)    falsely characterize the publically-reported reasons for Corey Clark's 2003 disqualification from the *Idol* contest;

    (d)    deliberately neglect to investigate or challenge the false misrepresentations issued by FOX and *American Idol's* producers concerning Plaintiff's 2003 disqualification from the show;

    (e)    stigmatize Corey Clark with libelous statements describing him as a "degenerate" and a "liar" before the world community at large;

    (f)    impute Corey Clark with the violent crime of being an "alleged sister-beater" four years *after* the State dismissed misdemeanor assault charges against Plaintiff for complete lack of evidence (and given that a cursory examination of the public record would reveal that the assault charges were fabricated in the first instance);

    (g)    commercially disparage Corey Clark's musical contributions and direct Defendants'

audience to boycott musical compositions embodied on Plaintiff's debut album, released on Bungalo / Universal Music Recordings, even though six years had passed since the Album's commercial release and Cantiello had never even listened to the songs on the Album; and

(h)     altogether spread malovolent ill will about Plaintiff Corey Clark to an international, new audience of millions with calculated intent to poison the waters of *any* lifetime endeavor in which Plaintiff seeks to pursue happiness – whether through the pride of fatherhood and respect of his family and immediate peers, gainful employment in a suitable field of endeavor, sales of his own CDs hand-to-hand in local streets and shopping markets, collaborations with other artists in his profession, respect as a true artist and a Man endowed with inalienable rights protected by the constitution.

51.     Defendants' campaign to use MTV News as a tool to solidify Plaintiff's legacy in the most defamatory manner possible is shocking and outrageous to the moral conscience, particularly in light of MTV News' traditional reputation for reporting the objective facts.

52.     By publishing a continuous stream of libelous MTV News Room articles that have no function other than to systematically defame Plaintiff's name, work product and personal integrity, Defendants have caused Plaintiff injuries.

53.     With no access to voice his rebuttal, Plaintiff has been helplessly subjected to Defendants' on-going campaign of public ridicule, hatred and contempt for years, dating back to 2006.

54.     Through legal counsel, Plaintiff has repeatedly demanded that Corporate Defendants "cease and desist" from engaging in their wrongful conduct and retract their libelous statements. Having received no response or consideration from any of the Defendants to redress his suffering, Plaintiff must now seek this Court's assistance for an appropriate remedy and relief.

14

## STATEMENT OF FACTS

### Background re: *American Idol*

55.     *American Idol* (originally titled *American Idol: The Search for a Superstar*) is a worldwide television series, talent show, music industry contest, global brand name and multi-billion dollar merchandising franchise, among other things.

56.     The television show premiered on FOX on June 11, 2002 and it has since become the highest-rated and most popular television program in history. The show completed its eleventh season in May 2012.

57.     The show's concept, which was imported from Great Britain after the success of a television show called *Pop Idol*, was based on combining two elements: (a) the traditional televised talent show concept whereby contest winners were judged by a panel of experts in the live audience (e.g., *Star Search*); with (b) technological advances which enabled the televised viewing audience to participate in and (allegedly) determine the selection of the contest winners (via phone, texting and internet).

58.     While *American Idol* has been characterized as a "Reality TV" show, its foundation at law and the ethical canons governing its implementation are no different than any other ancient contest of skill and chance devised by men where a valuable prize is awarded to the contestant who wins.

59.     The television show *American Idol* is broadcast by Fox Broadcasting Company, a subsidiary of News Corporation, Inc. ("FOX") and is produced by FremantleMedia North America, American Idol Productions, Inc., 19 Entertainment Group, and an senior production team consisting of British executives Nigel Lythgoe, Ken Warwick and Cecile Frot-Coutaz.

### Plaintiff Corey Clark's 2002 Audition in Nashville, Tennessee

60.     Plaintiff Corey Clark was one of 70,000(+) United States citizens between the ages of 18 and 28 who publically auditioned for Season Two of the hit show in the fall of 2002.

15

61.    From October 30, 2002 through November 4, 2002, Plaintiff auditioned for the Second Season of *American Idol* in Nashville, Tennessee. Roughly 5,000 contestants auditioned in Nashville that year.

62.    On November 4, 2002, after four days of auditions, Plaintiff became one of thirty-one (31) contestants from Nashville and one of two hundred and thirty-four (234) singers nationwide who was awarded a "Golden Ticket" to Hollywood for Season Two of *American Idol*. Contestants with a "Golden Ticket" are provided with all-expenses-paid trips to Los Angeles to compete in the "Hollywood Rounds", where, in the case of Season Two, the contestants were narrowed down from 234 singers to 32 Semi-Finalist contestants.

63.    Plaintiff was awarded a "Golden Ticket" based on his extraordinary talent as a singer and natural charisma as a performer.

64.    Plaintiff was awarded a "Golden Ticket" to Hollywood based on a unanimous decision from *American Idol's* distinguished panel of judges: Simon Cowell ("Cowell"), Abdul ("Abdul") and Randy Jackson ("Jackson"). Regarding Plaintiff's audition, Abdul commented that Plaintiff had "star quality"; Cowell stated that Plaintiff had a "good recording voice".

65.    Plaintiff was permitted to audition for the three judges in Nashville only after his merit as a singer had been adjudged and certified by *American Idol's* senior production team of Nigel Lythgoe and Ken Warwick, as well as junior producers Jonathan Entz and Ron Deshea.

**Simon Cowell's Documented Prediction That Plaintiff Corey Clark Was Strong Contender to Win Season Two of the *American Idol* Contest**

66.    Simon Cowell is one of the most highly respected and successful record industry professionals in the history of the music business. His professional success is largely based on his ability to predict the future success of unknown, aspiring singers and to "tell it like it is."

67.    At the time that Plaintiff participated on season two of *American Idol*, Cowell had amassed considerable success in Europe as an "A&R" man, and had been credited with selling more than eighty

16

million albums, thirty number one singles, and a hundred Top 30 singles, non-inclusive of the role he played in forming *American Idol* contestants into viable music industry stars with industry longevity and millions of dollars in sales (e.g., Kelly Clarkson, Carrie Underwood, Clay Aiken).

68.     At some point during Hollywood Week of Season Two, which took place December 9-13, 2002, or shortly thereafter, Cowell publically stated to the media that Plaintiff Corey Clark was a strong contender to win Season Two of *American Idol*.

69.     Specifically, in April 2004, Cowell caused to be published his autobiography entitled "I Don't Mean To Be Rude, But . . . The Truth About Fame, Fortune and my Life in Music," in which he wrote: "I did an interview around that time [Hollywood Week] in which I was asked who might win, and I mentioned Frenchie [Davis], Ruben [Studdard], Clay [Aiken] and Corey [Clark]." Upon information and belief, Cowell's predictions regarding Plaintiff were made on or about December 14, 2002, over five months before a winner of the contest was announced.

70.     It was reasonably foreseeable to Simon Cowell, the most celebrated of *American Idol* Judges, that Plaintiff Corey Clark would win Season Two of *American Idol*.

71.     Cowell's predictions regarding the success of Season Two *American Idol* contestants turned out to be entirely accurate with respect to Ruben Studdard and Clay Aiken. Studdard won the *American Idol* contest in Season Two and Aiken became the runner-up. The other two contestants who Cowell predicted had a reasonable, likely shot at winning the contest were Frenchie Davis and Plaintiff Corey Clark, each of whom were unilaterally disqualified from the contest and gutted of the opportunity to compete on their merit.

72.     Studdard was the winner of Season Two of *American Idol*. According to Cowell's autobiography, had Studdard not participated in the *American Idol* talent contest, he never would have landed a record deal with a Major Label. As a direct and proximate result of Studdard's participation in the *American Idol* contest, Studdard has earned in excess of $40 Million since being crowned the *American*

17

*Idol* of Season Two.

73.     Aiken was the runner-up winner of season two of *American Idol*. As a direct and proximate result of Aiken's second place victory in the *American Idol* contest, Aiken has earned in excess of $40 Million since being crowned the runner-up of *American Idol*.

74.     The other two contestants who Simon Cowell predicted had the strongest probability to win the Season Two contest, Frenchie Davis and Plaintiff Corey Clark, were unlawfully disqualified from the contest and deprived of their rightful opportunity to compete for the valuable prize.

75.     Frenchie Davis, an African-American female contestant, was disqualified from the *American Idol* contest.

76.     In November 2002, as a part of the extensive, multi-tiered background check process administered by *Idol*'s Producers and FOX, *inter alia*, Davis disclosed to *American Idol* producers in a written application that she had taken topless photos for an erotic website when she was a teenager, some four years before her audition.

77.     On December 14, 2002, Davis was selected as a Top 32 Finalist.

78.     On February 11, 2003, approximately three months after Davis had submitted her written background information form, *Idol*'s Producers announced her disqualification to the national media, claiming that she had "failed to disclose" the existence of the topless photos.

**Plaintiff Corey Clark's 2003 Disqualification from the *American Idol* Contest**

79.     On March 31, 2003, *American Idol* producers notified Clark that he had been unilaterally disqualified from the contest just hours after a tabloid website called "The Smoking Gun" published an article concerning attached highly confidential, Court-sealed documents consisting of Plaintiff's criminal and civil court record information from Kansas.   The criminal record information pertained to misdemeanor charges stemming from an October 12, 2002 arrest in Topeka, the trial of which was still pending at the time of Plaintiff's disqualification from the *American Idol* contest.

18

80.     Plaintiff has at all times maintained that his arrest in Topeka, Kansas on October 12, 2002 was unwarranted.  In fact, as a matter of public record, the charges against Plaintiff were dropped in their entirety by the Municipal Court on November 18, 2002.

81.     The government's charges against Plaintiff were re-instated and a criminal complaint filed by the Shawnee County District Attorney on December 4, 2002.

82.     Plaintiff did not learn of the reinstated Kansas charges until January 7, 2003, after he had completed *Idol's* multi-tiered background information check process.

83.     In June 2003, two out of the three misdemeanor charges brought against Plaintiff, including the volatile charges that he had physically assaulted and restrained his 15-year-old sister, were dismissed by the prosecutor for lack of any evidence.

84.     Upon the advice of his counsel and in order to avoid traveling back to the State of Kansas, Plaintiff pled no contest to one misdemeanor count of "obstruction of justice" based on resisting arrest.

