**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **COREY D. CLARK and JAERED ANDREWS,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **Civil No. 3:12-cv-0675** |
| **v.** | ) ) | **JUDGE HAYNES** |
| **VIACOM INTERNATIONAL INC., VIACOM MEDIA NETWORKS, VIACOM INC., and JIM CANTIELLO,** | ) ) ) ) ) | **Jury Demand** |
| **Defendants.** | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS SECOND AMENDED COMPLAINT**</u>

Defendants offer the following Memorandum of Law in support of their Motion to Dismiss Plaintiffs' Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

<u>**Introduction**</u>

Plaintiffs Corey Clark and Jaered Andrews were once contestants on the nationally televised singing competition *American Idol*. Each claims that Defendants libeled him.[1] Clark claims that Defendants libeled him by publishing the following five (5) statements:

- A July 6, 2011, statement that Clark was "[d]isqualified [from *American Idol*] for lying about a hairy domestic dispute";

---

[1] Plaintiffs allege that Viacom International Inc. and Viacom Inc. "own[] and operate[] the internet properties *MTV News*, *VH1 News* and *MTV International*" and that the alleged libelous statements were published in news articles on these sites by news correspondent, Jim Cantiello. (2nd Am. Comp., Doc. No. 106 ¶¶ 12, 18, 23). It is not clear what role Plaintiffs contend was played by Viacom Media Networks.

- A July 6, 2011, statement that, "Believe it or not, the controversial Clark…was once a part of the Universal Music Group (which includes Interscope Records). His 2005 self-titled album…boasted a Black Eyed Peas cameo and production by one of the top producers at that time, Scott Storch. Seriously";

- A July 6, 2011, statement that, "[N]obody cared about his album….I say it's because his music was laughably bad. Look up 'Paulatics' to see what I mean. Actually, don't";

- A July 6, 2011, statement that, "Camile is yet another 9th placer who scored a brief deal with the Universal family. Strangely, like Corey Clark, she worked with the Black Eyed Peas, too….Alas, with no tall tales about sleeping with an Idol judge, even less people cared about her brief music career than Corey's"; and

- A March 4, 2012, statement that, "During season two, Corey Clark was booted for concealing his arrest record on battery charges."

Andrews claims that Defendants libeled him by publishing the following statement:

- A March 14, 2012, statement that he "was sent home [from *American Idol*] over undisclosed assault charges."

Defendants move to dismiss the Second Amended Complaint in its entirety because each of these alleged libelous statements is non-defamatory as a matter of law. As set forth more fully on pages 15 to 23, *infra*, each of the alleged libelous statements is true or substantially true based upon the allegations in Plaintiffs' Second Amended Complaint and exhibits; a comment upon or characterization of previously reported facts, including facts set forth in Plaintiffs' Second Amended Complaint and exhibits; a subjective opinion of the author that is incapable of objective verification and non-defamatory as a matter of constitutional law; and/or not sufficiently of and concerning Plaintiffs to be actionable. Plaintiffs' other causes of action, which essentially re-state their defamation claims, are barred by the applicable statutes of limitation or otherwise fail to state a claim. Accordingly, Defendants respectfully submit that Plaintiffs' Second Amended Complaint should be dismissed in its entirety with prejudice.

## Legal Standard

A civil complaint survives a motion to dismiss only if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Courie v. Alcoa Wheel & Forged Prods.,* 577 F.3d 625, 629 (6th Cir. 2009). The Court need not accept as true legal conclusions or unwarranted factual inferences. *See Gregory v. Shelby Cnty.,* 220 F.3d 433, 446 (6th Cir. 2000). Although the complaint need not contain detailed factual allegations, the plaintiff must provide the grounds for his entitlement to relief and this "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). The factual allegations supplied must be enough to show a plausible right to relief. *Id.* at 555–61.

In determining whether a complaint sets forth a plausible claim, the court may consider not only the allegations in the complaint but also any exhibits attached thereto. *S & M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604, 611 (M.D. Tenn. 2005) (*citing* Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes"). In addition, the court "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005). The Sixth Circuit has taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001).

In the instant case, all of the material allegations relied upon by Defendants are taken directly from Plaintiffs' Second Amended Complaint or the exhibits attached thereto. Certain

3

allegations from previous iterations of the Complaint have also been included where necessary to provide context.[2]

**Plaintiffs' Allegations**

## I.    Corey Clark.

In late October and early November 2002, Clark auditioned in Nashville, Tennessee for the Second Season of *American Idol*, a televised singing competition.  (*See* 2nd Am. Compl., Doc. No. 106 ¶ 80).  On November 4, 2002, Clark was selected as one of 234 singers nationwide to compete in the "Hollywood Rounds" of *American Idol*.  (*Id.*)[3]  Clark was subsequently selected as one of 32 semi-finalists.  (*Id.* ¶ 100).

### A.  The Smoking Gun article that precipitated Clark's disqualification from *American Idol*.

On March 31, 2003, however, the Smoking Gun website – a media outlet unrelated to Defendants – published a story that Clark had been arrested on October 12, 2002, by police in Topeka, Kansas.  (*Id.* ¶ 123).  One of the charges resulting from this arrest was that Clark had "physically assault[ed] his younger sister."  (*Id.* ¶ 73).  The Smoking Gun article – attached as an exhibit to the Second Amended Complaint – contains the following relevant statements:

- An "American Idol" finalist is facing trial next month on charges <u>he assaulted his teenage sister</u> and battled with cops while resisting arrest.

- Corey Clark, 22, was arrested last October following <u>a disturbance in his family's Topeka, Kansas home</u>.  Neighbors called police after hearing a girl yelling <u>inside the Clark residence</u> on SW 33rd Terrace.  One witness told TSG that while he

---

[2] Plaintiffs' Second Amended Complaint is the fifth Complaint proffered in this case.  The four previous iterations of the Complaint are: the original Complaint (Doc. No. 1); the Amended Complaint (Doc. No. 20); a Proposed Second Amended Complaint (Doc. No. 55), a second Proposed Second Amended Complaint (Doc. No. 104), and the Second Amended Complaint (Doc. No. 106).  Plaintiff has added or deleted allegations to each of these iterations of the Complaint.
[3] To be clear, Defendants were not (and are not) involved in the production of *American Idol*.

4

heard loud noises coming from the home, "what finally caught my attention was a lot of screaming. Then I knew somebody was getting hurt."

- [Clark] was booked into the Shawnee County jail and charged with a variety of misdemeanors, including battery on four law enforcement officers, <u>battery on his sister</u>, and endangering a child. After three days in custody, Clark was released on bond, a condition of which prohibited him from contacting his sister.

- The complaint, which modified the original police counts, charged Clark with resisting arrest, <u>battery upon his sister</u>, and criminal restraint.

- TSG will venture a guess that Fox knew about Clark's rubber checks, but were unaware <u>that he had been popped for battering his little sister</u> (if true, not exactly "Idol" behavior).

(Exhibit 7 to 2nd Am. Compl., Doc. No. 106-7 at pages 42-44, Smoking Gun article) (emphasis added).

