IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

COREY D. CLARK and                          )
JAERED N. ANDREWS,                          )
                                            )
        Plaintiffs,                         )           Case No. 3:12-0675
                                            )           Chief Judge Haynes
v.                                          )
                                            )
VIACOM INTERNATIONAL, INC.,                 )
VIACOM MEDIA NETWORKS,                      )
MTV NETWORKS ENTERPRISES,                   )
INC., JIM CANTIELLO and                     )
JOHN DOES 1-20,                             )
                                            )
        Defendants.                         )

## M E M O R A N D U M

Plaintiff, Corey D. Clark, a Tennessee citizen and original plaintiff, filed this action under

28 U.S.C. § 1332, the federal diversity statute, against the Defendants: Viacom International, Inc.,

Viacom Media Networks, MTV Networks Enterprises, foreign corporations, and Jim Cantiello, a

New York citizen. Plaintiff asserts claims for libel and defamation arising out of Defendants'

published statements about Plaintiff's disqualification from the *American Idol* television program.

In earlier proceedings, the Defendants filed a motion to dismiss (Docket Entry No. 16) that

the Court denied as moot when Plaintiff filed his first amended complaint adding allegations and

claims. When the Defendants renewed their motion to dismiss Plaintiff's first amended complaint,

Plaintiff moved to file a second amended complaint (Docket Entry No. 54) with additional Plaintiffs,

that the Court granted (Docket Entry No. 56). In the second amended complaint, Plaintiff Clark

added three plaintiffs including Jaered N. Andrews an Ohio citizen and asserted claims for false light

1

invasion of privacy; commercial disparagement; right of publicity; and negligent hiring or retention. The Defendants' filed a motion to reconsider the Order allowing the second amended complaint. (Docket Entry No. 58). The Court granted the motion to reconsider, setting aside the Order granting leave to file the second amended complaint (Docket Entry No. 68) and reinstated the Defendants' motion to dismiss. Id. Plaintiffs filed a motion for order altering allegedly erroneous statements of fact contained in Court's Memorandum (Docket Entry No. 75) and motion to vacate (Docket Entry No. 87). The Court granted the motion to reconsider, in part (Docket Entry No. 99) to allow Plaintiffs to file a revised second amended complaint (Docket Entry No. 104) with undisputed timely claims. The parties then stipulated to another revision of Plaintiffs' second amended complaint. (Docket Entry Nos. 105 and 106).

## A. Analysis of the Revised Second Amended Complaint[1]

In late October and early November 2002, Plaintiff auditioned in Nashville, Tennessee for the Second Season of *American Idol*, a nationally televised singing competition. (Docket Entry No. 106, Second Amended Complaint at ¶ 80). On November 4, 2002, Plaintiff was selected as one of 234 singers nationwide to compete in the "Hollywood Rounds" of *American Idol*. Id. Plaintiff was subsequently selected as one of 32 semi-finalists. Id. at ¶ 100.

On March 31, 2003, the Smoking Gun website published a story that Plaintiff Clark had been arrested on October 12, 2002, by police in Topeka, Kansas. Id. at ¶ 123. This Smoking Gun article is attached as an exhibit to the Second Amended Complaint and includes, in pertinent part:

- An "American Idol" finalist is facing trial next month on charges he assaulted

---

[1] This is actually Plaintiff's fourth amended complaint in this action. See Docket Entry Nos. 1, 20, 55, 104, 106, with the last three being referred to by Plaintiffs as their second amended complaint . Plaintiffs added or deleted allegations in each version.

2

his teenage sister and battled with cops while resisting arrest.

- Corey Clark, 22, was arrested last October following **a disturbance in his family's Topeka, Kansas home**. Neighbors called police after hearing a girl yelling **inside the Clark residence** on SW 33rd Terrace. One witness told TSG that while he heard loud noises coming from the home, "what finally caught my attention was a lot of screaming. Then I knew somebody was getting hurt."

- [Clark] was booked into the Shawnee County jail and charged with a variety of misdemeanors, including battery on four law enforcement officers, battery on his sister, and endangering a child. After three days in custody, Clark was released on bond, a condition of which prohibited him from contacting his sister.

- The complaint, which modified the original police counts, charged Clark with resisting arrest, **battery upon his sister**, and criminal restraint.

- TSG will venture a guess that Fox knew about Clark's rubber checks, but were unaware **that he had been popped for battering his little sister** (if true, not exactly "Idol" behavior).

(Docket Entry No. 106-7 at 42-44, Exhibit 7 to Second Amended Complaint, Smoking Gun article) (emphasis added).

Attached as exhibits to Plaintiffs' Second Amended Complaint is the official Arrest Report by responding officers who investigated a "domestic dispute." (Docket Entry No. 106-4 at 20, Arrest Report). One officer described this "domestic dispute" as an argument between Clark and his sister, Alecia, during which "Cor[e]y slapped Alecia on the face," "put his arm around Alecia's neck and proceeded to wrestle her to the ground" and "continued being physically abusive to Alecia and yelled at her." (Docket Entry No. 106-5 at 50, Supplemental Offense Report of Officer Soden). Another officer reported that Clark's older sister, Ajia, "came to the case residence because her sister Alicia Clark [] had called her and said their older brother Corey D. Clark [] was hitting her" and that "next-door neighbor DeAndre Anderson [] advised that he could hear the two fighting next door and

3

could hear the female yelling 'stop hitting me, let me go.'" Id. at 53, Supplemental Offense Report of Officer Harden. A third arresting officer cited one of the complainants who "heard a disturbance…that sounded as if an assault and battery had been occurring" and that "the disturbance had been occurring between Corey and Alicia." Id. at 56. In his Supplemental Offense Report, Officer Evans, a fourth officer stated that, "I was also told that the victim stated she was struck and held down by her older brother Cory [sic] Clark." Id. at 79, Supplemental Offense Report of Officer Grayson.