85.     On March 31, 2003, the date of Plaintiff's disqualification, TheSmokingGun.com, a sensationalist website known for posting government-classified documents on-line, reported that "Nine hours after TSG reported on the pending criminal charges faced by "American Idol" finalist Corey Clark, the 22-year-old singer was removed from the hit program by Fox television and the show's producer."

86.     Since the date of Corey Clark's disqualification from *American Idol* on March 31, 2003, FOX and *American Idol* Producers have published or caused to be published two, separate written statements to the news media concerning the alleged justification for disqualifying Plaintiff Corey Clark from Season Two of the *American Idol* contest.

87.     The March 31, 2003 Press Release, issued by FOX to TheSmokingGun.com, states as follows:

"Due to events that have recently come to light, *American Idol* participant Corey Clark has been removed from the contest.

All participants are required to provide full and accurate information to assist in background checks, including disclosure of any prior arrests. Corey withheld information about a prior arrest which, had it been known, might have affected his participation in the show. Due to his failure to disclose, compounded by an error in a police report which misspelled Corey's name, the incident was not discovered during the background check. The producers and network feel that Corey's behavior warrants his disqualification.

Unfortunately, the search process is not perfect. We regret the error, but the only thing we can do is learn from the incident, continue to improve the background check process, and move on.

At this time, no decision has been made as to how this will impact this week's shows."

88.    May 16, 2005 *American Idol* Press Release: On May 16, 2005, in response to public reports that Plaintiff Clark had engaged in a sexual relationship with *American Idol* judge Paula Abdul during the production of Season Two, the producers for *American Idol* publically reiterated the reason for why Plaintiff was disqualified from the contest. In an article published in PEOPLE MAGAZINE, May 16, 2005, Vol. 63, No. 19, entitled "Idol Under Attack", authors Michelle Tauber and Jill Smolowe reported that: "*Idol* producers issued this statement to PEOPLE: 'Corey Clark was removed from the show for failing to disclose his criminal arrest history....'"

89.    The Contestant Agreement signed by *American Idol* contestants as a pre-requisite to their participation on *American Idol* provide that the *American Idol* producers and/or FOX may disqualify any contestant at any time for any reason at their sole and absolute discretion.

90.    Fremantle, the corporate producer of *American Idol*, and 19 Entertainment Ltd., the creator and co-owner of the franchise, are co-owners of the copyright to the underlying text contained in a book entitled AMERICAN IDOL: THE OFFICIAL BOOK. The book was published in August 2002 by Bantam Books, a division of Random House, Inc. The book sets forth the requirements for competing

20

on *American Idol*. Regarding disqualification, the book states: "Disqualifications: We reserve the right to disqualify or exclude, in our sole and absolute discretion, any individual from any of the auditions for any reason."

### 2005 Paula Abdul "Sex Scandal"

91.    In December 2002, *American Idol* Judge Paula Abdul, who was publically magnetized by what she described as Corey Clark's "star quality", initiated communications with Plaintiff via her backstage assistant and promptly offered to be his "special friend". Within hours of first speaking to Abdul on her home telephone, Abdul sent a car service to pick Corey Clark up and transport him to her home.

92.    Abdul assumed the role of Corey Clark's music industry mentor for several months. After they grew to know each other personally, a romantic connection evolved and was ultimately consummated. Abdul and Clark each confessed their love for each other.

93.    After Corey Clark was disqualified from *American Idol* on March 31, 2003, Abdul ceased communications with him.

94.    For two years following his 2003 disqualification, Plaintiff remained quiet about his special relationship with Abdul, having wanted to be received by the public based on his own merits as a singer and songwriter.

95.    While attempting to obtain a Major Label record deal in Los Angeles, Clark increasingly found himself being "blacklisted" by music industry professionals. He ultimately learned that representatives of the *American Idol* franchise were actively interfering with his efforts to secure contracts.

96.    Despite the formidable obstacles to securing a major label record deal, Plaintiff eventually succeeded on the strength of his musical talent and natural charisma. Paul Ring of Bungalo Records, which is distributed by major Universal Music, signed Corey Clark to an exclusive recording contract and work promptly thereafter began on assembling a team of professionals to produce Plaintiff's debut

21

album.

97.    Still frustrated by the unwarranted interference from *American Idol* producers, and shunned by his former love interest Abdul, who had promised him substantial moral and financial support in his career, Plaintiff resolved in or about December 2004 to "hold nothing back" and ultimately decided that it would serve his soul's best interest to tell his true story.

98.    After publically disclosing the factual details of his special relationship with Abdul on an May 5, 2005 ABC News broadcast special program called "Fallen Idol", Clark faced a "media backlash" led by FOX and *American Idol* producers.  Plaintiff's credibility – rather than his factual evidence – was called into question.

99.    To date, despite a cryptic press release issued by her representatives, Paula Abdul has never *personally* made a public statement or utterance in which she expressly denied her mentoring and/or romantic relationship with Corey Clark during his participation as a contestant in season two.

100.   On or about July, 2005, FOX publically stated that it had retained an "Independent Counsel" to conduct a "private investigation" of Corey Clark's "accusations" regarding his "affair" with Paula Abdul.

101.   The common, ordinary meaning of "Independent Counsel", whether used in a strictly legal context or used in the laymen's understanding of that term, is an independent prosecutor hired by the federal government to investigate misconduct by governmental officials (e.g., Watergate).   Indeed, the term "Independent Counsel" is the title of the federal statute 28 U.S.C. Chapter 40 which governs the authority and duties of the government's independent counsel.

102.   FOX never retained an "independent counsel", as that term is commonly understood by the public and used by Congress in 28 U.S.C. Chapter 40.

103.   For purposes of the 2005 "private investigation" concerning Plaintiff's relationship with Abdul, FOX retained *private* law firms Loeb & Loeb and Gibson Dunn.  Upon information and belief,

each of these law firms were already on retainer to perform legal services for FOX and/or had previously performed a wide range of legal services on behalf of FOX and/or *American Idol's* producers.

104. Upon information and belief, as legal advocates retained by FOX for the express purpose of protecting FOX's corporate interests, both law firms of Gibson Dunn and/or Loeb & Loeb had an economic or other vested interest to conduct an investigation that would best serve the business interests of its highly valued corporate client.

105. Any representation that the law firms Gibson Dunn and/or Loeb & Loeb were retained as "independent counsel" by FOX is plainly misleading and conveys a false impression that the law firms had no vested or economic interest in the result of the investigation.

106. When Peter Ligouri, then Chairman of FOX, was asked by the press whether Abdul would be fired if it was determined by the investigation that she engaged in a sexual relationship with Plaintiff, Ligouri responded: "Look, the audience loves Paula. She continues to light up our online site, our message boards. Her specific style seems to be working quite well."

107. On August 12, 2005, FOX released a statement to the Press claiming that based on the investigation conducted by FOX's private counsel, Gibson Dunn and Loeb & Loeb, FOX determined to "clear" Abdul of all wrongdoing and allow her to maintain her position as an *American Idol* judge moving forward.

108. The investigation conducted by Gibson Dunn and Loeb & Loeb purportedly entailed 43 personal interviews and 600 hours of legal work. However, none of the law firms' work product, nor any evidence gathered during the course of the purported investigation was disclosed to the public.

109. For the private law firms' part, they did not issue any public or written statement to the press concerning the quality, methodology or reliability of their purported "independent investigation."

110. FOX's conclusions and statements to the press concerning the investigation conducted by Gibson Dunn and Loeb & Loeb were purportedly based on FOX's review of the law firms' investigative

23

results. Upon information and belief, such results have never been reviewed by a disinterested attorney at law.

### Background re: MTV News

111.  MTV News is the news division of Defendant MTV Networks, who owns, operates and controls the content reported on the internet property www.mtv.com/news

112.  MTV News also maintains correspondents, affiliates and/or divisions in foreign countries, including Canada, United Kingdom, Italy, Ireland, Greece, Turkey, Australia, the Netherlands, and countries throughout Latin America, among others.

113.  As a programming entity or brand, MTV News began in the late 1980s with the television program *The Week In Rock*, hosted by Kurt Loder, the first official MTV News correspondent. Before joining MTV News, Loder obtained a formal degree in the U.S. Army school of journalism and had worked as an editor-in-chief of *Rolling Stone* magazine.

114.  Since its inception, MTV News has marketed itself as a <u>traditional provider of news</u> relevant to American music and youth culture. The scope of subject matter reported by MTV News has extended beyond music and entertainment and includes political coverage of presidential elections, teen pregnancy, civil rights, voting drives, drug abuse and the War in Iraq, among other substantial topics. President Obama and President Clinton have both appeared on MTV News television programs.

115.  Other notable, long-term MTV News Correspondents over the years have included John Norris, who graduated with a degree in broadcast journalism from New York University, Chris Connely, who attended the UC Berkeley Graduate School of Journalism, and Tabitha Soren, who graduated New York University with a Bachelor of Arts in Journalism.

116.  MTV News has built a quarter-century long reputation on providing real news information content to its audience; content that is provided to inform, educate or enlighten its audience.

24

117.     MTV News has not traditionally been used as a platform to engage in yellow journalism and is not known for reporting baseless gossip.

118.     For example, in the context of MTV's televised broadcasts, any MTV News segment, whether presented as a 30-second "flash update" or a full length program, features the "MTV News" banner and logo so as to notify television viewers that the information being conveyed is news (as opposed to fiction, fantasy, gossip or conjecture). The MTV News Correspondents are typically featured behind a traditional news desk or seen in the field holding an MTV News microphone.

119.     The MTV News banner or logo is used on television to convey the message to viewers that the information being provided within the context of MTV News is: (a) newsworthy; (b) contemporaneous; (c) objective; (d) presented in a fair and reasonable manner; and (e) for the benefit of the public's knowledge and wisdom about current events or individuals in the public spotlight.

120.     A television viewer of MTV News programs or segments can readily discern the difference between news information content labeled as "MTV News" versus other kinds of programming or content based on sensationalism, fiction, fantasy, gossip or satire.

121.     The Corporate Defendants, through MTV News, operates and controls the internet property www.MTV.com/news (the "MTV News Site").

122.     The MTV News Site publishes articles written by MTV News Correspondents in a section entitled "MTV Newsroom", located at www.newsroom.mtv.com

123.     The "MTV Newsroom" is a separate section than other MTV internet sections offered on MTV's website, such as "Buzzworthy", "MTV Shows", "Music", "MTV Act", "Rapfix", "Style", "Teen Celebs", "Guy Stuff", "Geek", "Activism", "Cosmic Movie", "Indie Music", "Movies", "Shows Soundtrack", "Video Games."