### B. The police and court records regarding Clark's arrest.

The facts in the Smoking Gun article are supported by the police and court records that Clark himself attached as exhibits to the Second Amended Complaint. For instance, according to the official Arrest Report, officers were called to the scene to investigate a "domestic dispute." (Exhibit 4 to 2nd Am. Compl., Doc. No. 106-4 at page 20, Arrest Report). An arresting officer reported that this "domestic dispute" involved an argument between Clark and his sister, Alecia, during which "Cory [sic] slapped Alecia on the face…" and "put his arm around Alecia's neck and proceeded to wrestle her to the ground" and "continued being physically abusive to Alecia and yelled at her." (Exhibit 5 to 2nd Am. Compl., Doc. No. 106-5 at page 50, Supplemental Offense Report of Officer Soden). Another arresting officer reported that Clark's older sister, Ajia, "came to the case residence because her sister Alicia Clark [] had called her and said their older brother Corey D. Clark [] was hitting her" and that "next-door neighbor DeAndre Anderson [] advised that he could hear the two fighting next door and could hear the female yelling 'stop hitting me, let me go.'" (*Id.* at page 53, Supplemental Offense Report of Officer

5

Harden).   A third arresting officer reported that one of the complainants "heard a disturbance…that sounded as if an assault and battery had been occurring" and that "the disturbance had been occurring between Corey and Alicia."   (*Id*. at page 56, Supplemental Offense Report of Officer Evans).  A fourth arresting officer stated that, "I was also told that the victim stated she was struck and held down by her older brother Cory [sic] Clark."  (*Id*. at page 79, Supplemental Offense Report of Officer Grayson).

Based upon these facts, the State of Kansas charged Clark on December 4, 2002, with three (3) misdemeanors: Obstructing Legal Process or Official Duty; Battery – Physical Contact; and Criminal Restraint.  Clark entered a plea deal on June 12, 2003, in which he was found guilty of Obstructing Legal Process or Official Duty; the other charges against him were dismissed.  (Exhibit 4 to 2nd Am. Compl., Doc. No. 106-4 at pages 30, 76-79, Criminal Docket, Consent to Enter Plea).

### C.  Clark's failure to disclose his arrest and charges in the *American Idol* background questionnaire.

Three (3) weeks after being charged with these three (3) misdemeanors – and just over two (2) months after his arrest – Clark completed and signed the *American Idol* Participant Background Questionnaire Form (the "Questionnaire") on December 24, 2002.  (Exhibit 5 to 2nd Am. Compl., Doc. No. 106-5 at pages 3, 30, Questionnaire).   By signing the Questionnaire, Clark expressly recognized that "any discrepancies, misstatements, omissions, and/or falsifications [in the Questionnaire] will be cause for disqualification."  (*Id*. at page 30).  The Questionnaire specifically asked, "Have you ever been detained, arrested, or convicted of a felony or misdemeanor offense either as a juvenile or an adult?"  (2nd Am. Compl., Doc. No. 106 ¶ 111).  Despite having just been arrested and charged with three (3) misdemeanors, Clark untruthfully responded "No."  (Exhibit 5 to 2nd Am. Compl., Doc. No. 106-5 at pages 3, 30,

Questionnaire).  Clark then falsely certified that "all statements made in this Background

Investigation Form are true accurate."  (*Id*. at page 30).

### D.  Prior statements and media reports regarding Clark's disqualification from *American Idol*.

Shortly after the Smoking Gun's initial March 31, 2003, report regarding Clark's criminal

background, the Smoking Gun posted an update that "[Clark] was removed from [*American Idol*]

by Fox television and the show's producer."  (Exhibit 7 to 2nd Am. Compl., Doc. No. 106-7 at

page 46, Smoking Gun article).  With respect to Clark's disqualification, the Fox television

network ("Fox") and *American Idol* producers issued a press release (quoted in the Second

Amended Complaint), which states, in part:

> Due to events that have recently come to light, American Idol participant Corey
> Clark has been removed from the contest….Corey withheld information about a
> prior arrest which, had it been known, might have affected his participation in the
> show.  Due to his failure to disclose, compounded by an error in a police report
> which misspelled Corey's name, the incident was not discovered during the
> background check.  The producers and network feel that Corey's behavior
> warrants his disqualification.

(2nd Am. Compl. Doc. No. 106 ¶ 130).  (emphasis added).  Three years after Clark's

disqualification, on May 16, 2005, *American Idol* producers issued another statement, again

confirming that "Corey Clark was removed from the show for failing to disclose his criminal

arrest history…."  (Compl., Doc. No. 1 ¶ 88; Am. Compl., Doc. No. 20 ¶ 320; Prop. 2nd Am.

Compl., Doc. 55 ¶ 349) (ellipsis in original) (emphasis added).

*American Idol*'s May 2005 statement was issued in response to Clark's claims that,

during production of Season Two, he had engaged in a sexual relationship with *American Idol*

judge Paula Abdul.  (2nd Am. Compl., Doc. No. 106 ¶ 135).  *American Idol* subsequently

commissioned two well-respected law firms to conduct an independent investigation into these

claims.  The investigators concluded that, "Mr. Clark's allegations that he and Ms. Abdul had a

7

sexual relationship have not been substantiated by any corroborating evidence or witnesses, including those provided by Mr. Clark, and Ms. Abdul expressly denies that any such relationship ever existed." (Exhibit 6 to 2nd Am. Compl., Doc. No. 106-6 at page 97, Press Release).

At or around the time of Clark's allegations regarding Abdul, MTV News correspondent Gil Kaufman published several articles about Clark. (Exhibit 2 to 2nd Am. Compl., Doc. No. 106-2 at pages 42-43, 46-47, 49-50, Kaufman articles). These articles are attached as exhibits to the Second Amended Complaint and, according to Plaintiff, contain "the objective set of facts" regarding his disqualification from *American Idol*. (*Id*. at pages 42-43, 46-47, 49-50; Am. Compl., Doc. No. 20 ¶ 330).[4] Among the "objective facts" reported by Kaufman were the following:

- "Clark was booted from 'Idol' when producers learned that he had been charged with resisting arrest and misdemeanor assault against his sister," (Exhibit 2 to 2nd Am. Compl., Doc. No. 106-2 at page 42);

- "Clark, 24, was booted from 'Idol' for not revealing to judges that he was facing criminal charges of battery and resisting arrest following an alleged assault on his sister," (*id*. at page 46); and

- "Clark was booted from the show for failing to fully disclose his arrest record, which included charges of resisting arrest and assault on his sister," (*id*. at page 50).

Countless other well-respected news organizations reported these same "objective facts," including the following – all of which Clark himself attached as exhibits to the Second Amended Complaint:

- *The Tennessean*, May 14, 2003 – "Contestant Corey Clark was bounced after thesmokinggun.com reported he was arrested on charges he assaulted his younger

---

[4] The allegations in Clark's Amended Complaint are matters of public record and are, therefore, appropriate for consideration on a Motion to Dismiss his Second Amended Complaint. *See Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005).

sister….Producers said Clark never revealed the arrest to American Idol," (Exhibit 8 to 2nd Am. Compl., Doc. No. 106-8 at page 64);

- *The Boston Herald*, March 24, 2005 – "Finalist Corey Clark got himself disqualified because he faced assault charges," (*id*. at page 96);

- *The Cleveland Plain Dealer*, April 2, 2005 – "In 2003, finalist Corey Clark lost his slot because he was awaiting trial on assault charges. He withheld information about the arrest that, had it been known, might have affected his participation on the show, Fox said at the time," (*id*. at page 100);

- *The Chicago Sun Times*, February 13, 2007 – "[Corey Clark] was disqualified in 2003 when a prior arrest was revealed. He faced charges of assaulting his sister and police and pleaded no contest to obstructing the legal process," (*id*. at page 104); and

- *People Magazine*, July 9, 2007 – "He [Clark] was dismissed from *Idol* for not revealing a past arrest," (Exhibit 6 to 2nd Am. Compl., Doc. No. 106-6 at pages 165-66).