On December 4, 2002, the State of Kansas charged Plaintiff Clark with three (3) misdemeanors: Obstructing Legal Process or Official Duty; Battery – Physical Contact; and Criminal Restraint. On June 12, 2003, Plaintiff Clark entered a plea agreement pleading guilty of Obstructing Legal Process or Official Duty, but with the other charges were dismissed. (Docket Entry No. 106-4 at 30, 76-79, Exhibit 4 to Second Amended Complaint, Criminal Docket, Consent to Enter Plea).

On December 24, 2002, three (3) weeks after Kansas charges were filed and two (2) months after his arrest, Plaintiff Clark completed and signed the *American Idol* Participant Background Questionnaire Form (the "Questionnaire"). (Docket Entry No. 106-5 at 3, 30). By signing the Questionnaire, Plaintiff Clark expressly recognized that "any discrepancies, misstatements, omissions, and/or falsifications [in the Questionnaire] will be cause for disqualification." Id. at 30. The Questionnaire specifically asked, "Have you ever been detained, arrested, or convicted of a felony or misdemeanor offense either as a juvenile or an adult?" (Docket Entry No. 106, Second Amended Complaint at ¶ 111). Plaintiff Clark responded "No." (Docket Entry No. 106-5 at 3, 30, Questionnaire). Clark then certified that "all statements made in this Background Investigation Form are true and complete." Id. at 30.

4

The Smoking Gun website later posted an update that "[Clark] was removed from [*American Idol*] by Fox television and the show's producer." (Docket Entry No. 106-7 at 46, Smoking Gun article). The Fox television network and *American Idol* producers issued a press release that stated, in part:

> Due to events that have recently come to light, American Idol participant Corey Clark has been removed from the contest....**Corey withheld information about a prior arrest** which, had it been known, might have affected his participation in the show. **Due to his failure to disclose**, compounded by an error in a police report which misspelled Corey's name, the incident was not discovered during the background check. The producers and network feel that Corey's behavior warrants his disqualification.

(Docket Entry No. 106, Second Amended Complaint at ¶ 130) (emphasis added). On May 16, 2005, three years after Plaintiff's disqualification, *American Idol* producers issued another statement, confirming that "Corey Clark was removed from the show for failing to disclose his criminal arrest history...." (Docket Entry No. 1, Complaint at ¶ 88; Docket Entry No. 20 Amended Complaint, at ¶ 320; Docket Entry No. 55, Prop. Second Amended Complaint, at ¶ 349) (ellipsis in original) (emphasis added).[2]

*American Idol*'s May 2005 statement also responded to Plaintiff Clark's allegations that during the Season Two production, he had engaged in a sexual relationship with *American Idol* judge Paula Abdul. (Docket Entry No. 106, Second Amended Complaint at ¶ 135). *American Idol* subsequently commissioned two law firms to investigate Clark's allegations and the firms concluded that, "Mr. Clark's allegations that he and Ms. Abdul had a sexual relationship have not been substantiated by any corroborating evidence or witnesses, including those provided by Mr. Clark,

---

[2] The allegations in Clark's earlier complaints are matters of public record and are, therefore, appropriate for consideration on a motion to dismiss. See Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp., 413 F.3d 553, 560 (6th Cir. 2005).

and Ms. Abdul expressly denies that any such relationship ever existed." (Docket Entry No. 106-6 at 97, Press Release).

About the time of Plaintiff Clark's allegations about Abdul, MTV News correspondent Gil Kaufman published several articles in 2005 about Plaintiff Clark. (Docket Entry No. 106-2, at 42-43, 46-47, 49-50, Kaufman articles). Plaintiff Clark describes these articles as "the objective set of facts" regarding his disqualification from *American Idol*. Id. at 42-43, 46-47, 49-50; see also (Docket Entry No. 20, Amended Complaint at ¶ 330). Plaintiff Clark's challenges the following statements in Kaufman's articles:

- "Clark was booted from 'Idol' when producers learned that he had been charged with resisting arrest and misdemeanor assault against his sister," (Docket Entry No. 106-2 at 42);

- "Clark, 24, was booted from 'Idol' for not revealing to judges that he was facing criminal charges of battery and resisting arrest following an alleged assault on his sister," id. at 46; and

- "Clark was booted from the show for failing to fully disclose his arrest record, which included charges of resisting arrest and assault on his sister," id. at 50.

Plaintiff Clark also attached as exhibits to the revised complaint other articles about his disqualification from the *American Idol* show:

- The Tennessean, May 14, 2003 – "Contestant Corey Clark was bounced after thesmokinggun.com reported he was arrested on charges he assaulted his younger sister....Producers said Clark never revealed the arrest to American Idol," (Docket Entry No. 106-8 at 64);

- *The Boston Herald*, March 24, 2005 – "Finalist Corey Clark got himself disqualified because he faced assault charges," id. at 96;

- *The Cleveland Plain Dealer*, April 2, 2005 – "In 2003, finalist Corey Clark lost his slot because he was awaiting trial on assault charges. He withheld information about the arrest that, had it been known, might have affected his

6

participation on the show, Fox said at the time," id. at 100;

- *The Chicago Sun Times*, February 13, 2007 – "[Corey Clark] was disqualified in 2003 when a prior arrest was revealed. He faced charges of assaulting his sister and police and pleaded no contest to obstructing the legal process," id. at 104; and

- *People Magazine*, July 9, 2007 – "He [Clark] was dismissed from Idol for not revealing a past arrest," (Docket Entry No. 106-6 at 165-66).