124.     The presence of the MTV News and MTV Newsroom tradenames on the Corporate Defendants' website signify to readers that the content provided in the MTV Newsroom section is

25

reliable, fact-based information based on current events.

**2003-2005 Newsworthy Articles Published by MTV News Regarding Corey Clark's 2003 Disqualification from _American Idol_**

125.     From April 1, 2003 through August 12, 2005, the Corporate Defendants published no less than ten (10) full length news articles on MTV News concerning Plaintiff.  At least seven (7) of the MTV News articles published during this timeframe contained direct quotations from Plaintiff regarding the subject matter of interest.

126.     All of the MTV News Articles published concerning Plaintiff during the April 1, 2003 through August 12, 2005 timeframe were authored by professional journalists who had been trained in the standards, practices and ethical canons of the journalism trade.

127.     The Corporate Defendants have employed and/or retained a journalist named Corey Moss as an MTV News Correspondent.  Moss is an Iowa State University journalism graduate.  Moss wrote multiple articles published by the Corporate Defendants on www.MTV.com concerning the events surrounding Plaintiff's 2003 disqualification from _American Idol_.  Such articles were published at the direction of the Corporate Defendants in the relevant timeframe during which the subject matter of the article was newsworthy and of public concern.

128.     The Corporate Defendants have employed or retained a journalist named Chris Harris, who was an MTV News Correspondent from March 2005 through December 2008.  Prior to joining MTV, Harris worked for a period of seven years in the news reporting industry, including professional experience as a managing editor, writer and reporter for reputable publications.

129.     The Corporate Defendants have employed or retained a journalist named Gil Kaufman, who is now a Senior Writer at MTV News after joining the organization in 2000.  Kaufman is a journalism graduate of University of Wisconsin-Madison and worked as a newspaper editor at various publications, including the _Cincinnati Enquirer_ for over 8 years before joining MTV News.

26

130.    Kaufman wrote several, lengthy news articles in April and May of 2005, and published by the Corporate Defendants on www.MTV.com, about the events surrounding Plaintiff's 2003 disqualification from *American Idol*.   Such articles were published at the direction of the Corporate Defendants in the relevant timeframe during which the subject matter of the articles was deemed newsworthy and subject to public debate.   Kaufman also wrote a full length review of Corey Clark's 2005 debut album on behalf of MTV News.

131.    With respect to Corey Clark's 2003 disqualification, and on behalf of the Corporate Defendants, journalist Kaufman wrote as follows:

- "Clark was booted from the show for failing to fully disclose his arrest record, which included charges of resisting arrest and assault on his sister. He pleaded no contest to a charge of obstructing legal process in June of 2003 and was sentenced to six months unsupervised probation and had two other charges dropped.   [See *Corey Clark Advertises Paula Abdul Affair, LP On 'Primetime'*, Gil Kaufman, May 5, 2005, currently located at http://m.mtv.com/news/article.rbml?id=1501304].

- "Clark, 24, was booted from 'Idol' for not revealing to judges that he was facing criminal charges of battery and resisting arrest following an alleged assault on his sister; he pleaded no contest to a charge of obstructing legal process in June 2003. He was sentenced to six months of unsupervised probation and had two other charges dropped." [See *'Fallen Idol' Corey Clark Claims Abdul Gave Him Backstage Help*, May 4, 2005, currently published at http://m.mtv.com/news/article.rbml?id=1501231].

- "Clark was booted from 'Idol' when producers learned that he had been charged with resisting arrest and misdemeanor assault against his sister; he was later acquitted."  [See *Paula Abdul Denies Affair Allegation As Producers Investigate,* Gil Kaufman, April 27, 2005, currently published at http://www.mtv.com/news/articles/1500887/paul-abdul-denies-affair-allegation.jhtml]

132.    Consistent with Kaufman, Moss and Harris' formal education as journalists and their knowledge of journalistic standards established by both Corporate Defendants and the trade, the

27

statements concerning Plaintiff in news reports written by Kaufman, Moss and Harris and published by the Corporate Defendants in 2003 and 2005 are susceptible to objective, verifiable proof of facts that were publically available at the time such news articles were published.

133. All of Kaufman's statements concerning Plaintiff's criminal record information was objectively presented back when such information could be deemed a matter of public interest. Kaufman took care to indicate that the misdemeanor charges for assault had been dropped and/or that Plaintiff had been acquitted of such charges.

134. Both Harris and Kaufman conducted a personal interviews of Plaintiff in May-July 2005 and accurately reported quotations in the MTV News articles that set forth the true facts underlying his 2003 disqualification and romantic relationship with Abdul.

135. Having published the contemporaneous news articles written by MTV journalists Kaufman, Moss and Harris, Corporate Defendants were on notice concerning the objective set of facts, then publically available, surrounding Corey Clark's 2003 disqualification from *American Idol*, FOX's stated reasons for such disqualification, and Abdul relationship.

136. The Corporate Defendants were on notice that Plaintiff had vehemently refuted the reasons proffered by FOX and Nigel Lythgoe for his 2003 public disqualification; particularly given that Plaintiff's recitation of facts were quoted by journalists Kaufman and Harris in an previous articles published on MTV.com, in addition to the evidence cited by Kaufman which was offered to the public by ABC News on a May 2005 program concerning Plaintiff.

137. At anytime thereafter, when the Corporate Defendants undertook the assignment of reporting facts pertaining to Plaintiff Corey Clark through its MTV News Correspondents, particularly under the guise or banner of "MTV News" or MTV Newsroom", Corporate Defendants had a duty of care to report such facts concerning Plaintiff with proper attribution and in a fair, balanced and objective manner.

28

**Defendant Cantiello's Employment as "MTV News Correspondent" and "_American Idol Expert_"**

138.    Upon information and belief, Defendant Cantiello worked as an independent contractor and/or employee of the Corporate Defendants for a period of more than nine (9) years.

139.    Upon information and belief, from approximately late 2003 through early 2007, Defendant worked for Corporate Defendants in the capacity of video editor.

140.    Upon information and belief, Corporate Defendants granted Cantiello the title of _MTV News Correspondent_ in early 2007, a prestigious title at a respected news organization that had been reporting on current events impacting American youth culture since the late 1980s.

141.    According to the biography of Defendant Cantiello as published on MTV's website, located at http://mtvpress.com/bios/profile/jim_cantiello, "Jim's ascension within MTV is now legendary in-house folk-lore. Plucked from tape operator obscurity in 2005 by an executive producer at MTV News who was impressed by his pop culture know-how and offbeat writing, Jim's been working his way up the ranks ever since. From production assistant to segment producer, from online commentator to on-air correspondent."

142.    As of the date of the filing of this Verified Complaint, the Wikipedia page of MTV Networks continues to list Cantiello as a "Former MTV News Corrrespondent."Cantiello's Wikipedia Page currently lists him as an "MTV News Correspondent"

143.    In marked contrast to formally trained and experienced journalists working as MTV News Correspondents such as Kurt Loder, John Norris, Chris Connelly, Tabitha Soren, Gil Kaufman, Corey Moss, and Chris Harris, Defendant Jim Cantiello was retained by the Corporate Defendants as a News Correspondent despite the fact that he lacked a degree in journalism from an accredited university and lacked any professional experience working as a reporter for a reputable news media outlet.

144.    Upon information and belief, Defendant Cantiello had no experience of any kind with respect to journalism or news reporting prior to being retained by the Corporate Defendants as an MTV

29

News Correspondent.

145. Since at least early 2007, Corporate Defendants have marketed and/or held out Defendant Cantiello to the public as a correspondent and provider of news information, in substantially the same manner, presentation and context as the Corporate Defendants have held out the professional journalists such as Kaufman, Moss and Harris.

146. Corporate Defendants have also held out Defendant Cantiello to the public as their "*American Idol* Expert," charged with the task of covering the television show and reporting to MTV's vast audience on current events relating to the contestants.

147. Corporate Defendants knew or should have known that Cantiello's lack of formal education or experience as a journalist would expose the Corporate Defendants to vicarious liability for Cantiello's marked deficiencies as a news reporter.

148. Corporate Defendants knew or should have known that Cantiello engaged in a pattern of communicating defamatory material concerning Plaintiff under the guise of "news".

### Defendant Cantiello's Systematic Use of MTV News and VH1 News to Disseminate False and Defamatory Statements About Plaintiff Corey Clark

149. Defendant Cantiello, on behalf of and under the direct supervision and control of the Corporate Defendants, engaged in a continuous course of unlawful conduct that deprived Plaintiff the constitutional right to publicity in his own name, image and/or likeness.

150. From at least early 2007 through July of 2011, Plaintiff was no longer a contestant on *American Idol*, no longer on television or signed to a major record label, and no longer embroiled in any media-created controversy.

151. Despite Plaintiff's marked absence from the public eye, Defendant Cantiello used his position as an MTV News Correspondent and leveraged the MTV News content delivery platform to launch a vicious campaign in the guise of "news" to attack, embarrass, humiliate, defame and degradate Plaintiff's reputation, character and integrity.

152.    As a part of Cantiello's campaign, which was authorized by and/or aided by the Corporate Defendants, Defendant Cantiello literally described Plaintiff in MTV Newsroom and VH1 News articles as a "degenerate"; imputed to Plaintiff the charge of a violent crime for which he had long ago been exonerated; claimed that Plaintiff had "lied" about his 2002 misdemeanor charges to *American Idol* producers; instructed readers of MTV News to boycott the commercial sale of music from Plaintiff's 2005 debut album without ever having listened to the compositions embodied on the album; and altogether spread injurious falsehoods and bad will about Plaintiff without any effort to investigate the true, underlying facts surrounding Plaintiff's 2002-2003 participation on *American Idol.*

153.    Defendant Cantiello's untimely and unprovoked false statements about Plaintiff were published for the sake of humiliating Plaintiff and portraying him in the most derogatory manner possible.

154.    Defendant Cantiello's false statements about Plaintiff as published on MTV News and VH1 News were known by Defendants to be false when made; and/or were made in reckless disregard for the truth of such statements.

155.    All of the libelous statements written by Defendant Cantiello that are the subject of this action were published by the Corporate Defendants in the "MTV News" section of MTV.com; or the VH1 News section of the VH1 website, also owned by Viacom.