Clark has now asserted a cause of action for Libel (Count I) against Defendants for reporting these same objective facts along with certain other statements that Defendants contend are non-defamatory as a matter of law. In addition to his Libel claim, Clark alleges the following causes of action: False Light Invasion of Privacy (Count II); Commercial Disparagement under the Tennessee Consumer Protection Act (Count III); Misappropriation of Image or Likeness – Right of Publicity (Count IV); and Negligent Hiring and Retention (Count V). Each of these claims is barred in large part by the statute of limitations and otherwise fails to state a claim upon which relief can be granted.

## II.     Jaered N. Andrews.

In late October and early November 2002, Andrews auditioned for the Second Season of *American Idol*. (*See* 2nd Am. Compl., Doc. No. 106 ¶¶ 200-01). Andrews was awarded a "Golden Ticket" to compete in *American Idol's* Hollywood rounds. (*Id*. ¶ 201). On or about December 13, 2002, Andrews was chosen by the *American Idol* judges as one of the 32 Semi-

Finalist contestants for Season Two. (*Id.* ¶ 209). Andrews, however, was informed on January 31, 2003, that he had been disqualified from *American Idol*. (*Id.* ¶ 222). According to the Second Amended Complaint, Andrews was not immediately provided with a reason for his disqualification. (*Id.*) It was widely reported by several third party media organizations, however, that Andrews had been disqualified when *American Idol* learned of his involvement in a November 2002 bar fight that ended with the death of Thomas Blakely. (*See* Exhibit 8 to 2nd Am. Compl., Doc. No. 106-8). On February 27, 2003, Andrews was formally charged with assault in connection with the incident. (2nd Am. Compl., Doc. No. 106 ¶ 228). Numerous reputable media organizations – relying on, among other things, Andrews' own public statements – reported the fact that Andrews was disqualified for his involvement in the November 2002 fight, including the following (all of which Andrews attached as exhibits to the Second Amended Complaint):

- *The Sharon Herald*, March 1, 2003 – "Andrews said he believed his involvement [in Blakely's death] was the reason he was kicked off 'American Idol,'" (Exhibit 8 to 2nd Am. Compl., Doc. No. 106-8 at page 12);

- *The New York Post*, March 5, 2003 – "I [Andrews] would speculate it was because I'm in an investigation," (*id.* at page 35);

- *The Associated Press*, March 6, 2003 – "Andrews told WKBN-TV…last month that he thought he was dropped from the show for witnessing Blakely's death," (*id.* at page 48);

- *AP Online*, March 14, 2003 – "Andrews…maintains he was kicked off because of the fight," (*id.* at page 52);

- *The Pittsburgh Post-Gazette*, March 15, 2003 – "Andrews…maintains he was kicked off because of the bar incident," (*id.* at page 54);

- *The Wichita Eagle*, March 4, 2003 – "Now we know why 'American Idol' really disqualified semifinalist Jaered Andrews in January….Andrews was arrested for assaulting an Ohio man in a bar fight," (*id.* at page 35);

10

- *The Tennessean*, May 14, 2003 – "Contestant Jaered Andrews was booted after police eventually arrested him in connection with a bar brawl that left a 39-year-old man dead," (*id*. at page 64);

- *The New York Post*, February 5, 2004 – "Last season…Jaered Andrews made it to the finals, but was booted when officials learned he'd been arrested on assault charges connected to a bar fight in which a man died," (*id*. at page 89);

- *The New York Daily News*, February 28, 2004 – "Jaered Andrews was dropped when he was charged with assault in a bar fight, which ended in a man dying," (*id*. at page 93);

- *The Boston Herald*, March 24, 2005 – "Jaered Andrews was knocked out for his involvement in a fatal fight," (*id*. at page 97);

- *The Cleveland Plain Dealer*, April 2, 2005 – "In 2002, semifinalist Jaered Andrews was disqualified for not telling producers about an assault arrest," (*id*. at page 100); and

- *The Chicago Sun Times*, February 13, 2007 – "[Jaered Andrews] was ejected in 2003 after he got in a fistfight in a case where a guy died," (*id*. at page 104).

Andrews has now asserted a claim of Libel (Count VI) against Defendants for reporting this same fact, *i.e.*, that he was disqualified from *American Idol* in connection with the November 2002 fight that left Blakely dead. In addition to his Libel claim, Andrews alleges a claim for False Light Invasion of Privacy (Count VII), which is barred in large part by the statute of limitations and otherwise fails as a matter of law.

## Legal Argument

### I.    The supposed libelous statements are non-defamatory as a matter of law.

#### A.  Tennessee defamation law mandates dismissal of Plaintiffs' libel claims.

The libel claims asserted by Plaintiffs are non-defamatory as a matter of law. As a threshold matter in a defamation case, the court must determine as a matter of law whether the statement is capable of being understood by readers as defamatory. *Stilts v. Globe Int'l, Inc.*, 950 F. Supp. 220, 223 (M.D. Tenn. 1995), *aff'd*, 91 F.3d 144 (6th Cir. 1996). The statement must

11

reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule, thereby comprising a serious threat to the plaintiff's reputation. *Id.* (internal citation and quotation marks omitted). In making this determination, the Court is not bound by the plaintiff's interpretation of the words used but looks to the words themselves. *Id.*

In addition, because the damaging words must be factually false, if the statement in question is true or substantially true, it is not actionable. *Id.* The literal truth of every word need not be established; rather, it is sufficient to demonstrate that the "sting" or "gist" of the statement is substantially true. *Id.* The statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced. *Id.* Further, because a statement must be factually false in order to be actionable, comments upon or characterizations of published facts are not in themselves actionable. *Stones River Motors, Inc. v. Mid-S. Pub. Co.*, 651 S.W.2d 713, 720 (Tenn. Ct. App. 1983). If the published facts being commented upon are true and non-defamatory, the writer's comments upon them are not actionable, even though they are stated in strong or abusive terms. *Id.*

Likewise, subjective assertions are not actionable. *Stilts*, 950 F. Supp. at 223. The United States Supreme Court has recognized constitutional protection for "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual," further noting the difference between "a subjective assertion" and "an articulation of an objectively verifiable event." *Id.* (*quoting Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20 (1990)). Accordingly, statements utilizing words in a loose, figurative manner or as imaginative expression, such as "rhetorical hyperbole," are not properly the subject of a defamation action. *Stilts*, 950 F. Supp. at 223 (*quoting Milkovich*, 497 U.S. at 17). Similarly, the connotation resulting from a statement

12

must be "sufficiently factual to be susceptible of being proved true or false" in order to be actionable. *Stilts*, 950 F. Supp. at 223 (*quoting Milkovich*, 497 U.S. at 21).