In an attachment to his complaint, Plaintiff Clark identified the following libelous defamatory statements:

| Date | # | Description of Article and Identifiable Statements | Bate Stamp [CDC_00000] |
|------|---|---------------------------------------------------|------------------------|
| 7/6/2011 | | MTV NEWS article entitled Pia Toscano Got a Record Deal, But How Are The Other Ninth Place 'Idols' Faring [JIM CANTIELLO] | |
| | 23 | • "SEASON TWO: COREY CLARK: Believe it or not, the controversial CLARK – who was disqualified for lying about a hairy domestic dispute and later claimed to have had an affair with Paula Abdul - was once a part of the Universal Music Group, (which includes Interscope Records). His 2005 self-titled debut album – independently produced but distributed by Universal - boasted a Black Eyed Peas cameo and production by one of the top producers at that time, Scott Storch. Seriously." | CDC_001828 |
| | 24 | • "Despite widespread coverage of his alleged Abdul showmance – including an hour long ABC Primetime Live special called... wait for it... Fallen Idol – nobody cared about his album. He said it was because Clear Channel radio stations were in bed with Idol and refused to play his single. I say it's because his music was laughably bad. Look up "Paulatics" to see what I mean. Actually, don't." | CDC_001828 |

| Date | # | Description of Article and Identifiable Statements | Bate Stamp [CDC_00000] |
|---|---|---|---|
| | 25 | • Season Three: Camile Velasco Camile is yet another 9th placer who scored a brief deal with the Universal family. Strangely, like COREY CLARK, she worked with the Black Eyed Peas, too. (I spy an Idol at the 2:21 mark of their "Bebot" music video!) Alas, with no tall tales about sleeping with an Idol judge, even less people cared about her brief music career than COREY's. Despite headlining some big concerts in the Filipino-American community, Camile has yet to release an album." | CDC_001828 |
| 3/14/2012 | | MTV NEWS article entitled Jermaine Jones To Be Booted From American Idol. [GIL KAUFMAN] | |
| | 26 | • "The seesaw ride of American Idol top 12 finisher Jermaine Jones appears to have run out after producers found out this week that the deep-voiced singer apparently misled them about his criminal past . . .. Jones allegedly concealed the fact that he was arrested twice last year . . . The towering singer is just the latest Idol finalist to run afoul of producers for his rap sheet. During season two, COREY CLARK was booted for concealing his arrest record on battery charges, as was semi-finalist Jaered Andrews, who was sent home over undisclosed assault charges." | CDC_001837 |

8

| Date | # | Description of Article and Identifiable Statements | Bate Stamp [CDC_00000] |
|---|---|---|---|
| 5/24/2012 | | MTV NEWS article entitled American Idol Awards: The Highs and Lows of Season 11 [GIL KAUFMAN ET AL.] | |
| | 27 | • "The COREY CLARK / Frenchie Davis Award for Past Indiscretions: From the moment he showed up in the audition episodes, there was something special about enormous crooner Jermaine Jones . . . And when the top 12 finisher got booted for not disclosing his rap sheet, our suspicions were confirmed." | CDC_001841 |

(Docket Entry No. 106-2 at 4).

In addition to his libel claim, Plaintiff Clark alleges claims for false light invasion of privacy; commercial disparagement under the Tennessee Consumer Protection Act; misappropriation of image or likeness – right of publicity; and negligent hiring and retention. Defendants contend that these claims are time barred or otherwise fail to state grounds upon which relief can be granted.

### B. Jaered N. Andrews

According to the latest revised amended complaint, in late October and early November 2002, Andrews auditioned for the Second Season of American Idol. (Docket Entry No. 106, Second Amended Complaint at ¶¶ 200-01). Andrews was awarded a "Golden Ticket" to compete in *American Idol*'s Hollywood rounds. Id. ¶ 201. On or about December 13, 2002, Andrews was chosen by the American Idol judges as one of the 32 Semi-Finalist contestants for Season Two. Id. at ¶ 209. On January 31, 2003, *American Idol* informed Andrews that he had been disqualified from *American Idol*. Id. ¶ 222. Andrews alleges that he was not provided a reason for his disqualification. Id. Several third party media organizations reported that Andrews had been disqualified after

9

*American Idol* learned of his involvement in a November 2002 bar fight that resulted in the death of Thomas Blakely. (Docket Entry No. 106-8). On February 27, 2003, Andrews was charged with assault in connection with the incident, (Docket Entry No. 106, Second Amended Complaint at ¶ 228).

Citing Andrews's public statements and other reports, several media entities also reported that Andrews was disqualified from *American Idol* for his involvement in the November 2002 fight. Andrews attaches to the revised Complaint the following articles with the alleged statements listed below:

- *The Sharon Herald*, March 1, 2003 – "Andrews said he believed his involvement [in Blakely's death] was the reason he was kicked off 'American Idol,'" (Docket Entry No. 106-8 at 12);

- *The New York Post*, March 5, 2003 – "I [Andrews] would speculate it was because I'm in an investigation," id. at page 35;

- The Associated Press, March 6, 2003 – "Andrews told WKBN-TV...last month that he thought he was dropped from the show for witnessing Blakely's death," id. at page 48;

- *AP Online*, March 14, 2003 – "Andrews...maintains he was kicked off because of the fight," id. at page 52;

- *The Pittsburgh Post-Gazette*, March 15, 2003 – "Andrews...maintains he was kicked off because of the bar incident," id. at page 54;

- *The Wichita Eagle*, March 4, 2003 – "Now we know why 'American Idol' really disqualified semifinalist Jaered Andrews in January....Andrews was arrested for assaulting an Ohio man in a bar fight," id. at page 35;

- *The Tennessean*, May 14, 2003 – "Contestant Jaered Andrews was booted after police eventually arrested him in connection with a bar brawl that left a 39-year old man dead," id. at 64;

- *The New York Post*, February 5, 2004 – "Last season...Jaered Andrews made it to the finals, but was booted when officials learned he'd been arrested on

assault charges connected to a bar fight in which a man died," id. at page 89;

- *The New York Daily News*, February 28, 2004 – "Jaered Andrews was dropped when he was charged with assault in a bar fight, which ended in a man dying," id. at 93;

- *The Boston Herald*, March 24, 2005 – "Jaered Andrews was knocked out for his involvement in a fatal fight," id. at 97;

- *The Cleveland Plain Dealer*, April 2, 2005 – "In 2002, semifinalist Jaered Andrews was disqualified for not telling producers about an assault arrest," id. at 00; and

- The Chicago Sun Times, February 13, 2007 – "[Jaered Andrews] was ejected in 2003 after he got in a fistfight in a case where a guy died," id. at 104.

Andrews's libel claim against Defendants is for their reporting these fact about his disqualification from *American Idol*. Andrews also alleges a claim for false light invasion of privacy that Defendants assert is time barred and fails as a matter of law.