156.    There is no disclaimer, category label, section title or other "caveat emptor" language cited by the Corporate Defendants in the context of any MTV News articles written by Defendant Cantiello that warn readers that statements contained in the Cantiello articles are solely based on Cantiello's biased opinions.

157.    Recipients of content information viewed on MTV News would reasonably believe that Cantiello's false statements of fact concerning Plaintiff were truthful and based on diligent investigation and reliable reporting.

31

158.     Prior to making false and defamatory statements about Plaintiff, Defendant Cantiello failed to undertake any investigation into publically available facts surrounding Plaintiff's 2003 disqualification from *American Idol*, including facts that were previously reported by MTV News Correspondents Kaufman, Moss and Harris.

159.     Within the context of Defendant Cantiello's MTV News articles, Cantiello failed to cross-reference or provide internet links to earlier, contemporaneous articles published by the Corporate Defendants through the writings of MTV News Correspondents Kaufman, Moss and Harris.

**Toscano Article [July 6, 2011]**

160.     The most recent libelous statement written by Defendant Cantiello was published by the Corporate Defendants in an article entitled *"Pia Toscano Got a Record Deal, But How Are the Other Ninth Place 'Idols' Faring?"* The publication is dated as of July 6, 2011. At the date of the filing of this Verified Complaint, the article continues to be disseminated in the MTV News Room, located at http://newsroom.mtv.com/2011/07/06/pia-toscano-record-deal-american-idol/ (the "Toscano Article").

161.     Based on the news that Pia Toscano, a ninth-place finisher on Season Ten of *American Idol*, had secured a recording contract with Interscope Records, Defendant Cantiello purported to offer the readers "a look back at the careers of previous ninth-place finishers to see how they've fared . . ."

162.     Defendants' stated purpose of the Toscano Article was to convey factual information concerning the professional musical careers of former *American Idol* contestants.

163.     The Toscano Article lists the names of former *American Idol* contestants who finished in the ninth place spot. The list was made in chronological order, starting with Season One (2002) and ending with Season Eight (2010).

164.     In the body text of the Toscano Article, Defendant Cantiello references "Season Two" and then lists the name of Plaintiff "Corey Clark" as the Ninth Place finalist. Defendant Cantiello writes

32

the following about Corey Clark:

> **Believe it or not, the controversial Clark – *who was disqualified for lying about a hairy domestic dispute*** and later claimed to have had an affair with Paula Abdul - was once a part of the Universal Music Group, (which includes Interscope Records). His 2005 self-titled debut album – independently produced but distributed by Universal - boasted a *Black Eyed Peas* cameo and production by one of the top producers at that time, Scott Storch. Seriously.

> **Despite widespread coverage of his alleged Abdul showmance** – including an hour long ABC Primetime Live special called... wait for it... *Fallen Idol* – **nobody cared about his album**. He said it was because Clear Channel radio stations were in bed with *Idol* and refused to play his single. **I say it's because his music was laughably bad. Look up "Paulatics" to see what I mean. Actually, don't.** [emphasis added]

165. Defendant Cantiello's unbridled contempt for Plaintiff extends into his entire description of Season Three's ninth place finalist Camile Velasco. Cantiello writes:

> Camile is yet another 9th placer who scored a brief deal with the Universal family. Strangely, like **Corey Clark**, she worked with the Black Eyed Peas, too. (I spy an Idol at the 2:21 mark of their "Bebot" music video!) Alas, with no tall tales about sleeping with an Idol judge, even less people cared about her brief music career than Corey's. [emphasis added]

166. Defendant Cantiello's statement in the Toscano Article that Plaintiff was **"disqualified for lying about a hairy domestic dispute"** is a false statement of fact that can be readily proven false through the applicable federal rules of evidence.

167. The statement in the Toscano Article that Plaintiff was "disqualified for lying about a hairy domestic dispute" is defamatory on its face because, when viewing the words in their ordinary meaning and considering the phrase as a whole, it conveys the literal, unmistakable messages, *inter alia*, that Plaintiff: (a) is a liar; (b) was disqualified from *American Idol* for telling a lie or lies; (c) was telling lies about a criminal charge involving domestic violence.

168. Defendant Cantiello's statement in the Toscano Article that Plaintiff was involved in "a hairy domestic dispute" refers to the historical fact of Plaintiff's October 2002 arrest in Topeka, Kansas

33

and the misdemeanor charges brought against Plaintiff by the State of Kansas in December 2002.

169.    Defendant Cantiello's distorted mischaracterization of the 2002 misdemeanor charges as "a hairy domestic dispute" is objectively false.

170.    Plaintiff was never charged with any crimes in 2002 that implicated "domestic abuse" or "domestic violence," as those terms are defined by the applicable state criminal statutes in Kansas.

171.    As a matter of public record, Plaintiff was never convicted of any crime relating to his 2002 Kansas Arrest that could be reasonably inferred to have stemmed from a "hairy domestic dispute". As a matter of verifiable fact, there was no hairy domestic dispute.

172.    The statement in the Toscano Article that Plaintiff was "disqualified for lying about a hairy domestic dispute" is defamatory when viewed in context of the entire Toscano Article, which omits any reference to the actual nature of the charges against Plaintiff or the fact of Plaintiff's exoneration from the charges some eight years before Defendants published this statement on MTV News.

173.    The statement in the Toscano Article that Plaintiff was "disqualified for lying about a hairy domestic dispute" is defamatory when viewed in context of *all* articles written by Cantiello on behalf of the Corporate Defendants that exploit Corey Clark's name, given that Cantiello repeatedly cites (and distorts) Plaintiff's arrest record information from Kansas without informing the reader of the objective fact of Plaintiff's exoneration from any crime relating to the 2002 Kansas arrest.

174.    Defendant Cantiello's statement in the Toscano Article that Plaintiff was "disqualified for lying about a hairy domestic dispute" purports to convey the historical fact of Plaintiff's 2003 disqualification from the *American Idol* contest.

175.    Defendant Cantiello's statement in the Toscano Article concerning Plaintiff's 2003 disqualification purports to convey the historical fact for why Plaintiff was disqualified from *American Idol*.

34

176. Defendant Cantiello's statement in the Toscano Article that Plaintiff was "disqualified for lying about a hairy domestic dispute" purports to convey the reason for Plaintiff's disqualification, as reported to the news media in March-April 2003, and again in April-May 2005 when evidence of Plaintiff's special relationship with *American Idol* Judge Paula Abdul captured the public interest.

177. Defendant Cantiello's statement in the Toscano Article that Plaintiff was "disqualified for lying" refers to the historical fact that FOX issued a written statement to the national press claiming that Plaintiff had "withheld information" and "failed to disclose" the record of his October 2002 arrest in Kansas during the "background check process" of *American Idol* contestants.

178. In April and May of 2005 MTV News Correspondent Gil Kaufman wrote, and Corporate Defendants published, articles on MTV News that reported facts surrounding Plaintiff's 2003 disqualification from *American Idol*.

179. With respect to the 2002 Kansas Arrest, Kaufman accurately reported that the misdemeanor charges of assault and physical restraint had been dismissed by the State and that Plaintiff had been acquitted of any charge relating to violence against his sister, who was a juvenile at the time.

180. Defendants knew that Cantiello's statement in the Toscano Article that Plaintiff was "disqualified for lying about a hairy domestic dispute" was false when made.

181. Defendants published the statement in the Toscano Article that Plaintiff was "disqualified for lying about a hairy domestic dispute" with reckless disregard for the the truth or falsity of the statement.

182. Unlike Cantiello's libelous statement in the Toscano Article, FOX never claimed in its written press releases to the public that Plaintiff had been disqualified from *American Idol* for **"lying"** about his criminal arrest; or being a liar; or for telling lies.

183. By common definition, the act of "lying" requires an affirmative telling, utterance or false statement of fact.

35

184.    The act of omitting a *pending* criminal charge from an employment application does not convey the same defamatory meaning as the act of writing false statements about a pending criminal charge on the employment application. Only the latter can be fairly described as "lying" in the ordinary meaning of the English language.

185.    Defendants published the statement in the Toscano Article that Plaintiff was "disqualified for lying **about** a hairy domestic dispute" with knowledge that Plaintiff was not disqualified from *American Idol* for making false statements <u>about</u> the events surrounding his October 2002 arrest in Kansas nor <u>about</u> the nature of the charges brought against him. To the contrary, FOX's claim – as clearly stated in writing in its March 31, 2003 press release - was that Plaintiff's disqualification was based on Plaintiff's alleged failure to say anything about the charges.

186.    Defendant Cantiello's libelous statement that Plaintiff was "disqualified for lying about a hairy domestic dispute" conveys the false impression to readers that Plaintiff was disqualified for making false and deceptive statements about the underlying events that triggered the 2002 Kansas arrest, as opposed to remaining silent when asked by his employer about an arrest for which he had not been convicted.

187.    Upon information and belief, FOX's statements to the national media in March-April 2003 and April-May 2005 concerning its reason(s) for disqualifying Plaintiff from *American Idol* were false misrepresentations of fact when made.

188.    At all times relevant to this action, Corporate Defendants were on notice of facts in the public record and in possession of information that provided substantial grounds upon which to question the truth, accuracy or good faith motivation behind public representations made by FOX concerning Plaintiff's 2003 disqualification.

189.    Upon information and belief, at any time prior to the publication of false and defamatory statements concerning Plaintiff, Defendants had access to substantial investigative resources that would

enable their news organization to determine the truth, accuracy or good faith motivation behind written statements made by FOX concerning the purported reason(s) for Plaintiff's 2003 disqualification.

190. Upon information and belief, Nigel Lythgoe's statements to the public media in March-April 2003 and April-May 2005 concerning Plaintiff's 2003 disqualification were false misrepresentations of fact when made.

191. At all times relevant to this action, Corporate Defendants were on notice of facts in the public record and in possession of information that provided substantial grounds upon which to question the truth, accuracy or good faith motivation behind public representations stated by Nigel Lythgoe concerning Plaintiff's 2003 disqualification.

192. Upon information and belief, at any time prior to the publication of false and defamatory statements concerning Plaintiff, Defendants had access to substantial investigative resources that would enable their news organization to determine the truth, accuracy or good faith motivation behind public representations stated by Nigel Lythgoe concerning Plaintiff's 2003 disqualification.

193. Defendants knew or should have known that Corey Clark disclosed the 2002 Kansas record of his misdemeanor arrest and pending trial to *American Idol* producers and Abdul several <u>months</u> prior to the date of Plaintiff's public disqualification.