In the case of *Stilts v. Globe Int'l, Inc.* – in which the plaintiff's defamation claims were dismissed on summary judgment – this Court addressed libel claims similar to those in the instant case. 950 F. Supp. 220. The controversy in *Stilts* involved an article published in the Globe periodical about Ken Stilts, the former business manager of the country music duo "The Judds" (comprised of Naomi and Wynonna Judd). *Id*. The title of the article read as follows: "Wynonna and Naomi: We were ripped off for $20 million!," with a subsequent sub-caption stating that "they blame ex-business manager, say pals." *Id*.

The article described the Judds' accusation that Stilts had exploited his business relationship with them, to his financial advantage and their financial detriment. *Id*. Stilts claimed that the article insinuated he had stolen money from the Judds, which impugned his honesty and integrity and damaged his reputation and career as a manager of professional musical artists. *Id*. Stilts specifically identified the following statements in the article as defamatory:

(1) Stilts "ripped off [the Judds] for $20 Million!";
(2) Stilts "couldn't be trusted";
(3) Stilts was "bleeding [the Judds] dry" and then "dump[ed] them";
(4) Stilts "wound up with nearly $20 MILLION of the money [the Judds] earned, and they were left with only $5 million";
(5) Stilts "threw a pile of papers on the table and yelled: 'You don't get it, do you? I don't care what you do anymore—we're through!'";
(6) Stilts "pocketed most of what [the Judds] had earned";
(7) Stilts "owns practically everything [the Judds] worked so hard for—even their cars"; and
(8) Stilts "had the [Judds'] cars picked up from their driveways!"

*Id*. at 221-22.

The defendants alleged that the article provided a substantially true and accurate account of a controversy between the Judds and Stilts and was, therefore, not actionable. *Id*. at 222. The defendants also contended that the published statements were all either opinion or characterizing statements, substantially true or not defamatory and, therefore, did not constitute libel. *Id*.

After reviewing the law on defamation, the Court concluded that the Globe article was not defamatory, but "simply recount[ed] the existence of an actual controversy between the Judds and Mr. Stilts." *Id*. at 223. With respect to the headline "Wynonna and Naomi: We were ripped off for $20 million…they blame ex-business manager, say pals," the court held that the language used was "imaginative expression" or "rhetorical hyperbole," and could not reasonably be construed as stating actual facts about Stilts. *Id*. The Court observed that this language was "subjective, imprecise and subject to numerous interpretations" and "simply incapable of verification or refutation by means of objective proof." *Id*. at 224. According to the Court, "a reader would understand the words for their obvious meaning, namely, that the Judds blame their former business manager for having lost money." *Id*.

The Court also concluded that "it is impossible to believe that any reader could construe the text of the article as defamatory." *Id*. Quoting the *Milkovich* case from the U.S. Supreme Court, the Court noted that "[t]he language employed within the text is the very 'sort of loose, figurative or hyperbolic language which would negate the impression that the writer was seriously maintaining that' the plaintiff committed the misdeeds in question." *Id*. As with the headline of the article, the Court held that the alleged defamatory text was "incapable of objective verification" and could not "reasonably be interpreted as stating actual facts about Mr. Stilts." *Id*. The Court concluded by holding that "the article cannot reasonably be construed as

14

stating that Mr. Stilts did *in fact* exploit his business relationship with the Judds or engage in any financial wrongdoing." *Id*. (emphasis in original).

Finally, the Court found that even though "the precise accuracy of several specific details set forth in the article is disputed….the 'gist' or substance of the article is accurate." *Id*. at 225. There existed a real dispute between the Judds and Stilts, in which the Judds alleged, among other things, that Stilts "had grossly abused his fiduciary role" and had engaged in "misappropriation of funds." *Id*. at 224-25. As such, the Court concluded that "the article in question is substantially true and that no reasonable jury could conclude otherwise." *Id*. at 225.

### B. The alleged libelous statements regarding Clark are non-defamatory as a matter of law.

In the instant case, Clark has identified five (5) alleged libelous statements. Just like the statements in *Stilts*, however, these alleged libelous statements are non-defamatory as a matter of law. Each of the statements is either true or substantially true; a comment upon or characterization of previously reported facts; a subjective assertion incapable of objective verification; or not "of and concerning" Plaintiff. As a matter of law, the alleged libelous statements are incapable of being understood by readers as defamatory and Clark's libel claim should be dismissed for failure to state a claim upon which relief can be granted.

### 1. "Disqualified for lying about a hairy domestic dispute."

Clark contends he was defamed by the July 6, 2011, statement that he "was disqualified [from *American Idol*] for lying about a hairy domestic dispute." (Exhibit 2 to 2nd Am. Compl., Doc. No. 106-2 at page 3, No. 23). This statement, however, is non-defamatory as a matter of law on at least two (2) independent grounds.

15

### a. True or substantially true.

Initially, the statement is incapable of a defamatory meaning because it is true or substantially true. According to Clark himself, Fox and *American Idol* producers stated that Clark was disqualified because he "withheld information about a prior arrest," (Doc. No. 106, 2nd Am. Compl. ¶ 130), and "fail[ed] to disclose his criminal arrest history," (Compl., Doc. No. 1 ¶ 88; Am. Compl., Doc. No. 20 ¶ 320; Prop. 2nd Am. Compl., Doc. 55 ¶ 349). Clark corroborates these statements by admitting in his Second Amended Complaint that he lied on his *American Idol* application about having been arrested. (2nd Am. Compl., Doc. No. 106 ¶ 111; Exhibit 5 to 2nd Am. Compl., Doc. No. 106-5 at pages 3, 30, Questionnaire).

The statement that Clark was "disqualified for lying about a hairy domestic dispute" is also true or substantially true according to the articles written by Gil Kaufman on MTV.com in April and May 2005 – which Clark attached as exhibits to his Second Amended Complaint – and which, according to Clark, contain "the objective set of facts" regarding his disqualification from *American Idol*. (Compl., Doc. No. 1 ¶ 135; Am. Compl., Doc. No. 20 ¶ 330; Exhibit 2 to 2nd Am. Compl., Doc. No. 106-2 at pages 42-43, 46-47, 49-50). Among the "objective set of facts" reported by Kaufman are the following:

- "Clark was booted from 'Idol' when producers learned that he had been charged with resisting arrest and misdemeanor assault against his sister";

- "Clark, 24, was booted from 'Idol' for not revealing to judges that he was facing criminal charges of battery and resisting arrest following an alleged assault on his sister"; and

- "Clark was booted from the show for failing to fully disclose his arrest record, which included charges of resisting arrest and assault on his sister."