## B. Conclusions of Law

For a Rule 12(b)(6) motion to dismiss, the Court must deny the motion if the complaint's factual allegations "raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). As to the merits of the Plaintiff's motion to dismiss, "a civil complaint only survives a motion to dismiss if it 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629 (6th Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted)). The Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff," but "need not accept as true legal conclusions or unwarranted factual inferences ... and [c]onclusory allegations or legal conclusions masquerading as factual allegations will not suffice." Tam Travel, Inc. v. Delta

11

Airlines, Inc., 583 F.3d 896, 903 (6th Cir. 2009) (citations and quotation marks omitted).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief." Iqbal, 556 U.S. at 677 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)). The Supreme Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678. "A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." Id. (citing Twombly, 550 U.S. at 555, 557). The Sixth Circuit has taken a "liberal view of what matters fall within the pleadings for purposes of Rule 12(b) (6)." Armengau v. Cline, 7 Fed Appx. 336, 344 (6th Cir. 2001). "If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings. Id. (citing Jackson v. City of Columbus, 194 F.3d 737, 745 (6th Cir. 1999)).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (emphasis added). The Supreme Court also laid out the underlying principles of this analysis:

First, the tenet that a court must accept as true all of the allegations contained in a

12

complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice....

Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Id., at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157–158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 678–79 (emphasis added). "In practice, 'a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" Lillard v. Shelby Bd. of Edu., 76 F.3d 716, 726 (6th Cir. 1996) (citations omitted).

In a diversity action, as here, the District Court must apply the applicable State law of the forum. Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). Here, Plaintiff Clark, a Tennessee citizen, invokes Tennessee law. (Docket Entry No. 106, Revised Amended Complaint at 8, 38, 40, 49, 51, 54). Plaintiff Andrews, an Ohio citizen, asserts rights under Ohio law. Id. at 6, 38, 40, 41 and 67.

Prior to an analysis of the legal sufficiency of Plaintiffs' claims, the Court's ruling allowing the revised second amended complaint clearly granted leave to assert only clearly undisputed timely claims. (Docket Entry No. 99).

Plaintiff's libel and related claims are governed by Tenn. Code Ann. § 28–3–104(a)(1) that provides a one-year limitations period and a defamation claim accrues 'upon the date the alleged defamatory language was published.' Riley v. Dun

13

& Bradstreet, 172 F.2d 303, 308 (6th Cir.1949). Tennessee adopts the single publication rule, namely that a plaintiff's libel or defamation claim accrues only once, at the time of publication, and later publications do not give rise to a separate defamation claim. Milligan v. United States, 670 F.3d 686, 698 (6th Cir.2012).

In Applewhite v. Memphis State Univ., 495 S.W.2d 190, 194 (Tenn.1973), the Tennessee Supreme Court formally adopted the single publication rule with respect to alleged libelous statements of "widespread circulation." Applewhite held that "[t]o permit a separate suit to be brought in regard to the sale or delivery of every single copy of a modern publication would be inconceivable and intolerable." Id. at 193–94. In a word, "a plaintiff has only one cause of action on a widespread circulation of a libelous matter" and the statute of limitations runs from the date of original publication. Id. at 194.

The single publication rule applies to information published on the Internet. See In re Philadelphia Newspapers, LLC, 690 F.3d 161, 174 (3d Cir.2012), as corrected (Oct. 25, 2012), cert. dismissed, —— U.S. ——, 133 S.Ct. 1001, —— L.Ed.2d —— (U.S.2013) (holding that there is "no rational basis upon which to distinguish publication of a book or report through traditional printed media and publication through electronic means," and that "[w]e believe that Pennsylvania courts would extend the single publication rule to publicly accessible material on the Internet."); Roberts v. McAfee, Inc., 660 F.3d 1156, 1169 (9th Cir.2011) (applying the single publication rule to material posted on the Internet); Nationwide Bi–Weekly Admin., Inc. v. Belo Corp., 512 F.3d 137, 139 (5th Cir.2007) (noting that "every case to consider the issue has applied the single publication rule to publicly available Internet articles."); see also Mitan v. Davis, 243 F.Supp.2d 719, 724 (W.D.Ky.2003) ("After carefully examining the issue, we can find no basis for treating defamatory Internet communication differently than any other form of aggregate communication."). As a leading treatise observed:

> The single publication rule applies to electronic postings, including those on the Internet. Despite the continued public availability—some would call it the repeated publication—of such material, there is a single publication at the time the posting is made, and the statute of limitations begins to run then.

Sack on Defamation: Libel, Slander, and Related Problems § 7:2.2.

**Here, Clark's claims involve alleged defamatory statements that were published prior to July 5, 2011. The alleged defamatory statements cited by Plaintiffs Andrews and Brittenums were published prior to February 23, 2012 (one year before they joined as parties to the Second Amended Complaint), are barred by Tennessee's one-year statute of limitations for libel. The Court concludes that**

14

**to add these claims in the second amended complaint is futile**.

Plaintiffs rely upon <u>Swafford v. Memphis Individual Practice Assn.</u>, 1998 WL 281935, (Tenn. Ct. App. June 2, 1998) as "controlling" on the timeliness of their claims. Plaintiffs argue that <u>Swafford</u> "expressly rejected the 'single publication rule' as it applies to defamatory internet-based publications." (Docket Entry No. 40, Plaintiffs' Motion for Partial Summary Judgment at 9). In <u>Swafford</u>, a doctor filed a libel suit against a health maintenance organization for its alleged false report of his termination to the National Practitioner Data Bank—a private data bank on physicians that health care entities only access. <u>Id.</u> at *1. The doctor cited the Data Bank's statements about his status to three hospitals and asserted a libel claim for each report. <u>Id.</u> at *5. The issue in Swafford was "[w]hether the single publication rule should be applied to the dissemination of alleged defamatory information in the Data Bank to health care providers." <u>Id.</u> at *5. The Tennessee Court of Appeals cited <u>Applewhite</u> for the proposition that the single publication rule applies in Tennessee to "aggregate communication[s]" such as "the mass publication of a book, magazine, or television commercial." <u>Id.</u> at *5, 8.