194. Defendants knew or should have known that FOX and *American Idol*'s producers had knowledge and information in their possession of the State's pending charges against Corey Clark several <u>months</u> prior to the date of his public disqualification.

195. Defendants knew or should have known that as a pre-requisite for their participation on *American Idol*, contestants must consent to a lengthy, multi-tiered, and exhaustive criminal background check process, administered in various stages during the contestant's audition process by a large network of information gatherers and third-party corporate investigators, consisting of former FBI agents and highly trained background information specialists who employ the most advanced techniques for

37

gathering confidential and government-regulated information.

196.    Upon information and belief, the exhaustive nature of the *American Idol* contestant background check process, the quality of agents retained by FOX to conduct such background checks, the financial resources *American Idol* producers have at their disposal to ensure the reliability of such background checks rendered it a factual improbability that FOX did not know of Corey Clark's October 12, 2002 Kansas Arrest until on or about March 31, 2003.

197.    Defendant Cantiello's statements of purported fact concerning Plaintiff in the Toscano Article cannot be deemed newsworthy, nor based on matters of public concern, at the time they were first published or re-published.

198.    The false and defamatory statements in the Toscano Article published by the Corporate Defendants cannot be adequately refuted to or corrected by Plaintiff via instant access to any media platform comparable to the authoritative MTV News.

199.    MTV News widely reports news about the popular music industry.

200.    Since the early 1990s, Corey Clark has worked professionally in the popular music industry.

**Cantiello's Video Timeline Articles [May 21, 2007 and February 19, 2008]**

201.    On May 21, 2007, the Corporate Defendants published an article written by Defendant Cantiello entitled "American Idol Video Timeline: Five Seasons In Five Minutes (Or 2,500 Words)", and located at: http://www.mtv.com/news/articles/1560016/american-idol-video-timeline.jhtml.    At the date of the filing of this Verified Complaint, the article continues to be disseminated in the MTV News section of MTV.com.

202.    The May 21, 2007 article referenced in the preceding paragraph of this Verified Complaint was also published, and continues to be accessible, on VH1 News website, an internet property owned and operated by the Viacom, located at

38

http://m.vh1.com/news/article.rbml?id=1560016&artist=bice__bo.

203.    On February 19, 2008, the Corporate Defendants published an article written by Defendant Cantiello entitled "'American Idol' Video Timeline: Six Seasons Of High Notes And Hot Messes: From Jordin to Kelly, 'Idol' expert Jim Cantiello relives each season of the cultural phenomenon in 60 seconds" and located at www.mtv.com/news/articles/1581836/american-idol-video-timeline-six-seasons-six-minutes.jhtml. At the date of the filing of this Verified Complaint, the article continues to be disseminated in the MTV News section of MTV.com.

204.    In the May 21, 2007 MTV News article, the May 21, 2007 VH1 News article and the February 19, 2008 MTV News article authored by Defendant Cantiello (together, the "Video Timeline Articles"), Defendant Cantiello writes the following statements concerning Plaintiff Corey Clark:

> SEASON SCANDALS: Pack a lunch — it's gonna take awhile to weed through all this. First, before the semifinals begin, front-runner Frenchie Davis is told to hit the road after it is uncovered that she has modeled topless for a skuzzy porn site. Although Frenchie says she was honest to executives about her past, the same cannot be said about Corey Clark.

> Nine hours after the Smoking Gun posts a mug shot of the **alleged sister-beater**, the blindsided producers oust Corey from "Idol." . . .

> Season-two **degenerate Corey Clark** (see season-two scandals below) re-emerges with an inflammatory book to sell.  In it, he claims that the real reason he was DQ'd from the show back in '03 was because he was having an illicit affair with Abdul. On a sensational prime-time news special (called — wait for it — "Fallen Idol") the former contestant speaks (and sings) about his "relationship" in graphic detail. (I'm still trying to track down an MP3 of the song "Paulatics," by the way.) Abdul denies it, "Idol" hires a private investigative team, and wouldn't you know it? They conclude that Paula was straight-up telling the truth.

205.    Defendants' libelous characterization of Corey Clark as a "<u>degenerate</u>", which statement was first published in May 2007 and continues to be re-published in separate on-line articles featured in the MTV News Room section of MTV.com and the VH1 News Room, under the authorization and supervision of Corporate Defendants, is defamatory *per se* as it would be deemed highly offensive to any reasonable person.

206. Defendants' libelous characterization of Corey Clark as an "alleged sister-beater", first published in May 2007 and re-printed again in 2008, and continuing to be re-published, was written by Defendant Cantiello four to five years after Plaintiff had been cleared and acquitted of a 2002 Kansas misdemeanor charge of assault in which his then 15-year-old sister, Alecia Clark, was implicated as the victim. As such, the statement is defamatory *per se* because it imputes Plaintiff with the charge of a violent crime for which he was acquitted by the State.

207. Defendants failed to conduct its own factual investigation in May 2007, or anytime thereafter, into the events surrounding Plaintiff's 2002 Kansas Arrest.

208. Many of the relevant facts pertaining to the 2002 Kansas Arrest are a matter of public record, including that: (a) Plaintiff was beaten and arrested for protecting his 15-year-old sister against officers who sought to commit her to juvenile intake without justification; (b) as evidenced by the police reports filed in the Kansas case, no one, including any of the arresting officers or neighbors, ever witnessed Plaintiff touch his sister; (c) the officer who reported Plaintiff's assault upon his sister (after having senselessly beaten Plaintiff) stated in his police report that Clark's sister exhibited "no visible signs of bruising"; (d) in an April 13, 2003 article printed in the nationally-distributed PEOPLE Magazine, Plaintiff's sister, Alecia, publically denied that Corey Clark had ever touched her during the alleged incident on October 12, 2002; (e) on November 18, 2002, ALL criminal charges against Plaintiff were dismissed by the Court in Topeka, Kansas a month after Plaintiff's arrest and his bond money was refunded in full; and (f) the misdemeanor charges were, without any notice to Plaintiff, re-instated by the Shawnee County District Attorney's office after it was learned that Plaintiff was going to be a contestant featured on *American Idol.*

209. Defendants' libelous statements concerning Plaintiff, as contained in the Video Timeline Articles, are actionable at law given Defendants' continuing course of conduct to defame Plaintiff with the republication of false statements of fact, relating to the same subject matter, in a "crusade" to

40

portray him in the most negative light humanly possible.

**Plaintiff's History of Communications to Viacom Demanding that the Corporate Defendants Cease and Desist from Publishing Libelous Statements**

210.    Plaintiff Corey Clark has experienced a long, <u>six-year</u> history of pleading with the Corporate Defendants to cease and desist their continuous wrongful course of conduct in disseminating falsehoods concerning Plaintiff.

211.    In May 2006, Plaintiff's counsel, Anthony J. Parascandola, threatened to file a $20 million lawsuit suit on behalf of Plaintiff for slander, libel and false light invasion of privacy against Defendant Viacom, *inter alia*, in connection with false statements of purported fact made about Plaintiff during the 2006 broadcast of a television program entitled "VH1 All Access: Embarassing Moments 2". The show branded Plaintiff as a liar and opportunist who was deemed morally corrupt and fame-starved for allegedly devising a "hoax", i.e., an entirely fictional account of his relationship with Paula Abdul whilst a contestant on *American Idol.*

212.    Plaintiff was unable to proceed with the lawsuit against Defendant Viacom in 2006 due to the lack of financial resources to pay his litigation counsel.

213.    Notwithstanding Plaintiff's inability to proceed with the litigation, Viacom was on notice from the inception of its campaign to humiliate Plaintiff Corey Clark that false statements being published by the Corporate Defendants in widely-broadcast television programs were libelous *per se*, and that Plaintiff was not going to sit back for the remainder of his Life and permit Defendants to stigmatize him with falsehoods that permanently expose his character and reputation to contempt, ridicule, shame and disgrace.

214.    On December 14, 2011, Plaintiff's counsel John Ray Clemmons wrote to the Office of the General Counsel of the Corporate Defendants asking Defendants to retract Cantiello's libelous statements, as contained in the Toscano Article.

215.    On December 20, 2011, Defendants' Senior Counsel of Litigation, Lavutus Powell,

41

responded to Plaintiff's counsel by correspondence, on behalf of the Corporate Defendants, indicating that the Corporate Defendants would conduct an investigation into Plaintiff's claims.

216.    Having failed to receive any response, Plaintiff's counsel wrote to legal counsel for the Corporate Defendants again on February 15, 2012.

217.    At the date of this filing, the Corporate Defendants have failed to respond to Plaintiff's good faith demands for a retraction.

### Non-Applicability of State Anti-SLAAP Statutes

218.    Plaintiff's claims are not part of a strategic lawsuit against public participation.

219.    Plaintiff's claims are a *good faith* effort to seek Truth and Justice, the absence of which shall permanently castigate Plaintiff to a Life of Exile and impair the valuable economic interest in Plaintiff's right of publicity.

220.    Defendants' publication of false and defamatory statements concerning Plaintiff were <u>not</u> made in furtherance of a right of free speech.

221.    Defendants' publication of false and defamatory statements concerning Plaintiff were <u>not</u> made in furtherance of a right to petition to the govenrment.

222.    Defendants' publication of false and defamatory statements concerning Plaintiff were <u>not</u> made in connection with a public or government issue.

223.    Defendants' publication of false and defamatory statements concerning Plaintiff were <u>not</u> made to any government agency regarding a matter of concern of that government agency.

224.    Any applicable Anti-SLAPP state statutes, including those adopted by the States of Tennessee and New York, do not apply to Plaintiff's causes of action because state Anti-SLAPP statutes are inapplicable to defamation actions premised on diversity jurisdiction in federal courts.

225.    Any applicable Anti-SLAPP state statutes, including those adopted by the States of Tennessee and New York, do not apply to Plaintiff's causes of action because Defendants' publication

of the false and defamatory statements were made with knowledge of their falsity, reckless disregard of falsity or negligence of falsity.

## CAUSES OF ACTION

### COUNT I. Defamation – Libel *Per Se* Against All Defendants

226.　Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 224 of this Verified Complaint and each and every part thereof with the same force and effect as though set out at length herein.