(Exhibit 2 to 2nd Am. Compl., Doc. No. 106-2 at pages 42-43, 46-47, 49-50). It is also true or substantially true that the arrest about which Clark lied involved a "domestic dispute."[5] The Arrest Report itself describes the incident as a "domestic dispute." (Exhibit 4 to 2nd Am. Compl., Doc. No. 106-4 at page 20, Arrest Report). Clark was charged with having "physically assault[ed] his younger sister" and the alleged assault occurred "inside the Clark residence" and involved "a disturbance in [Clark's] family's Topeka, Kansas home." (2nd Am. Compl., Doc. No. 106 ¶ 73; Exhibit 7 to 2nd Am. Compl., Doc. No. 106-7 at pages 42-44, Smoking Gun article). The statement that Clark was disqualified for lying about a domestic dispute is true and non-defamatory. To the extent the statement is not literally true, the "gist" of the statement is true and cannot support a cause of action for libel. *See Stilts*, 950 F. Supp. at 225.[6]

### b. Comment upon or characterization of previously reported facts.

In addition to being true or substantially true, this statement is also a "comment[] upon or characterization[] of published facts," and, thus, not actionable. *See Stones River Motors, Inc. v. Mid-S. Pub. Co.*, 651 S.W.2d at 720. Specifically, the statement is a comment upon or characterization of Fox's public statements – quoted by Clark in his various iterations of the Complaint – that he was disqualified because he "withheld information about a prior arrest" and "fail[ed] to disclose his criminal arrest history." (Compl., Doc. No. 1 ¶ 88; Am. Compl., Doc. No. 20 ¶ 320; Prop. 2nd Am. Compl., Doc. 55 ¶ 349; 2nd Am. Compl., Doc. No. 106 ¶ 130). The statement is also a comment upon or characterization of "the objective set of facts" reported in

---

[5] The author's assertion that the "domestic dispute" was "hairy" is incapable of objective verification and constitutes mere rhetorical hyperbole; it is, therefore, non defamatory. *See Stilts*, 950 F. Supp. at 223-24.
[6] Further, any non-literal portion constitutes "imaginative expression" or "rhetorical hyperbole," just like the headline in the *Stilts* case "Wynonna and Naomi: We were ripped off for $20 million." *Stilts*, 950 F. Supp. at 223.

the Kaufman articles and identified on pages 8 and 16, *supra*. Finally, the statement is a comment upon or characterization of the facts concerning Clark's disqualification as reported by countless reputable news organizations, including those facts reported by *The Tennessean*, *The Boston Herald*, *The Cleveland Plain Dealer*, *The Chicago Sun Times*, and *People Magazine* and set forth on pages 8 to 9, *supra*.

> **2. "Believe it or not, the controversial Clark…was once a part of the Universal Music Group (which includes Interscope Records). His 2005 self-titled album…boasted a Black Eyed Peas cameo and production by one of the top producers at that time, Scott Storch. Seriously."**

While claiming that he was defamed by this July 6, 2011, statement, (Exhibit 2 to 2nd Am. Compl., Doc. No. 106-2 at pages 3-4, No. 23), Clark has not identified any part of the statement that is false. *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005). He has thus failed to allege an essential element of a claim for defamation and, on that basis alone, this statement is non-defamatory as a matter of law.

In addition, the statement is constitutionally protected commentary that is non-defamatory. While Clark offers no explanation in his Second Amended Complaint for how this statement is defamatory, in a previous iteration of the Complaint he contends that the "sarcastic phrase" "Believe it or not….Seriously" transforms this true statement into one that is capable of defamatory meaning because it "conveys the clear impression that Clark did not have the musical talent to work with professional musicians and top-notch record labels." (Proposed 2nd Am. Compl., Doc. No. 55 ¶ 616).[7] Even if there were any legal merit to this position – and there is not – the phrase "Believe it or not….Seriously" is mere "rhetorical hyperbole" or "imaginative expression" that is constitutionally protected and not properly the subject of a defamation action.

---

[7] The Court is not bound by Plaintiff's interpretation of the words used, but looks to the words themselves. *Stilts*, 950 F. Supp. at 223.

*Stilts*, 950 F. Supp. at 223 (*quoting Milkovich*, 497 U.S. at 17).  Likewise, any comment upon Plaintiff's musical talent is constitutionally protected because it embodies the writer's subjective opinion and cannot reasonably be interpreted as stating actual facts about Plaintiff.  *Stilts*, 950 F. Supp. at 223 (*quoting Milkovich,* 497 U.S. at 20).  To hold otherwise would permit every artist who received a bad review to sue for defamation.  *See*, *e.g.*, *Hammer v. Trendl*, 2003 WL 21466686, *3 (E.D.N.Y. Jan. 18, 2003) ("[B]ecause the defendant's reviews are merely his personal opinion about the plaintiff's books, the Court finds that the plaintiff fails to prove a likelihood of success on the merits with respect to his defamation claim") (copy attached as Exhibit 1).

> ### 3.  "[N]obody cared about his album….I say it's because his music was laughably bad.  Look up 'Paulatics' to see what I mean. Actually, don't."

This July 6, 2011, statement, (Exhibit 2 to 2nd Am. Compl., Doc. No. 106-2 at page 4, No. 24), constitutes an opinion regarding Plaintiff's music and is non-actionable as a matter of law.  The phrase "his music was laughably bad" is the subjective commentary or opinion of the writer, which cannot be proven true or false.  Such statements are non-defamatory as a matter of law.  *See*, *e.g.*, *Hammer v. Trendl*, 2003 WL 21466686, *3 (E.D.N.Y. Jan. 18, 2003) ("[T]he Court finds that the statements contained in the defendant's book reviews are expressions of pure opinion and are therefore protected").  As one commentator has noted: "[B]ecause opinion can be proved neither true nor false and a plaintiff must prove falsity to succeed, it remains nonactionable as a matter of constitutional law…. Defamation is actionable only if false; opinions cannot be false; opinions are not actionable."  Sack on Defamation: Libel, Slander, and Related Problems § 4:2.4.  To the extent Plaintiff contends the phrase "nobody cared about his album" is defamatory, this phrase constitutes protected "rhetorical hyperbole," loose, figurative

19

language, or "lusty and imaginative expression" – speech that although literally containing assertions of fact is intended to express only points of view.  *Id.*  An average reader would understand this phrase to convey the writer's subjective dislike of Plaintiff's music, rather than the literal fact that not one single person cared about Plaintiff's music.  This statement of editorial opinion is not actionable as defamation.

> 4. **"Camile is yet another 9th placer who scored a brief deal with the Universal family.  Strangely, like Corey Clark, she worked with the Black Eyed Peas, too….Alas, with no tall tales about sleeping with an Idol judge, even less people cared about her brief music career than Corey's."**

Clark's claim that he was defamed by this July 6, 2011, statement, (Exhibit 2 to 2nd Am. Compl., Doc. No. 106-2 at page 4, No. 25), fails because the statement is not "of and concerning" Clark.  As one commentator has noted, "In order to prevail in defamation litigation, a plaintiff must establish that it was he or she who was libeled or slandered: that the allegedly defamatory communication was about ('of and concerning') him or her."  Sack on Defamation: Libel, Slander, and Related Problems § 2:9.  *See also Steele v. Ritz*, 2009 WL 4825183, *3 (Tenn. Ct. App. Dec. 16, 2009) ("A plaintiff may not support a claim for defamation based on an alleged defamatory statement made 'of and concerning' a third party") (copy attached as Exhibit 2).  The above statement is "of and concerning" former *American Idol* contestant Camile Velasco, not Clark.  In fact, Clark is mentioned only in passing.  The statement notes that Velasco worked with the Black Eyed Peas; that Velasco had no tall tales about sleeping with an Idol judge; and that Velasco's brief music career was unremarkable.  This statement is not "of and concerning" Clark and it cannot support his claim for libel.