Yet, the Tennessee Court of Appeals did not consider the three reports to be an "aggregate communication" or "mass publication" under the single publication rule that was inapplicable. <u>Id.</u> at *8. Rather, the Tennessee Court of Appeals deemed the three responses to be separate and distinct publications of alleged defamatory material analogous to "action[s] arising out of an allegedly defamatory statement in a credit report." <u>Id.</u> at *6. For this distinction, the Court cited "the confidential nature of a credit report necessarily means that each new issuance results in a distinct and separate injury." <u>Id.</u> Thus, that Court concluded as follows:

> The facts in this case are analogous to the facts in the above credit report decisions. Unlike the mass publication of a book, magazine, or television commercial, it is unlikely that more than a handful of individuals or entities would gain access to information stored in the data base. Unlike Applewhite, the information stored in the Data Bank is not within the domain of the "contemporary publishing world." In addition, the health care entities in this case, like the entities accessing credit information, requested information from the Data Bank on separate and distinct occasions. Therefore, there is no "aggregate publication" as contemplated in cases applying the single publication rule. While information in the Data Bank may be accessed by several entities, the justification for the single publication rule, a vast multiplicity of lawsuits resulting from a mass publication, is simply not present here. Under the facts of this case, we hold that the single publication rule is inapplicable. Therefore, a separate limitations period attaches to each publication.

15

Id. at *8 (internal citation omitted) (emphasis in original). Yet, that court made clear that "[w]e do not address a situation in which the information in the Data Bank could be accessed by the general public." Id. at *8, n.8.

The Court concludes that Plaintiffs' reliance on Swafford is misplaced. As Swafford expressly disclaimed such a broad interpretation of its holding. "We do not address a situation in which the information in the Data Bank could be accessed by the general public." Id. at *8, n.8.

Plaintiffs next argue that certain non-substantive modifications to the Defendants' websites at issue constitute "republication" so that the statute of limitations commences anew upon "republication." Yet, Plaintiffs earlier conceded the absence of substantive material to the alleged defamatory articles: "the actual text of the defamatory articles remains unchanged from the original date of publication." (Docket Entry No. 20, Plaintiffs' Motion for Partial Summary Judgment at 20). In any event, courts have rejected this republication argument. See In re Philadelphia Newspapers, LLC, 690 F.3d at 175 (noting that "[w]ebsites are constantly linked and updated," and that "[i]f each link or technical change were an act of republication, the statute of limitations would be retriggered endlessly and its effectiveness essentially eliminated."); Roberts v. McAfee, Inc., 660 F.3d 1156, 1169 (9th Cir.2011) (holding that republication does not arise from continuing alleged defamatory information on a website); Atkinson v. McLaughlin, 462 F. Supp. 2d 1038, 1055 (D.N.D. 2006) (rejecting republication argument where modification "did not change the content or substance of the [alleged defamatory] website."). As a leading treatise observed, "[m]odifications of a website, such as minor changes or addition of material irrelevant to the allegedly defamatory material, or changes in the manner in which the material may be accessed, do not ordinarily constitute a new publication." Sack on Defamation: Libel, Slander, and Related Problems § 7:2.1.

As to Plaintiffs' reliance upon the "continuing defamation" doctrine, in 2008 the Tennessee Court of Appeals held that **"Tennessee courts have never recognized a 'continuing defamation' " and that "this Court has previously commented on the dubiousness of the very concept of a 'continuing defamation.**" Rose v. Cookeville Reg'l Med. Ctr., 2008 WL 2078056, *5 (Tenn. Ct. App. May 14, 2008); see also Ward v. Knox County Bd. of Educ., 869 F. Supp. 2d 860, 870 (E.D. Tenn. 2012) (holding that **"Tennessee courts have never recognized a 'continuing defamation.").**

Clark v. Viacom Intern., Inc., No. 3:12–0675, 2013 WL 1245681 at *2-5 (M.D. Tenn. March 26, 2013). The relation back doctrine under Fed. R. Civ. P. 15(c) does not apply to defamation claims under Ohio law because each claim is a distinct claim and a claim based on replication of the

16

defamatory statement does not relate back. Burt v. CBS, Inc., 769 F. Supp. 1012, 1015-16 (S.D. Ohio 1991).

Although Plaintiff Clark alleges a conspiracy to defame, such claims are also subject to the one year statute of limitations under Tennessee law. Swafford v. Memphis Individual Practice Ass'n, No. 02A01-9612-CV-00311, 1998 WL 281935, at *11 (Tenn. Ct. App. June 2, 1998) ("As noted above, the gravamen of Dr. Swafford's action is libel. Therefore, his claim of civil conspiracy to libel is governed by the one year statute of limitations. Tenn. Code Ann. § 28-3-104"). Similarly, as to Andrews's claims, "Ohio law requires that "[a]n action for libel ... shall be commenced within one year after the cause of action accrued ...." Creatore v. Girton, Oakes & Burger, Inc., No. 4:09–CV–2926, 2010 WL 3672229, at *7 (N.D. Ohio Sept. 10, 2010) (quoting O.R.C. § 2305.11(a) with other citations omitted). The statute of limitations applicable to libel claims "begins to run **on the date the alleged defamatory remarks are published, not the date a plaintiff learns of the remarks**...." Slough v. Telb, 644 F. Supp. 2d 978, 996 (N.D. Ohio 2009). Moreover, under Ohio law, "a claim for conspiracy cannot be made subject of a civil action unless something is done which, in the absence of the conspiracy allegations, would give rise to an independent cause of action. Thus, the applicable statute of limitations for the underlying cause of actions applies to the civil conspiracy charge." West v. Kysela, No. 75594, 2000 WL 23083, at *5 (Ohio App. Dist. 8 Jan. 13, 2000) (citations omitted).