#### FALSE AND DEFAMATORY STATEMENTS *PER SE* CONCERNING PLAINTIFF

227.　Defendants have published false and defamatory statements of fact about and concerning Plaintiff Corey Clark.

228.　The false and defamatory statements of fact concerning Corey Clark were written by Defendant Cantiello and published by the Corporate Defendants in the News Divisions of the websites owned and operated by the Corporate Defendants, [see, www.MTV.com/news and www.VH1.com/news]

229.　Plaintiff can prove through the applicable federal rules of evidence governing this proceeding that the defamatory statements of fact published by the Defendants are <u>false</u>.

230.　Defendants have published defamatory statements in writing that unequivocally identify Plaintiff as **"the degenerate Corey Clark",** as an **"alleged sister-beater"** (four years after charges of battery had been dismissed by the State), and has falsely stated that Plaintiff was **"<u>disqualified [from *American Idol*] for lying about a hairy domestic dispute</u>."**

231.　The ordinary meaning reasonably conveyed by the published false assertions of fact identified in the preceding paragraph of this Verified Complaint ("the false and defamatory statements *per se*") are reasonably understood in a defamatory sense by the recipients of such publication.

43

232.    Defendants' false and defamatory statements *per se* consist of words and language that in their ordinary meaning, considered as a whole in context, have a tendency to harm Plaintiff's reputation or character in the community.

233.    Defendants' false and defamatory statements *per se* tend to expose the Plaintiff to public contempt, hatred, ridicule, aversion and disgrace; or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of his friendly intercourse in society.

234.    Defendants have published false and defamatory statements *per se* that have a tendency to prejudice the Plaintiff in the eyes of a substantial and respectable minority of the community.

235.    Defendants have published false and defamatory statements *per se* concerning Plaintiff that have a tendency to deter third persons from associating or dealing with him, either socially or in his profession.

236.    Defendants have published false and defamatory statements *per se* concerning Plaintiff that have a tendency to injure Plaintiff in his occupation, business, trade or profession.

### COMMUNICATIONS TO THIRD PARTIES

237.    Defendants' publication of false and defamatory statements *per se* concerning Plaintiff have been communicated to third parties.

238.    Defendants' publication of false and defamatory statements *per se* concerning Plaintiff are available to anyone throughout the world who has access to an internet connection.

239.    According to the Internet World Stats that collects its data from Nielsen/Net Ratings and the International Telecommunications Union (ITU) World website, as of December 31, 2011, there were 2.27 billion (2,267,233,742) people on the Internet worldwide and almost 275 million people in the United States using the Internet. http://www.internetworldstats.com/stats.htm

240.    Defendants' false and defamatory statements are re-published on a daily basis to over *two billion* people throughout the world with access to the websites MTV.com and VH1.com owned and

44

operated by Corporate Defendants.

## DEFENDANTS' CONTINUING COURSE OF TORTIOUS CONDUCT

241. The false and defamatory statements of fact *per se* concerning Plaintiff which continue to be published to more than two billion on the websites owned and operated by the Corporate Defendants are part and parcel of a <u>singular campaign</u> and <u>unified transaction</u> perpetrated by <u>identical wrongful actors</u> against the <u>same victim</u> relating to <u>identical subject matter</u>. Defendants engaged in this continuing course of wrongful conduct without provocation and without legal or equitable justification.

242. Defendants' continuing course of unlawful conduct relating to its re-publications of libelous statements dates back to at least May of 2007, when Defendant Cantiello began writing – and the Corporate Defendants began publishing - false and defamatory statements concerning Plaintiff on the MTV News website (and VH1 website) and extends through at least July 6, 2011, when Defendants published the Toscano Article.

243. The publication of the libelous statements identified in this Verified Complaint were <u>not</u> merely isolated incidents of defamatory communications published by the Defendants in a series of un-related news articles. They were part of a <u>singular transaction</u>: a "crusade" launched and systematically maintained by THE "*American Idol* Expert" and MTV News Correspondent Cantiello, operating under the authority and supervision of the Corporate Defendants and acting within the scope of his agency, to permanently malign Corey Clark's name and reputation and expose him to disgrace and contempt.

244. The written content of Defendant Cantiello's "news" articles concerning *American Idol*, particularly the Video Timeline Articles, coupled with his apparent authority as an "*American Idol* Expert*", clearly demonstrate Cantiello's manifest intention to create and perpetuate a "legacy" – an indelible, historic impression in the public record - concerning *American Idol* contestants.

245. Defendant Cantiello's libelous crusade to permanently impair Corey Clark's upstanding role in society is motivated by Scarlett Letter-minded primordial cruelty, a bizarre motivation to engrave

45

disgrace into Plaintiff's family lineage.

246. The First Amendment was designed to enhance the lives of United States citizens in their pursuit and happiness, not to serve as a shield from civil liability for systematic character assassination.

247. Defendants' singular, biased crusade against former *American Idol* contestant Corey Clark was prosecuted in bad faith over at least a four-year period of time and for no other reason than to defame Corey Clark in a calculated effort to solidify Plaintiff's "legacy" in the community as the lowest form of human being, e.g., a "degenerate" and most tabloid-denigrated *American Idol* contestant of all time.

248. Defendants' singular, biased crusade against Corey Clark on MTV Music Television, the most influential website and television network in the global music industry, was prosecuted by Defendants in a bad faith effort to permanently disparage Corey Clark's copywritten compositions for sale in the marketplace. Such commercial disparagement of Plaintiff's valuable intellectual property rights was made even though evidence shows that Defendants had never even listened to any of Corey Clark's music.

## RE-PUBLICATION OF RELATED DEFAMATORY MATERIAL BY SAME WRITER

249. From at least May of 2007 and extending through July 6, 2011, Defendants have published libelous statements concerning Corey Clark on the same website (MTV.com), using the same author / news correspondent (Defendant Cantiello), relating to the identical material or occurrence (Plaintiff's participation on *American Idol*) under the guise of the same news media organization (MTV News).

250. The defamatory material concerning Plaintiff has been re-transmitted on MTV.com and continues to be disseminated by the Corporate Defendants with the goal of reaching a new audience.

251. All the libelous statements written by Defendant Cantiello and published by the Corporate Defendants on MTV.com, dating back to May 2007, are actionable under the doctrine of re-publication. To hold otherwise would give Defendants *carte blanche* to continue publishing defamatory material

46

relating to identical subject matter concerning Plaintiff on MTV.com in perpetuity and without any actionable remedy.

### ABSENCE OF FAIR REPORTING PRIVILEGE

252.    Defendants' publication of the false and defamatory statements *per se* concerning Plaintiff are not shielded by the qualified privilege of "Fair Reporting" of official proceedings and/or public records.

253.    The false and defamatory statement that characterized Plaintiff as an "alleged sister-beater" was published by Defendants in 2007 and 2008, *more than four years after* Plaintiff had been adjudged <u>not guilty</u> of the misdemeanor charge of assault and the State judicial proceeding had been terminated.

254.    Corporate Defendants' publication characterizing Plaintiff as an "alleged sister-beater" in 2007, which makes clear reference to the Plaintiff's 2002 Kansas Arrest, is not a fair, accurate and complete recitation of the official proceeding given that Plaintiff was adjudged by a Court of law as <u>not guilty</u> of assault.

255.    Corporate Defendants' publication characterizing Plaintiff as an "alleged sister-beater" in 2007, which makes clear reference to a 2002 Kansas Arrest, is not a fair, accurate and complete recitation of the public record given that Plaintiff was adjudged <u>not guilty</u> of assault by a Court of law in June 2003.

256.    Defendants' characterization of Plaintiff as a "sister-beater", regardless of whether Plaintiff was alleged to have physically assaulted his sister, conveys the false impression that Plaintiff is consistently or habitually involved in physically attacking his sister or sisters. Given that Plaintiff was never convicted of assaulting his sister, and given that all evidence in the public record demonstrates that Plaintiff never assaulted his sister in October 2002 (or any other time in his life), Defendants' characterization of Plaintiff as a "sister-beater" is particularly egregious and defamatory *per se*.

257. Corporate Defendants' untimely and spiteful characterization of Plaintiff as an "alleged sister-beater" in 2007, which makes reference to 2002 misdemeanor assault charge for which Plaintiff was never convicted, was not published by Defendants for justifiable ends.

258. The false and defamatory statements made by Defendants concerning Plaintiff's criminal arrest history do not qualify as a *bona fide* report of the official proceedings brought against Plaintiff in a court of justice.

259. Defendants' publication of the defamatory *per se* statements concerning Plaintiff's criminal arrest history do not provide a fair, accurate or complete summation of the official criminal proceeding brought by the State of Kansas against Plaintiff, nor do such statements convey a correct and just impression of the circumstances under which Plaintiff was arrested and charged, nor do they contain any reference to the dismissal of the charges.

260. Defendants' publication of the defamatory *per se* statements concerning Plaintiff's criminal arrest history constitute a one-sided, inaccurate account of the judicial proceedings so as to cause public contempt and ridicule for Plaintiff's reputation and character.

261. Defendants' false and defamatory statements *per se* are not a fair abridgment nor recitation of the criminal proceedings brought by the 2002 State of Kansas against Plaintiff.

262. The purpose of the fair reporting privilege is defeated because the false and defamatory statements concerning Plaintiff do not serve the public's interest of being informed of official actions or proceedings that are themselves public.

263. Defendants have repeatedly characterized Plaintiff, indeed summarized the core of Plaintiff's very existence, as a "degenerate".

264. Defendants' wholesale use of the phrase "degenerate Corey Clark" in three MTV News and VH1 News articles published by Defendants undeniably conveys to readers the message that

48

Plaintiff is a person who is possessed of low morals or character, who operates below the standard of conduct in society and who should be avoided at all costs. In short, use of the word "degenerate" to describe Corey Clark is defamatory *per se* and cannot be protected by the fair reporting privilege.

265. Defendants' false assertion of fact in the Toscano Article that Plaintiff was "disqualified from *American Idol* for lying about a hairy domestic dispute" is not protected by the Fair Reporting privilege because: (a) it does not accurately or fairly describe FOX's stated reason for disqualification from American Idol; (b) mischaracterizes the nature of the criminal charges brought against Plaintiff by the State of Kansas in 2002; and (c) imputes the commission of a crime to Plaintiff for which he was never convicted (much less charged).