To the extent any of the tangential references to Clark are sufficiently "of and concerning" him to support a claim for defamation, the references are non-defamatory as a

matter of law. Again, Clark offers no explanation in the Second Amended Complaint for how this statement could be considered defamatory. In a previous iteration of the Complaint, however, Clark contended that the phrase "tall tales about sleeping with an Idol judge" "conveys the clear impression that [he] was misrepresenting the nature of his actual relationship with Paula Abdul." (Proposed 2nd Am. Compl., Doc. No. 55 ¶ 616). A "tall tale," however, is not equivalent to a misrepresentation, but rather connotes "[a]n entertaining and often oral account of a real or fictitious occurrence."[8] The phrase "tall tale" – to the extent it is even "of and concerning" Clark – merely suggests that Clark's allegations of a sexual affair with Abdul were colorful and entertaining, rather than false. The other tangential reference to Clark in this statement (*i.e.*, "less people cared about her brief music career than Corey's") constitutes protected "rhetorical hyperbole," loose, figurative language, or "lusty and imaginative expression" – speech that although literally containing assertions of fact is intended to express only points of view. Sack on Defamation: Libel, Slander, and Related Problems § 4:2.4. This statement cannot be reasonably construed as having defamed Clark.

Finally, to the extent the phrase "tall tale" suggests that Clark's allegation of a sexual relationship with Abdul lacked evidentiary support, it is simply a comment upon or characterization of the factual findings of the independent investigators hired by *American Idol*, who concluded that: "Mr. Clark's allegations that he and Ms. Abdul had a sexual relationship have not been substantiated by any corroborating evidence or witnesses, including those provided by Mr. Clark, and Ms. Abdul expressly denies that any such relationship ever existed." (Exhibit 6 to 2nd Am. Compl., Doc. No. 106-6 at page 97, Press Release). Such a comment upon

---

[8] http://www.answers.com/topic/tall-tale (last visited February 7, 2014).

or characterization of previously reported facts is not actionable as defamation.  *See Stones River Motors, Inc. v. Mid-S. Pub. Co.*, 651 S.W.2d at 720.

### 5.  "During season two, Corey Clark was booted for concealing his arrest record on battery charges."

Clark contends he was defamed by the March 14, 2012, statement that he "was booted for concealing his arrest record on battery charges."  (Exhibit 2 to 2nd Am. Compl., Doc. No. 106-2 at page 4, No. 26).  This statement, however, is incapable of a defamatory meaning because it is true or substantially true for the reasons set forth on pages 16 to 17, *supra*.   In addition to being true or substantially true, this statement is also a "comment[] upon or characterization[] of published facts," and, thus, not actionable for the reasons set forth on pages 17 to 18, *supra*.   *See Stones River Motors, Inc. v. Mid-S. Pub. Co.*, 651 S.W.2d at 720.   This statement is non-defamatory as a matter of law.

### B.  The alleged libelous statement regarding Andrews is non-defamatory as a matter of law.

Andrews identifies only one alleged libelous statement published within the one-year statute of limitations, namely that he "was sent home [from *American Idol*] over undisclosed assault charges."  (Exhibit 3 to 2nd Am. Compl., Doc. No. 106-3 at page 2, No. 11).   This statement, however, is non-defamatory as a matter of law because it is true or substantially true according to Andrews' own statements contained in the exhibits to the Second Amended Complaint, including the following: "Andrews said he believed his involvement [in Blakely's death] was the reason he was kicked off 'American Idol,'" (Exhibit 8 to 2nd Am. Compl., Doc. No. 106-8 at page 12); "I [Andrews] would speculate it was because I'm in an investigation," (*id.* at page 35); "Andrews told WKBN-TV…last month that he thought he was dropped from the show for witnessing Blakely's death," (*id.* at page 48); "Andrews…maintains he was kicked off

because of the fight," (*id*. at page 52); and "Andrews…maintains he was kicked off because of the bar incident," (*id*. at page 52). Moreover, the alleged libelous statement is non-defamatory because it is a "comment[] upon or characterization[] of published facts," *see Stones River Motors, Inc. v. Mid-S. Pub. Co.*, 651 S.W.2d at 720, including not only Andrews' own public statements but also the facts as reported by the numerous well-respected news organizations set forth on pages 10 to 11, *supra*. The defamatory statements alleged by Clark and Andrews are non-defamatory as a matter of law and their claims for libel should be dismissed.

## II. Clark's claim for violation of the Tennessee Consumer Protection Act should be dismissed and Defendants should be awarded their attorney's fees.

Clark's TCPA claim is without legal or factual merit and fails to state a claim for relief. Under the TCPA, a party may recover for certain unfair and deceptive acts or practices, including "[d]isparaging the goods, services or business of another by false or misleading representations of fact." Tenn. Code Ann. § 47-18-104(b)(8) (emphasis added). Courts have consistently held that claims brought pursuant to the TCPA must satisfy a heightened pleading standard. *Sony/ATV Music Pub. LLC v. D.J. Miller Music Distributors, Inc.*, 2011 WL 4729811, *11 (M.D. Tenn. Oct. 7, 2011) (citing numerous cases and applying heightened pleading standard to claim under Tenn. Code Ann. § 47-18-104(b)(8)) (copy attached as Exhibit 3). Moreover, a TCPA action "shall be brought within one (1) year from a person's discovery of the unlawful act or practice." Tenn. Code Ann. § 47-18-110. Finally, the TCPA permits a defendant to recover his attorney's fees and costs "upon [a] finding that the action is frivolous, <u>without legal or factual merit</u>, or brought for the purpose of harassment." Tenn. Code Ann. § 47-18-109(e)(2) (emphasis added).

Under Tennessee law, "[s]tatements of opinion, even when disparaging, are not punishable under the [TCPA]." *Ellipsis, Inc. v. The Color Works, Inc.*, 2006 WL 1207589, *14

23

(W.D. Tenn. May 4, 2006) (copy attached as Exhibit 4).  For instance, in *River Park Hosp., Inc. v. BlueCross BlueShield of Tennessee, Inc.*, a managed care organization, BlueCare, asserted a counterclaim against the plaintiff hospital alleging that the hospital had committed disparagement in violation of Tennessee Code Annotated § 47–18–104(b)(8).  173 S.W.3d 43, 50 (Tenn. Ct. App. 2002).  BlueCare's claim for disparagement was based on letters sent by the hospital to three obstetricians, stating that BlueCare was unresponsive to the hospital's needs; that it was "pushing patients to other counties for their care"; and that BlueCare's efforts to move obstetrics patients to in-network hospitals "shows Blue Cross's lack of concern for the healthcare needs of our patients in Warren County."  *Id*. at 61.  While noting that Tenn. Code Ann. § 47–18–104(b) prohibits "disparaging the goods, services or business of another by false or misleading representations of fact," the Court of Appeals concluded "that the comments made in the letters were opinions and, thus, did not constitute 'false or misleading representations of fact.'"  *Id*.  The Court of Appeals affirmed the trial court's rejection of BlueCare's TCPA claim.  *Id*.

Like the statements at issue in *River Park*, the alleged disparaging statements identified by Clark are opinions that do not constitute "false or misleading representations of fact."  Clark claims that a July 6, 2011, article authored by Defendant Cantiello "portrays Corey Clark's CD in the least favorable light possible" and "also instructs MTV News readers not to buy Plaintiff Clark's music, despite the fact that the writer had *never heard the* CD."  (2nd Am. Compl., Doc. No. 106 ¶¶ 294-95).  This allegation, however, fails to identify a "false or misleading representation of fact."  The Cantiello article merely contains the author's subjective opinion that Clark's music is bad.  Such an opinion, even if disparaging, is not actionable under the TCPA.