This action was filed on July 5, 2012. (Docket Entry No. 1, Complaint). Based upon the authorities cited in the Court's earlier ruling only claims arising on or after July 5, 2011 would be actionable. The original complaint alleges libelous statements against Plaintiff Clark on July 6, 2011. (Docket Entry No. 1, Complaint at ¶¶ 42, 160-200). In the first amended complaint filed on October

17

2, 2012 (Docket Entry No. 20), Plaintiff Clark again alleges libelous statements on July 6, 2011. Id. at ¶¶ 396, 418-458. In the next amended complaint filed on February 23, 2013, (Docket Entry No. 55) that adds Plaintiff Andrews, Plaintiff Clark alleges libelous or defamatory statements made against him on July 6, 2011, March 14, 2012 and July 6, 2012. Id. at ¶¶ 610 and 657; Docket Entry 55-1, at 3-4. That amended complaint also alleged libelous statements about Plaintiff Andrews that took place on March 14, 2012. (Docket Entry No. 55, at ¶ 810; Docket Entry No. 55-2, at 2). In the subsequent amended complaint filed on December 29, 2013 (Docket Entry No. 104), Plaintiff Clark alleged libelous statements as being made against him on July 6, 2011, March 14, 2012 and July 6, 2012. Id. at ¶ 239; Docket Entry No. 104-1, at 3-4. Plaintiff Andrews alleged libelous statements as being made against him on March 14, 2012. (Docket Entry No. 104, at ¶ 352; Docket Entry No. 104-2, at 2). In the last amended complaint that is the subject of this motion, filed on January 17, 2014, (Docket Entry No. 106) the dates of the libelous or defamatory statements for Plaintiff Clark are July 6, 2011, March 14, 2012 and July 6, 2012. Id. at ¶ 239; Docket Entry No. 106-2, at 3-4. For Plaintiff Andrews, the only libelous statement is dated March 14, 2012. (Docket Entry No. 106, at ¶ 355; Docket Entry No. 106-3, at 2).

As a matter of law, the amended complaint supercedes the prior complaint. Drake v. City of Detroit, Michigan, 266 Fed. Appx. 444, 448 (6th Cir. 2008) ("Although Drake pleaded a claim for abuse of process in his original complaint filed in state court, that complaint is a nullity, because an amended complaint supercedes all prior complaints. It follows that any defects in Drake's First Amended Complaint cannot be repaired by prior complaints."). Here, Plaintiff Clark's claim based upon the July 6, 2011 statement was filed on July 5, 2012 and is timely. Plaintiff Clark's claims based upon the March 14, 2012 and May 24, 2012 statements were timely asserted in the February

18

23, 2013 amended complaint. For Plaintiff Andrews, his only timely claim is based upon the March 14, 2012 statement that he asserted in the February 23, 2013 amended complaint. Thus, the only actionable claims are Plaintiff Clark's claims that arise out of the July 6, 2011, March 14, 2012, and May 24, 2012 statements and Plaintiff Andrews's claim that arises out of the March 14, 2012 statement.

For a defamation claim under Tennessee law, a party "must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." Hibdon v. Grabowski, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (citing Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d 569, 571 (Tenn. 1999) (relying on Restatement (Second) of Torts § 580 B (1977))). For such a claim, the Court should first determine "whether a statement is capable of a defamatory meaning." Battle v. A & E Tele. Networks, LLC, 837 F. Supp. 2d 767, 771 (M.D. Tenn. 2011) (citing Memphis Publ'g Co. v. Nicols, 569 S.W.2d 412, 419 (Tenn. 1978)). "If a court determines that the statement or communication is not defamatory, then dismissal of the action is appropriate; otherwise, it is for the jury to determine whether the statement was understood by its intended audience to be defamatory." Battle, 837 F. Supp. 2d at 771. The "'[a]llegedly defamatory statements should be judged within the context in which they are made,' and given their usual meaning, 'as a person of ordinary intelligence would understand them in light of the surrounding circumstances.'" Id. (quoting Revis v. McClean, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000)).

Under Tennessee law, the Court determines as a matter of law whether the alleged statement could be deemed defamatory. Stilts v. Globe Int'l, Inc., 950 F. Supp. 220, 223 (M.D. Tenn. 1995),

19

aff'd, 91 F.3d 144 (6th Cir. 1996). The issue is whether the statements subject Plaintiff to public hatred, contempt, or ridicule, or constituted a serious threat to Plaintiff's reputation. Id. (internal citation and quotation mark omitted). The Court's determination focuses on the words used. Id. The damaging words must also be factually false and if substantially true, the statement is not actionable. Id. Comments or characterizations of published facts are not actionable. Stone River Motors, Inc. v. Mid-S Pub. Co., 651 S.W.2d 713, 720 (Tenn. Ct. App. 1983). When published facts are true and non-defamatory, a writer's strong or abusive comments are not actionable. Id. Subjective assertions are also not actionable. Stilts, 950 F. Supp. at 223.

Also relevant is that the First Amendment only protects "statements that can 'reasonably [be] interpreted as stating actual facts' about an individual," further noting the difference between "a subjective assertion" and "an articulation of an objectively verifiable event." Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990)). In a word, "rhetorical hyperbole," is not defamation. Stilts, 950 F. Supp. at 223 (quoting Milkovich, 497 U.S. at 17). To state a plausible claim, and to fall outside the First Amendment, the statements at issue must be "sufficiently factual to be susceptible of being proved true or false." Stilts, 950 F. Supp. at 223 (quoting Milkovich, 497 U.S. at 21).

In Stilts, the Globe periodical published an article about Ken Stilts, the former business manager of the country music recording artists "The Judds," that read as follows: "Wynonna and Naomi: We were ripped off for $20 million!" A subsequent sub-caption stated that "they blame ex-business manager, say pals." Id. The article described the Judds' accusations of Stilts's exploitation of his business relationship with them, to his financial advantage and to the Judds' financial detriment. Id. In Stilts, the Honorable Thomas A. Higgins, District Judge, specifically identified the following statements in the article as defamatory:

20

(1) Stilts "ripped off [the Judds] for $20 Million!";

(2) Stilts "couldn't be trusted";

(3) Stilts was "bleeding [the Judds] dry" and then "dump[ed] them";

(4) Stilts "wound up with nearly $20 MILLION of the money [the Judds] earned, and they were left with only $5 million";

(5) Stilts "threw a pile of papers on the table and yelled: 'You don't get it, do you? I don't care what you do anymore—we're through!'";

(6) Stilts "pocketed most of what [the Judds] had earned";

(7) Stilts "owns practically everything [the Judds] worked so hard for—even their cars"; and

(8) Stilts "had the [Judds'] cars picked up from their driveways!"