266. According to the official press releases issued by FOX concerning Plaintiff's 2003 disqualification from *American Idol*, FOX never stated that Corey Clark was being disqualified for "lying", nor did FOX state that Corey Clark made false assertions about the nature or underlying facts surrounding the then-pending misdemeanor charges. Rather, FOX alleged in its press statements that Corey Clark had "failed to disclose" the existence of the criminal charges during Fox's background check process of contestants. In terms of defamatory impact of the statement, there is a substantial distinction between the act of making affirmative false statements about a criminal charge (i.e., lying about what happened the night of the arrest) and withholding confidential information from a prospective employer during the job application process.

267. Defendants' false statement that Plaintiff was involved in a "hairy domestic dispute" conveys the false impression to the reader that Plaintiff had been charged with a hazardous crime of domestic violence or sexual assault against his wife or girlfriend.

268. Corporate Defendants should know that the public regards allegations of "domestic abuse", "domestic violence" or "domestic disputes" as acts committed by a man against a woman with whom he maintains a sexual relationship and with whom he resides and maintains a position of

49

authority and control. A domestic violence charge connotes acts of harassment, intimidation, emotional abuse and/or sexual abuse. Plaintiff was not charged with any crime in 2002 that could fairly be labeled as a "hairy domestic dispute".

269. For purposes of defeating the Fair Reporting privilege, the misdemeanor charges brought by the State of Kansas against Corey Clark in December 2002 did <u>not</u> include any charges brought pursuant to the States' legislative codes governing domestic violence or domestic abuse, such as Kan. Stat. Ann. ¶ 22-2307.

## ABSENCE OF FAIR COMMENT AND CRITICISM PRIVILEGE

270. Defendants' publication of the false and defamatory statements of facts concerning Plaintiff are not shielded by the conditional privilege (and/or common law defense) of Fair Comment and Criticism.

271. Defendants' defamatory statement that describes Plaintiff as an "alleged sister-beater" is a false assertion of fact regarding criminal charges brought against Plaintiff by the State, and cannot be deemed to constitute a subjective expression of opinion.

272. Defendants' publication of the false and defamatory statements *per se* concerning Plaintiff's criminal arrest history were <u>not</u> a matter of legitimate public interest or concern at the time they were published.

273. Defendants' publication of the false and defamatory statements *per se* concerning Plaintiff's criminal arrest history were <u>not</u> newsworthy or relevant at the time they were published.

274. Defendants' statement that characterized Plaintiff as an "alleged sister-beater", as published by Defendants in May 2007 and February 2008, four to five years after Plaintiff's case was dismissed is not humane because Defendant Cantiello always omitted the fact (in *any* of his statements regarding Plaintiff) that Plaintiff had been exonerated by the State of any violent act in connection with his October 2002 arrest. Having been adjudicated not guilty in June 2003, then there can be no good

50

faith reason to raise the criminal allegations in May 2007 other than to impute Plaintiff with the commission of the crime.

275.    Having omitted the truthful disposition of the criminal charges brought against Plaintiff, Defendants' statement unfairly imputes Plaintiff with a violent crime against his own sister which he never committed.

276.    Defendants' statement that characterized Plaintiff as an "alleged sister-beater" was made for an improper reason, that is, to expose Plaintiff to ridicule, contempt and disgrace years after he had been exonerated by the State for a charge that never should have been brought in the first instance.

277.    At the time Defendants initially published their defamatory statements, Plaintiff had departed from the national public spotlight and there was no current event, occasion or circumstances that would have warranted a public comment concerning Plaintiff's 2002 criminal arrest history.

278.    There is no reasonable relationship between the false and defamatory statements *per se* concerning Plaintiff and the public interest to be informed or educated about Plaintiff's past criminal arrest history.

279.    The false and defamatory statements *per se* concerning Plaintiff and his 2002 criminal arrest history were not made by Defendants in good faith but were instead motivated by ill-will, spite and with intent to harm Plaintiff's reputation and character in the community.  The intent exhibited by Defendant Cantiello was to perpetuate a false and indelible legacy designed to cast Plaintiff and his heirs in the worst possible esteem before the community.

FAULT / INTENT OF DEFENDANTS

280.    Defendants' false and defamatory statements concerning Plaintiff were published to third parties with actual malice.

281.    Defendants' false and defamatory statements concerning Plaintiff were published to third parties with knowledge of their falsity.

51

282. Defendants' false and defamatory statements concerning Plaintiff were published to third parties with reckless disregard for the truth or falsity of the statements.

283. Defendants' false and defamatory statements concerning Plaintiff were published to third parties with Defendants' failure to ascertain the truth of the defamatory statements of fact concerning Plaintiff.

284. Defendants' publication of the false and defamatory statements omitted key facts surrounding the charges and disposition of a criminal proceeding instituted by the State and blatantly mischaracterized the nature and disposition of such proceeding.

285. Defendants knew or should have known that the defamatory statements concerning Plaintiff were false and had a tendency to lead to the defamation of Plaintiff's reputation and character.

286. Plaintiff can establish by clear and convincing evidence that Defendants published false and defamatory statements of fact concerning Plaintiff with serious doubts as to the veracity of the assertions.

287. Plaintiff can establish by clear and convincing evidence that Defendants published false and defamatory statements of fact concerning Plaintiff with a high degree of awareness that such statements could be proven false.

## CAUSATION AND DAMAGES

288. Plaintiff has suffered – and will continue to suffer – injuries to his reputation and his character as a direct, natural and proximate result of the false and defamatory statements published by Defendants.

289. As a direct, natural and proximate result of Defendants' false and defamatory statements, Plaintiff has suffered from *continuing* exposure to hatred, contempt, ridicule, aversion and disgrace in the community.

52

290. Plaintiff has suffered "special harm" as a direct, natural and proximate result of Defendants' continuing course of making false and defamatory statements *per se* concerning Plaintiff.

291. The special harm to Plaintiff's reputation and character is particularly shocking to the conscience here where the false and defamatory statements *per se* are being disseminated worldwide by the Corporate Defendants to over 700 million households that have immediate access to the defamatory statements.

292. The special harm to Plaintiff's reputation and character is particularly severe in this case where the defamatory statements are being disseminated worldwide by Corporate Defendants on a daily basis through a source - MTV News - which operates as a veritable authority, cultural arbiter and significant voice within the same trade of business as Corey Clark: the music industry.

293. The unwarranted contempt, hatred and ridicule with which MTV News regards Corey Clark exceeds any bounds of moral decency or fair play, particularly where the true facts underlying Corey Clark's 2003 disqualification from *American Idol* are readily available to any news reporter who cares to learn the Truth and possesses a modicum of common sense.

294. The "special harm" to Plaintiff's reputation and character is particularly egregious here where the defamatory statements are being disseminated worldwide on a daily basis by a source and an internationally-recognized brand, "MTV News," that has held itself out to the public as a traditional *news* media outlet built on credible news reporting, presented in an objective manner by formally trained and professionally experienced journalists of trade in a context that is readily distinguishable from unsubstantiated celebrity gossip, scandal-mongering and sensationalist innuendo.

295. The venerable history of MTV News and the 2003-2005 articles concerning Corey Clark makes clear that criticism, false attribution, gossip and one-sided opinions were deliberately excluded from the presentation of *any* MTV News article published by the Corporate Defendants.

296.     As a direct, natural and proximate result of Defendants' false and defamatory statements Plaintiff has sustained "special harm"` in the form of economic damages to his business, trade, occupation and/or profession as a professional musician, singer, songwriter and performer because Defendants false and defamatory statements have inhibited Plaintiff's ability to procure paid work in his profession that is commensurate with his recognized talent and abilities.

297.     As a direct, natural and proximate result of Defendants' false and defamatory statements, Plaintiff has sustained pecuniary loss relating to his business, trade, occupation and/or profession because of the amount of time, work and money he has had to expend in defending his reputation and character, explaining the true facts underlying the claims set forth herein, monitoring Defendants on-going wrongful conduct, and interacting with the Corporate Defendants' representatives in his futile attempts to procure a retraction.

298.     As a direct, natural and proximate result of Defendants' false and defamatory statements *per se*, Plaintiff has suffered monetary damages and loss of income due to the decline of his business, loss of good will and injury to business reputation.

299.     Plaintiff has in good faith demanded from the Defendants a retraction of the false and defamatory statements.  Despite his efforts, Defendants have failed to comply with Plaintiff's demand.

### COUNT II.  Commercial Disparagement / Trade Libel Against All Defendants.

300.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 297 of this Verified Complaint and each and every part thereof with the same force and effect as though set out at length herein.

301.     Defendants published false statements of fact to third parties that are harmful to the business and property interests of Plaintiff.

302.     The Toscano Article portrays Corey Clark and his intellectual property as a singer/songwriter in the least favorable, most injurious light possible, including instructions to MTV

54

News readers not to buy Plaintiff's music. The Toscano Article was not presented as an album review or an editorial, nor was it presented as a satire or caricature piece. It was presented as "news" within the context of the MTV News Room.

303.    Defendant Cantiello's campaign to disparage Plaintiff's music as a part of his "news" coverage is also evidenced by an article written by Cantiello entitled "We're Live-Blogging The "American Idol" Jacksonville Auditions!," first published in the MTV News Room on January 27, 2009, located at http://newsroom.mtv.com/2009/01/27/were-live-blogging-the-american-idol-jacksonville-auditions/. Cantiello wrote: "Idol likes to keep major label skeletons (especially gems like Joanna's '06 debut) in the very back of their closet, buried underneath all the old Corey Clark CDs . . ."

304.    On February 8, 2010, Cantiello also stated, when asked, on his Twitter account, located at http://twitter.com/jambajim/statuses/8844561112, that his favorite song on the Corey Clark CD was "Paulatics" (a song which references Plaintiff's relationship with Paula Abdul); and then stated "the other 16 songs are irrelevant."

305.    Corey Clark's 2005 debut album only contains 15 tracks.

306.    Defendant Cantiello disparaged the quality and viability of Corey Clark's musical works on MTV News even though he had never bothered to listen to Corey Clark's Album.

307.    Defendants' statements about Plaintiff's musical works were made to influence the public not to buy Plaintiff's goods or contract for his services.

308.    Defendants' statements were made to cast doubt upon the quality of Plaintiff's goods and services.

309.    Defendants acted with actual malice through the publication of the false statements concerning Plaintiff with intent to harm the interests of the Plaintiff.

310.    It was reasonably foreseeable to Defendants that the false and defamatory statements concerning Plaintiff's musical works would lead to the harm of Plaintiff's business or property interests.