24

*Ellipsis, Inc. v. The Color Works, Inc.*, 2006 WL 1207589, *14.[9]   Clark also contends that Cantiello disparaged his goods, services, or business with a January 27, 2009, statement that "Idol likes to keep major label skeletons (especially gems like Joanna's '06 debut) in the very back of their closet, buried underneath all the old Corey Clark CDs…"  (2nd Am. Compl., Doc. No. 106 ¶ 297) (ellipsis in original).  This statement is clearly barred by the TCPA's one-year statute of limitations as it was published well over one year before Clark filed his original Complaint on July 5, 2012.  (*See* Compl., Doc. No. 1).  Moreover, this allegation fails to identify a "false or misleading representation of fact," as no reasonable consumer would construe Cantiello's statement as anything but Cantiello's personal, subjective opinion regarding Clark's musical works.  Clark has failed to state a claim under the TCPA and, respectfully, this count should be dismissed.  Moreover, Clark's TCPA claim is "without legal or factual merit," Tenn. Code Ann. § 47-18-109(e)(2), and Defendants respectfully submit that they are entitled to recover their attorney's fees incurred in responding to the claim.

### III.   Clark's right of publicity claim is barred by the statute of limitations and otherwise fails as a matter of law.

Clark contends that Defendants have violated his right of publicity under Tennessee's Personal Rights Protection Act of 1984 (the "Act") because they "have, without [Clark's] consent or authority, used his name 'Corey Clark' in written statements published on MTV.com and VH1.com, in order to exploit the[ir] commercial interests."  (2nd Am. Compl., Doc. No. 106 ¶ 320).  A right of publicity claim, however, is subject to a one-year statute of limitations. *Gibbons v. Schwartz-Nobel*, 928 S.W.2d 922, 926 (Tenn. Ct. App. 1996). To the extent Clark

---

[9] Clark baseless contention that Cantiello "instructed" readers not to by his album is legally irrelevant.  (2nd Am. Compl., Doc. No. 106 ¶ 295).  Even assuming the truth of the allegation, an "instruction" is not a representation of fact and is not actionable under the TCPA.  *See* Tenn. Code Ann. § 47-18-104(b)(8).

purports to rely on any statements published more than one year before his Complaint was filed, his right of publicity claim is barred by the one-year statute of limitations.

Regardless, Clark's claim that Defendants violated his right of publicity by using his name in a news article fails as a matter of law. Pursuant to the Act, "[e]very individual has a property right in the use of that person's name, photograph, or likeness in any medium in any manner." Tenn. Code Ann. § 47-25-1103(a). This property right "is clearly directed at preventing the use of another's name or likeness, without consent, <u>for advertising purposes</u>." *Apple Corps Ltd. v. A.D.P.R., Inc.*, 843 F. Supp. 342, 348 (M.D. Tenn. 1993) (emphasis added). *See also* Tenn. Code Ann. § 47-25-1105(a) (creating a civil cause of action against "[a]ny person who knowingly uses or infringes upon the use of another individual's name…for <u>purposes of advertising</u> products, merchandise, goods, or services.…") (emphasis added). Thus, under the Act, "[i]t is deemed a fair use and no violation of an individual's rights shall be found…if the use of a name, photograph, or likeness is in connection with any news, public affairs, or sports broadcast or account." Tenn. Code Ann. § 47-25-1107(a). As noted by the Fifth Circuit:

> Courts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a literary work, motion picture, news or entertainment story. Only the use of an individual's identity in advertising infringes on the persona.

*Matthews v. Wozencraft*, 15 F.3d 432, 439 (5th Cir. 1994). Clark's right of publicity claim fails because Defendants simply used his name in connection with a news or entertainment story. *See* Tenn. Code Ann. § 47-25-1107(a).

Clark attempts to skirt this rule by claiming that Cantiello's articles are "*advertisements in disguise* for the television show American Idol." (2nd Am. Compl., Doc. No. 106 ¶ 323) (emphasis in original). A leading treatise has summarized the "advertisement in disguise" concept as follows:

26

> An unauthorized use of identity in a format that is facially a "news story" might be actionable as an advertisement in disguise. Often mentioned in dictum, the concept has only rarely resulted in a finding of liability for invasion of privacy or infringement of publicity rights.

2 Rights of Publicity and Privacy § 8:100 (2d ed.) This treatise further observed that "courts have almost always held that a use which arguably qualifies as a 'story' is in fact nothing more than that, and is constitutionally immunized as conveying information to the public." *Id.* at § 8:101. Defendants' use of Clark's name was in connection with a news or entertainment story and there is no basis to invoke the legally tenuous "advertisement in disguise" theory.

Moreover, Clark's "advertisement in disguise" theory is nonsensical because *American Idol*, as Plaintiffs' Second Amended Complaint acknowledges, is broadcast by Fox Broadcasting Company (a subsidiary of News Corporation, Inc.) (2nd Am. Compl., Doc. No. 106 at page 4). Thus, not only is *American Idol* not broadcast on one of Defendants' networks, it is broadcast on a network owned by a rival company. Plaintiff's contention that Defendants would be advertising – in disguise or otherwise – to promote *American Idol* does not merit serious discussion.[10]

### IV. Plaintiff's claim for negligent hiring and retention fails to allege a sufficient nexus between his injury and Cantiello's alleged unfitness.

Plaintiffs' Second Amended Complaint alleges that Defendants "breached their duty of care to Plaintiff through the hiring and retention of Jim Cantiello" because (presumably)

---

[10] Clark's Second Amended Complaint also claims that the "advertisement in disguise" theory is based upon the bald assertion that "Defendant Cantiello received additional material benefits from Original Defamers AIP/FOX." (2nd Am. Compl., Doc. No. 106 ¶ 322). Even assuming the truth of this allegation, however, the advertisement in disguise theory still fails because the use of Clark's name in Cantiello's articles is clearly related to the content of those articles (*i.e.*, former contestants on *American Idol*) and, thus, cannot as a matter of law be considered "a disguised advertisement for the sale of goods or services." *See Rogers v. Grimaldi*, 875 F.2d 994, 1004-05 (2d Cir. 1989) ("Here…the title 'Ginger and Fred' is clearly related to the content of the movie and is not a disguised advertisement for the sale of goods or services or a collateral commercial product").

Defendants knew, or should have known, Defendant Cantiello would defame Plaintiff when they hired him or continued to employ him. (2nd Am. Compl., Doc. No. 106 ¶ 335). A plaintiff in Tennessee may recover for negligent hiring or retention only if he establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness for the job. *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008). While Tennessee courts have not addressed a claim of negligent hiring or retention in the context of a defamation claim against a media defendant, the Supreme Court of Illinois addressed such a claim in the case of *Van Horne v. Muller*, 185 Ill. 2d 299 (1998) (copy attached as Exhibit 5).