<u>Id.</u> at 221-22. The defendants alleged that the article provided a substantially true and accurate account of a controversy between the Judds and Stilts and was, therefore, not actionable or were either opinion or characterizing statements, substantially true or not defamatory and, therefore, did not constitute libel. <u>Id.</u>

In <u>Stilts</u>, Judge Higgins concluded that the Globe article "simply recount[ed] the existence of an actual controversy between the Judds and Mr. Stilts." <u>Id.</u> at 223. As to the headline "Wynonna and Naomi: We were ripped off for $20 million…they blame ex-business manager, say pals," Judge Higgins held that the language used was "imaginative expression" or "rhetorical hyperbole," and could not reasonably be construed as stating actual facts about Stilts. <u>Id.</u> Judge Higgins also observed that this language was "subjective, imprecise and subject to numerous interpretations" and "simply incapable of verification or refutation by means of objective proof." <u>Id.</u> at 224. Judge Higgins concluded that, "a reader would understand the words for their obvious meaning, namely, that the Judds blame their former business manager for having lost money" and that "it is impossible to believe that any reader could construe the text of the article as defamatory" and "that no reasonable

21

factfinder could conclude that the article is defamatory." Id.[3]

Here, all three timely statements about Plaintiff Clark involved the concealment of his arrest for his *American Idol* appearance. In the July 6, 2011 statement, Clark "was disqualified for lying about a hairy domestic dispute." (Docket Entry No. 106-2, at 3). Plaintiff Clark claims that he was defamed in the March 14, 2012 statement that he "was booted for concealing his arrest record on battery charges." Id. at 4. As to the May 24, 2012 statement, Clark was deemed "booted for not disclosing his rap sheet." Id.

These statements are "comments upon or characterizations of published facts," and thus not actionable as libel. Stones River Motors, Inc., 651 S.W.2d at 720. These statements comment upon or characterize "the objective set of facts" reported in the Kaufman articles. These comments upon or characterizations were reported by other reputable news organizations, including *The Tennessean, The Boston Herald, The Cleveland Plain Dealer, The Chicago Sun Times,* and *People Magazine* and as quoted supra at 8 to 9.

> For a defamation claim under Ohio law, a plaintiff must prove:
>
> First, there must be the assertion of a false statement of fact; second, that the false statement was defamatory; third, that the false statement was published by defendants; fourth, that the publication was the proximate cause of the injury to the plaintiff; and fifth, that the defendants acted with the requisite degree of fault.

Voyticky v. Village of Timberlake, Ohio, 412 F.3d 669, 678 (6th Cir. 2005) (citing Celebrezze v. Dayton Newspapers, Inc., 535 N.E.2d 755, 759 (Ohio App. 1988). Additionally, "[a] true statement is not actionable no matter how injurious it is to the plaintiff." Conway v. International Ass'n of Heat

---

[3] Plaintiffs distinguish Stilts as a ruling on a motion for summary judgment but Plaintiffs' most recent amended complaint attaches more than 1300 pages of documents and articles and provides an ample context to evaluate the statements at issue here.

and Frost Insulators and Asbestos Workers, 209 F. Supp. 2d 731, 754 (N.D. Ohio 2002) (citing O.R.C. § 2739.02).

The one timely statement about Plaintiff Andrews involved his concealment of an arrest for his *American Idol* appearance. Plaintiff Andrews claims that the March 14, 2012 statement that he was "sent home over undisclosed assault charges" was defamatory. (Docket Entry No. 106-3, at 2). Plaintiff Andrews admits that he was in fact "charged with one misdemeanor account of 'simple assault.'" (Docket Entry No. 106, Complaint, at ¶ 228). The statement of Plaintiff Andrews's assault charge is true, even if it is injurious to Plaintiff Andrews, and as such, is not actionable under Ohio law.

For his TCPA claim, Plaintiff Clark must prove "[d]isparaging the goods, services or business of another by false or misleading representations of fact." Tenn. Code Ann. § 47-18-104(b)(8). Plaintiff Clark must satisfy a heightened pleading standard. Sony/ATV Music Pub. LLC v. D.J. Miller Music Distributors, Inc., 2011 WL 4729811, at *11 (M.D. Tenn. Oct. 7, 2011). Moreover, a TCPA action "shall be brought within one (1) year from a person's discovery of the unlawful act or practice." Tenn. Code Ann. § 47-18-110. Finally, the TCPA permits a defendant to recover his attorney's fees and costs "upon [a] finding that the action is frivolous, without legal or factual merit, or brought for the purpose of harassment." Tenn. Code Ann. § 47-18-109(e)(2) (emphasis added). Under Tennessee law, "[s]tatements of opinion, even when disparaging, are not punishable under the [TCPA]." Ellipsis, Inc. v. The Color Works, Inc., 2006 WL 1207589, *14 (W.D. Tenn. May 4, 2006).

As an example, in River Park Hosp., Inc. v. BlueCross BlueShield of Tennessee, Inc., 173 S.W.3d 43, 50 (Tenn. Ct. App. 2002), a managed care organization alleged that the hospital

23

disparaged it in violation of Tennessee Code Annotated § 47–18–104(b)(8), based on the hospital's letter to three obstetricians that BlueCare was unresponsive to the hospital's needs; that it was "pushing patients to other counties for their care"; and that BlueCare's efforts to move obstetrics patients to in-network hospitals "shows Blue Cross's lack of concern for the healthcare needs of our patients in Warren County." River Park, 173 S.W.3d at 61. In applying Tenn. Code Ann. § 47–18–104(b), the Tennessee Court of Appeals concluded "that the comments made in the letters were opinions and, thus, did not constitute 'false or misleading representations of fact.'" Id.