55

311.     Defendants knew that the statements concerning Plaintiff were false.

312.     Defendants acted in reckless disregard of the disparaging statements' truth or falsity.

313.     The Corporate Defendants permitted and/or authorized Defendant Cantiello to instruct readers of MTV News not to buy Plaintiff's music.  Cantiello's statements in the Toscano Article regarding the boycott of Plaintiff's commercial music releases are not relevant to the subject matter of the article.

314.     As a direct and proximate result of Defendants' disparaging remarks about the quality of Plaintiff's goods and services, Defendant has sustained special damages from the actual loss of CD sales and digital downloads of his musical works, loss of business opportunity in procuring employment commensurate with this talent as a professional singer and songwriter, and loss of good will and social mobility in the music industry.

## COUNT III.  Misappropriation of Image or Likeness – Right of Publicity Against All Defendants.

315.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 325 of this Verified Complaint and each and every part thereof with the same force and effect as though set out at length herein.

316.     Tenn Code Ann. § 47-25-1103(a) recognizes that an individual has "a property right in the use of his name, photograph or likeness in any medium in any manner."

317.     Plaintiff possesses an individual property right of publicity in the use of his name and likeness "Corey Clark", in any medium and in any manner.

318.     Plaintiff's right of publicity has economic value and is capable of being freely assigned, licensable and can be the subject of a contract.  The economic benefits of Plaintiff's right of publicity can be realized and enjoyed by the Plaintiff at his sole discretion.

319.     Tenn. Code Ann. § 47-25-1104(a) & (b)(1) provide that the right is exclusive in the individual or his heirs and assigns until it is terminated.

56

320.   Plaintiff's right of publicity to the name "Corey Clark" may be commercially exploited by the Plaintiff on an exclusive basis and Plaintiff possesses the right to prevent others from capitalizing on his name without his consent.

321.   Plaintiff has made financial and time commitments with respect to his investment in his career as a singer, songwriter, musician and performer.

322.   As a valuable capital asset, Plaintiff's right of publicity has survivability and its benefits are descendible to the executors, assigns, heirs, or devisees of Plaintiff.

323.   Plaintiff is a living person.

324.   Defendants have, without Plaintiff's consent or authority, used his name "Corey Clark" in written statements published on MTV.com and VH1.com, in order to exploit the commercial interests of Corporate Defendants.

325.   Upon information and belief, the purported "news articles" written by Cantiello and published by the Corporate Defendants which contain the false and defamatory statements about Plaintiff are *advertisements in disguise* for the television show *American Idol* and are not designed to be informative but are instead published as a means to promote viewership of the television show.

326.   As a direct and proximate result of Defendants' unauthorized use of Corey Clark's name and likeness in all articles written by Defendant Cantiello on the Corporate Defendants' website, Plaintiff has sustained damages, including special damages, as outlined more fully in the Prayer for Relief.

## COUNT IV.  Trade Malpractice / Negligence Against Corporate Defendants Viacom and MTV Networks.

327.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 337 of this Verified Complaint and each and every part thereof with the same force and effect as though set out at length herein.

328.   Corporate Defendants are engaged in the business of news reporting and the trade of journalism.

57

329. News Correspondents retained by the Corporate Defendants are engaged in the business of news reporting and the trade of journalism.

330. Corporate Defendants purport to offer verifiable factual information to the public under the trade banners of "MTV News" and "VH1 News".

331. As practitioners of the journalistic trade, Defendants have a duty of care to adhere to the professional standards established by authorities within the field of journalism.

332. Corporate Defendants have an obligation to the public to report information categorized for the public as "News" and, consistent with this obligation, are charged with a duty of care to: (a) verify the truth of the factual statements reported by journalists under its supervision and control; (b) maintain an independence and disinterestedness from the subjects and subject matter of the news articles; (c) keep the news reported comprehensive and proportional; (d) seek comments from both sides of the news story when the factual accounts are in dispute and to report with attribution; (e) disclose the source of the statements being preferred; (f) employ an independent fact-checker to verify the statement of facts written by the author prior to publication.

333. Corporate Defendants have a duty of care to report facts about Plaintiff in a manner consistent with the obligations set forth in the preceding paragraph.

334. Corporate Defendants have a duty of care to the individual subjects of its news reports to present information in a manner that is objective, reliable and accurate, consistent with the well-established standards and practices that govern the dissemination of news.

335. Corporate Defendants have breached their duty of care to Plaintiff through the publication of Jim Cantiello's articles on MTV News and VH1 News concerning Plaintiff.

336. Cantiello's statements concerning Plaintiff in the articles published by the Corporate Defendants and the context in which they are disseminated constitute an extreme departure from the standards of professional journalism.

337.    As a direct and proximate result of Corporate Defendants' breach of their duty of care, Plaintiff has sustained damages, including special damages, in the amounts outlined in the Prayer for Relief.

## COUNT V.  False Light Invasion of Privacy Against All Defendants.

338.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 312 of this Verified Complaint and each and every part thereof with the same force and effect as though set out at length herein.

339.    As an individual citizen of the State of Tennessee, Plaintiff is vested with inalienable rights, including the right to be left alone, the right to liberty and the right to privacy.

340.    Defendant Cantiello has written and the Corporate Defendants have published statements on MTV.com and VH1.com concerning the Plaintiff.

341.    Defendants have published statements that convey misleading information or create an erroneous factual inference that makes the Plaintiff out before the public to be something he is not and thereby casts the Plaintiff in a highly offensive false light to the reasonable person.

342.    Defendants knew or should have known that their defamatory statements concerning Plaintiff were false.

343.    Defendants acted with reckless disregard to the falsity of the publicized statements.

344.    Defendants' publication of disproportionately negative statements in 2006-2011 relating to Corey Clark's special relationship with Paula Abdul during the second season of *American Idol* are a serious, unreasonable, unwarranted and offensive interference with Plaintiff's right to privacy.

## COUNT VI.  Injurious Falsehood Against All Defendants.

345.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 319 of this Verified Complaint and each and every part thereof with the same force and effect as though set out at length herein.

346.    Defendants published false statements of fact to third parties that are harmful to the business and property interests of Plaintiff.

347.    Defendants acted with actual malice through the publication of the false statements concerning Plaintiff with intent to harm the interests of the Plaintiff.

348.    Defendants knew that the statements concerning Plaintiff were false.

349.    Defendants acted in reckless disregard of the statements' truth or falsity.

350.    It was reasonably foreseeable to Defendants that the false and defamatory statements concerning Plaintiff would lead to the harm of Plaintiff's business or property interests.

351.    As a direct and proximate result of Defendants' misconduct, Plaintiff has been damaged in amounts outlined in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand:

1.    that process be issued requiring Defendants to answer this Verified Complaint within the time required by law;

2.    that Defendants be permanently enjoined from publishing any false and defamatory statements about Plaintiff relating to his conduct in his trade or profession, and from publishing any disparaging statements about Plaintiff relating to his conduct in his trade or profession, including but not limited to the deletion from the Corporate Defendants' websites of any reference to Corey Clark's name or likeness without his express authorized consent;

3.    that Plaintiff be awarded compensatory damages of five-hundred thousand dollars [$500,000.00] to remedy Plaintiff for harm to his reputation, character and integrity in the community;

4.    that Plaintiff be awarded general damages of five million dollars [$5,000,000.00] to remedy Plaintiff for his mental anguish, suffering, humiliation, stress, anxiety, embarrassment, loss of well-being, loss of enjoyment of life and impairment of social mobility;

5.    that Plaintiff be awarded special damages of two-hundred and fifty thousand [$250,000.00] to remedy Plaintiff for his actual out-of-pocket pecuniary losses, diminution of business profits relating to the sale of Plaintiff's goods and services, costs of enforcing his legal rights as against Defendants, damages to his federal intellectual property rights and state constitutional rights;

6.    that Plaintiff be awarded aggravated damages of one and one-half million dollars [$1,500,000.00] for Defendants' deliberate misconduct, bad faith and ill-will vis-à-vis Plaintiff;

7.    that Plaintiff be awarded exemplary damages of twenty-five million dollars [$25,000,000.00], or any fair and reasonable amount to be determined at a trial by jury, to deter American media organizations similarly situated to Corporate Defendants from decomposing the content of its News divisions into senseless tabloid fodder;

8.    that Plaintiff be awarded punitive damages of ten million dollars [$10,000,000.00] to punish Corporate Defendants for abusing their constitutional right of free press, abandoning the core functions of journalistic objectivity and reliability, masquerading biased reports as news content, employing a non-journalist to perform the apparent role of a journalist; failing to treat with respect and civility the inherent value of a citizen's name, abusing the constitutional privilege of fair comment and criticism; and substantially deviating from the journalistic canons of ethics adopted by the *American Society of Newspaper Editors and the Society of Professional Journalists.*

9.      that Plaintiff be awarded costs, fees and disbursements of this action;

10.     that Plaintiff be awarded reasonable attorneys' fees of this action; and

11.     that Plaintiff be awarded such other, additional, or general relief as is considered necessary and proper as the interests of justice may require;

12.     For a jury to hear and render judgment on those causes of action so triable.

Respectfully Submitted,

**JH FREEMAN LAW**

James H. Freeman
1515 Broadway, 11th Floor
New York, NY 10036
Telephone: (212) 931-8535
Facsimile: (212)
james@jhfreemanlaw.com

**CHAFFIN & BURNSED, PLLC**

John Ray Clemmons (TN # 25907)
The Fridrich Building, First Floor
2909 Poston Avenue
Nashville, Tennessee 37203
Telephone: (615) 460-7478
Facsimile: (615) 460-7484
jclemmons@chaffinburnsed.com

*Attorneys for Plaintiff Corey D. Clark*

62

## VERIFICATION

STATE OF TENNESSEE    )
   )
COUNTY OF TENNESSEE   )

I, **Corey Delaney Clark**, the undersigned, am the Plaintiff in this action, Clark vs. Viacom

International, Inc., *et al.*   I have read the annexed Complaint and personally know the

contents thereof and the same are true to the best of my knowledge, except those matters

therein which are stated to be alleged on information and belief and to those matters, I

believe them in good faith to be true.


I affirm the foregoing statements are true under penalties of perjury.


Dated: Nashville, Tennessee

July 5, 2012


Corey D. Clark


Notary Public

JON J. HALL
STATE
OF
TENNESSEE
NOTARY
PUBLIC
DAVIDSON COUNTY

My Commission Expires July 6, 2015