In that case, former professional football player Keith Van Horne sued radio deejay Matthew "Mancow" Muller for allegedly defaming him during a radio broadcast. *Id*. at 302. Van Horne also sued WRCX Radio, the radio station employing Muller, and Evergreen Media Corporation, the owner of the radio station, for negligent hiring and retention of Muller. *Id*. at 302-03. Van Horne asserted that, before WRCX and Evergreen hired Muller, he had engaged in a course of conduct during his radio broadcasts that constituted "outrageous, irresponsible, reckless, and malicious behavior." *Id*. at 309. Van Horne further alleged that WRCX and Evergreen knew or should have known of Muller's prior conduct when they hired him; that they were negligent in hiring Muller with this knowledge; and that their negligence permitted Muller to defame Van Horne over the public airwaves. *Id*. at 309-310. Van Horne also claimed that, after Muller was hired, he continued to engage in "outrageous, irresponsible, reckless, malicious and illegal conduct in the course of his radio broadcasts." *Id*. at 310. As such, according to Van Horne, WRCX and Evergreen also committed negligence by retaining Muller as an employee and this negligence permitted Muller to defame Van Horne and cause him damages. *Id*.

28

The Illinois Supreme Court rejected this argument and held that Van Horne's "allegations in this case are insufficient to state a cause of action against WRCX or Evergreen for negligent hiring or retention of Muller." *Id*. at 316. The Court noted that, to state a cause of action for negligent hiring or retention, a plaintiff must show that the employer knew or should have known the employee was "unfit for the job so as to create a danger of harm to third persons." *Id*. at 313.[11] The unfitness alleged must be a particular unfitness that "rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position." *Id*. Thus, in the context of Van Horne's defamation claim, Van Horne was "required to plead facts showing that WRCX and Evergreen knew or should have known that Muller was likely to make false, defamatory statements during his radio show if he was hired." *Id*. None of Van Horne's allegations of Muller's pre-hiring and post-hiring conduct, however, involved his making false, defamatory statements. *Id*. at 313-14. As such, the Court concluded that Van Hornes' "allegations fail to establish a sufficient nexus between the particular alleged unfitness of Muller and the injury suffered by [Van Horne]." *Id*. at 313. The Court affirmed the trial court's dismissal of Van Horne's claims for negligent hiring and retention. *Id*. at 316.

Like Van Horne, Clark fails to allege a sufficient nexus between his injury and Cantiello's alleged unfitness. Plaintiffs' Second Amended Complaint fails to allege <u>any</u> pre-hiring conduct by Cantiello – much less any pre-hiring false and defamatory statements – that would have put Defendants on notice that, if hired, Cantiello was likely to publish false and

---

[11] The elements of a claim for negligent hiring or retention in Illinois are essentially the same as the elements for such a claim in Tennessee. *See Van Horne v. Muller*, 185 Ill. 2d at 310 ("Illinois law recognizes a cause of action against an employer for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons"); *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d at 717 ("A plaintiff in Tennessee may recover for negligent hiring, supervision or retention of an employee if he establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness for the job").

defamatory statements about Clark.[12]  Instead, Clark merely insinuates that because Cantiello "work[ed] his way up the ranks," (2nd Am Compl., Doc. No 106 ¶ 180), instead of obtaining a formal journalism degree, Defendants knew or should have known that he would make defamatory statements about Plaintiff.  Under *Van Horne v. Muller*, however, this nebulous allegation is insufficient to support the required nexus between Plaintiff's alleged injury and Cantiello's supposed unfitness.

Likewise, the Second Amended Complaint also fails to identify any post-hiring conduct by Cantiello that would render Defendants liable for negligent retention.  The only conceivable basis for such a claim would be that Defendants retained Cantiello after he wrote articles in which he referred to Clark as a "black sheep"; an "alleged sister beater"; a "degenerate"; and a "washout."  (*See* Exhibit 2 to 2nd Am. Compl., Doc. No. 106-2 at pages 1 to 3).  These statements, however, are non-defamatory as a matter of law.  The statement that Plaintiff is an "alleged sister beater" is true, even according to Clark's own Second Amended Complaint.  (2nd Am Compl., Doc. No. 106 ¶ 73).  The statements that Plaintiff is a "degenerate," a "black sheep," and a "washout" are, at worst, name-calling that is non-actionable as defamation.  Sack on Defamation: Libel, Slander, and Related Problems § 4:3.3.  Because these statements are non-defamatory as a matter of law, their publication could not reasonably have put Defendants on notice that Cantiello was likely to libel Clark.  As such, Clark has failed to allege the requisite

---

[12]  The Second Amended Complaint contains an allegation that a March 2007 statement by Cantiello about Clark put Defendants on notice before Cantiello was hired that he was likely to publish false or defamatory statements.  (2nd Am Compl., Doc. No. 106 ¶ 348).  This baseless statement, however, is contradicted by Clark's own exhibits to the Second Amended Complaint, which evidence that the statement – which is non-defamatory in the first place – was made while Cantiello was employed by MTV.com.  (*See* Exhibit 2 to 2nd Am. Compl., Doc. No. 106-2 at page 1, No. 3).

nexus between his injury and Cantiello's alleged unfitness and has failed to state a claim for negligent hiring or retention.

## V. Clark's false light invasion of privacy claim is barred by the statute of limitations and otherwise fails as a matter of law.

Clark and Andrews have asserted causes of action for False Light Invasion of Privacy based upon Defendants' publications of statements that allegedly "contain misleading information or create an erroneous factual inference" that place them "in a highly offensive false light to the reasonable person." (Doc. No. 106, 2nd Am. Compl. ¶¶ 276-77, 409-10). False light invasion of privacy claims are subject to the one-year statute of limitations that applies to libel. *W. v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 648 (Tenn. 2001). Clark has identified only five (5) statements published within the one-year statute of limitations while Andrews has identified only one (1). To the extent Plaintiffs' respective false light claims purport to rely on earlier statements, they are barred by the statute of limitations.

Moreover, Plaintiffs' respective false light claims fail because the statements Defendants published were true. Tennessee recognizes the tort of false light invasion of privacy as defined in Section 652E of the *Restatement (Second) of Torts* (1977) as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*W. v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 643-44 (Tenn. 2001). Comment a to Section 652E states that "it is essential to the rule stated in this Section that the matter published concerning the plaintiff is not true." As discussed on pages 15 to 22, *supra*, the supposedly objectionable statements with respect to Clark and Andrews are true or substantially true.

31

Therefore, just as these statements fail to support a cause of action for libel, they likewise fail to support a cause of action for false light invasion of privacy.

## Conclusion

For the foregoing reasons, Defendants respectfully submit that Plaintiffs have failed to state a claim upon which relief can be granted and move this Court to dismiss the Second Amended Complaint with prejudice.

Respectfully submitted,

/s Will Parsons
Jay S. Bowen, BPR No. 2649
Will Parsons, BPR No. 26519
BOWEN HAYES & KREISBERG, PLC
47 Music Square East
Nashville, TN 37203
Tel.: (615) 329-4440
Fax: (615) 329-4485
jay@bowenhayes.com
will@bowenhayes.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically and as such, was served on all counsel of record, via electronic service.

James H. Freeman
1515 Broadway, 11th Floor
New York, NY 10036
Facsimile: (212) 496-5870
Telephone: (212) 931-8535
james@jhfreemanlaw.com

Eugenia Grayer
306 Gay Street, Suite 206
Nashville, TN 37201
eugenia_grayer@yahoo.com

on this the 8th day of February, 2014.

/s Will Parsons