Applying River Park, the Court concludes that the July 6, 2011, March 14, 2012, and May 24, 2012 statements identified by Plaintiff Clark are opinions and do not qualify as "false or misleading representations of fact" to qualify as a TCPA claim.

Plaintiff Clark's right of publicity claim under Tennessee's Personal Rights Protection Act of 1984 contends that Defendants violated his right of publicity because the Defendants "have, without [Clark's] consent or authority, used his name 'Corey Clark' in written statements published on MTV.com and VH1.com, in order to exploit the[ir] commercial interests." (Docket Entry No. 106, Second Amended Complaint at ¶ 320). This claim has a one-year statute of limitations. Gibbons v. Schwartz-Nobel, 928 S.W.2d 922, 926 (Tenn. Ct. App. 1996).

For a right of publicity claim, under the Act, "[e]very individual has a property right in the use of that person's name, photograph, or likeness in any medium in any manner," Tenn. Code Ann. § 47-25-1103(a), that "is clearly directed at preventing the use of another's name or likeness, without consent, for advertising purposes." Apple Corps Ltd. v. A.D.P.R., Inc., 843 F. Supp. 342, 348 (M.D. Tenn. 1993) (emphasis added). See also Tenn. Code Ann. § 47-25-1105(a) (creating a civil cause of action against "[a]ny person who knowingly uses or infringes upon the use of another individual's

24

name…for purposes of advertising products, merchandise, goods, or services….") (emphasis added).

Under this Act, "[i]t is deemed a fair use and no violation of an individual's rights shall be found…if the use of a name, photograph, or likeness is in connection with any news, public affairs, or sports broadcast or account." Tenn. Code Ann. § 47-25-1107(a).

"Courts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a literary work, motion picture, news or entertainment story. **Only the use of an individual's identity in advertising infringes on the persona**." Matthews v. Wozencraft, 15 F.3d 432, 439 (5th Cir. 1994) (citations omitted) (emphasis added).

Plaintiff Clark's right of publicity claim fails because Plaintiff Clark fails to allege that the Defendants' July 6, 2011, March 14, 2012, or May 24, 2012 statements used his name in connection with any advertisement. Tenn. Code Ann. § 47-25-1107(a).

As to Plaintiff Clark's assertion that Cantiello's articles are "advertisements in disguise for the television show *American Idol*," (Docket Entry No. 106, Second Amended Complaint at ¶ 323) (emphasis in original), the "advertisement in disguise" concept requires:

> An unauthorized use of identity in a format that is facially a "news story" might be actionable as an advertisement in disguise. Often mentioned in dictum, the concept has only rarely resulted in a finding of liability for invasion of privacy or infringement of publicity rights.

2 Rights of Publicity and Privacy § 8:100 (2d ed.) This treatise further observed that "courts have almost always held that a use which arguably qualifies as a 'story' is in fact nothing more than that, and is constitutionally immunized as conveying information to the public." Id. at § 8:101. Plaintiff Clark's "advertisement in disguise" theory fails as *American Idol* is broadcasted by Fox, (Docket

25

Entry No. 106, Second Amended Complaint, at 4), that is not among the Defendants' networks. Plaintiff Clark's contention that Defendants would be advertising through a rival to promote *American Idol* lacks plausibility under Iqbal.

Plaintiffs' next claim is that Defendants "breached their duty of care to Plaintiff through the hiring and retention of Jim Cantiello" because Defendants knew or should have known that Defendant Cantiello would defame Plaintiff when they hired him or continued to employ him. (Docket Entry No. 106, Second Amended Complaint at ¶ 335). For this claim, Tennessee law requires that the employer had knowledge of the employee's unfitness for the job. Doe v. Catholic Bishop for Diocese of Memphis, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008), Van Horne v. Muller, 705 N.E.2d 898, 906 (Ill. 1998) (Plaintiff is "required to plead facts showing that WRCX and Evergreen knew or should have known that Muller was likely to make false, defamatory statements during his radio show if he was hired." [Plaintiff's] "allegations fail to establish a sufficient nexus between the particular alleged unfitness of Muller and the injury suffered by [plaintiff].").

Here, Plaintiffs failed to allege a sufficient nexus between their injuries and Cantiello's alleged unfitness as an employee. The Second Amended Complaint fails to identify any post-hiring conduct by Cantiello that would render Defendants liable for negligent retention. The only conceivable basis for such a claim would be that Defendants retained Cantiello after he wrote articles in which he referred to Clark as a "black sheep"; an "alleged sister beater"; a "degenerate"; and a "washout." (Docket Entry No. 106-2, at 1 to 3). Yet, these statements as a matter of law are non-defamatory, as having clear factual support.

Plaintiffs Clark and Andrews also assert claims for False Light Invasion of Privacy citing Defendants' publications of statements that allegedly "contain misleading information or create an

26

erroneous factual inference" that place them "in a highly offensive false light to the reasonable person." (Docket Entry No. 106, Second Amended Complaint at ¶¶ 276-77, 409-10). False light invasion of privacy claims have a one-year statute of limitations. W.V. Media Gen. Convergence, Inc., 53 S.W.3d 640, 648 (Tenn. 2001). Except for the July 6, 2011, March 14, 2012, and May 24, 2012 statements, the remainder of Plaintiffs' claims are barred by the one-year statute of limitations.

Yet, Plaintiffs' false light claim fails because the statements in the Defendants' July 6, 2011, March 14, 2012, and May 24, 2012 articles were true. Tennessee recognizes the tort of false light invasion of privacy as defined in Section 652E of the Restatement (Second) of Torts (1977) as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

W. V. Media Gen. Convergence, Inc., 53 S.W.3d 640, 643-44 (Tenn. 2001). Comment a to Section 652E states that "it is essential to the rule stated in this Section that the matter published concerning the plaintiff is not true." Here, the Defendants' alleged objectionable statements are true or substantially true. Thus, these statements fail to state a claim for false light invasion of privacy.

For these reasons, the Court concludes that the Defendants' motion to dismiss should be granted.

An appropriate Order is filed herewith.

27

**ENTERED** this the _13_ day of May, 2014.


William J. Haynes, Jr.
Chief United States District Judge

28